ORIGINAL

KOSHIBA AGENA & KUBOTA

JAMES E. T. KOSHIBA          768-0
CHARLES A. PRICE             5098-0
2600 Pauahi Tower
1001 Bishop Street
Honolulu, Hawaii 96813
Telephone No.: 523-3900
Facsimile No.: 526-9829
email:  jkoshiba@koshibalaw.com
        cprice@koshibalaw.com

Attorneys for Plaintiff

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAY 04 2007

at ___ o'clock and ___ min ___ M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED PUBLIC WORKERS, AFSCME, LOCAL 646, AFL-CIO, MUTUAL AID FUND TRUST, | ) ) ) ) | CIVIL NO. CV03-00598 DAE LEK |
| Plaintiffs, | ) ) ) ) | PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, FILED MARCH 28, 2007; CERTIFICATE OF SERVICE |
| vs. | ) ) ) | |
| GARY W. RODRIGUES, | ) ) | HEARING: |
| Defendant. | ) ) ) ) ) | DATE:   June 4, 2007 TIME:   9:00 A.M. JUDGE:  Hon. David A. Ezra |

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

Plaintiff United Public Workers, AFSCME, Local 646, AFL-CIO,

Mutual Aid Fund Trust ("Mutual Aid Fund") respectfully requests that Defendant

Gary W. Rodrigues' ("Rodrigues") Motion for Summary Judgment, filed March 28, 2007, be denied for the following reasons:

1.    Rodrigues made and controlled investment decisions for the Mutual Aid Fund. His role was not merely ministerial. He owed a fiduciary duty to the Mutual Aid Fund.

2.    Rodrigues breached his fiduciary duties by imprudently loaning $1.1 million to Best Rescue System, Inc. ("Best Rescue"), a small, under-capitalized, start-up, developmental company in Florida. Rodrigues made and directed the loans on behalf of the Mutual Aid Fund. He did so without adequate due diligence and despite knowing that the investment advisor's advice was obviously tainted and compromised. Rodrigues also failed to have investment guidelines in place at the time of the loans and invested a large percentage of Mutual Aid Fund monies into Best Rescue.

3.    This lawsuit against Rodrigues was properly initiated and authorized by a duly appointed Administrator in 2003, and subsequently authorized and ratified by the Mutual Aid Fund's newly elected Board of Trustees in 2004.

I.    STATEMENT OF THE FACTS

*Introduction.*

The Mutual Aid Fund is an ERISA-governed employee welfare benefit plan. It is voluntary contribution plan that provides hospitalization benefits for

participating employees and their dependents. All contributions to the Mutual Aid Fund are made by employees represented by UPW. The UPW State Director serves as the Mutual Aid Fund's Plan Administrator and various union officers or board members serve as trustees on the Mutual Aid Fund's Board of Trustees. While Rodrigues was the UPW State Director and Plan Administrator of the Mutual Aid Fund, he breached his fiduciary duties by imprudently and without adequate due diligence causing the Mutual Aid Fund to make $1.1 million in unsecured loans from November 1998 through November 1999 to Best Rescue, a risky, small, under-capitalized, start-up company in Florida.

*The Best Rescue Loans.*

Best Rescue was developing a product to rescue people out of high-rise buildings in the event of a fire or other emergency. Hewitt Deposition ("HD"), p. 16. Best Rescue signed six (6) promissory notes in favor of the Mutual Aid Fund and the Mutual Aid Fund in fact loaned Best Rescue the amounts reflected in the notes. The Notes' dates (and amounts) were as follows: November 24, 1998 ($250,000), February 5, 1999 ($200,000), April 26, 1999 ($150,000), June 20, 1999 ($250,000), August 24, 1999 ($50,000), and November 22, 1999 ($100,000), totaling $1.1 million. Exhibits "2" - "14".

Rodrigues made the loans through an investment advisor, Albert Hewitt. Mr. Hewitt always and only dealt with Rodrigues in connection with the Best Rescue

loans and thought Rodrigues was the authorized representative. HD pp. 15, 17. Mr.
Hewitt never met the Mutual Aid Fund Trustees made any presentations to the
Board or provided written reports. HD, pp. 68, 69. During the time of the Best
Rescue loans, Mr. Hewitt reported Best Rescue's status to Rodrigues on a monthly
basis.

### *Best Rescue was a New Company.*

At the time the loans were made, Best Rescue did not have a completed
business plan, marketing plan, shareholder agreement, engineering certification, fire
organization seal of approval, patent, product videos, or distributorship group
agreements. HD, pp. 19-20, 41, 42, 49, 55-56. Best Rescue only had one product
order, received in the summary of 1999, for $30,000. HD, p. 44. The Mutual Aid
Fund loans were used for continued development of the Best Rescue product. HD,
p. 34.

### *Mr. Hewitt's Financial Ties to Best Rescue.*

Mr. Hewitt had been hired by Best Rescue to obtain funding for the
company. HD, p. 16. He controlled the Best Rescue account where the loan monies
were placed. HD, p. 50, Ex. 2. He was paid a 5% loan origination fee out of the
Mutual Aid Fund loans. HD, pp. 27, 35. The loan monies were also used to pay Mr.
Hewitt's fee for management and consulting services he performed for Best Rescue.
HD, pp. 28, 35. In addition, the loan monies were used to reimburse Mr. Hewitt for

expenses and advances he previously paid on behalf of Best Rescue, including $57,000 in advances he was reimbursed for by Best Rescue in December 1998 out of the Mutual Aid Fund's first November 1998 $250,000 loan. HD, pp. 29, 35, 61.

*What Rodrigues Knew About Best Rescue and Hewitt.*

Rodrigues knew of Mr. Hewitt's financial ties to Best Rescue. HD, pp. 27-29. Rodrigues knew of the 5% loan origination fee, management and consulting fees, and reimbursements for advances. HD, p. 28, 29, 62. Rodrigues knew that Mr. Hewitt controlled the Best Rescue account. Ex. 1. Mr. Hewitt even signed the last November 1999 Promissory Note on behalf of Best Rescue that was delivered to Rodrigues. Ex. 13. Rodrigues knew that the initial loan monies were to be used to develop the Best Rescue product and that the loans were to be repaid from funding or capitalization from another source in early 1999. HD, p. 46, Ex. 1. That funding never was obtained, yet Rodrigues loaned additional Mutual Aid Fund monies thereafter.          Mr. Rodrigues did not meet the principles of Best Rescue (other than Hewitt), did not visit its business, and did not do any due diligence regarding the company. HD, pp. 25, 55, 76. The loan documentation was prepared by Best Rescue's lawyer, and not prepared or reviewed by a lawyer on behalf of the Mutual Aid Trust. Rodrigues did not tell Hewitt that the Mutual Aid Fund was an ERISA-governed employee welfare plan. HD, p. 13. Hewitt and Rodrigues had previously abandoned initial thoughts of investing monies from a separate UPW Pension Fund

to ERISA legal constraints.  HD, p. 22, Ex. 1.

*The Trustees' Involvement Regarding Best Rescue.*

Rodrigues first told the Mutual Aid Fund Trustees about Best Rescue in February 1999.  See Ex. A.  There were no Trustee meetings at all in 1998, the last previous meeting being June 1997.  Ex. A.  Rodrigues told the Trustees that Best Rescue was a good investment.  Declarations of Leong and Yasumoto.  Trustee approval was not sought or obtained regarding Best Rescue, and no loan terms or total investment amounts were discussed, and there was no vote by the Trustees. Declarations of Leong and Yasumoto.  By the time Rodrigues first mentioned Best Rescue to the Trustees in February 1999, he had already agreed to loan and had the Mutual Aid Fund pay $250,000 to Best Rescue in November 1998 and signed the Security Agreement.  Compare Ex. A, Ex. 2, Ex. 3.

At the next Mutual Aid Fund Trustees' meeting, on June 19, 1999, the 1998 audited Financial Statements were provided to the Trustees, which noted that a total of $600,000 had been loaned to Best Rescue as of March 30, 1998.  Ex. B, Note 2.  Again, there was no vote or formal approval by the Trustees on any of these Best Rescue loans.  Declarations of Leong & Yasumoto.

*Rodrigues Calls the Loans.*

In December 1999, Rodrigues called the loans and demanded repayment.  Ex. 15.  Rodrigues explained to Hewitt that he did so because UPW's

"parent" union, AFSCME, questioned the Best Rescue investment.  HD, p. 54.

In early 2000, Rodrigues replaced Hewitt with First Hawaiian Bank ("FHB") as the new Mutual Aid Fund investment advisor.  FHB presented an Investment Policy Statement, the first ever for the Mutual Aid Fund, and Rodrigues signed the FHB Agency Agreement, Fee Schedule, and Investment Policy Statement on behalf of the Mutual Aid Fund in March 2000.  Rodrigues subsequently presented these documents that he had already signed to the Mutual Aid Fund Trustees at their April 1, 2000 meeting.  Ex. C.

In January 2004, the Trustees saw the 1999 audited Financial Statements discussing the $1.1 million Best Rescue loans and the default.  Ex. D. In July 2001, the Trustees received the 2000 audited Financial Statements showing that the $1.1 million was uncollectible and was written off.  Ex. E.  None of these matters were presented to the Trustees for vote or approval.  Declarations of Leong and Yasumoto.

*Rodrigues Is Replaced As Plan Administrator.*

On November 19, 2002, Rodrigues, was found guilty on charges of federal money laundering, embezzlement, and mail fraud in connection with other UPW-sponsored health, dental, and life insurance plans (not involving the Mutual Aid Fund or Best Rescue loans).   Following the guilty verdict, AFSCME, the International Union with which UPW is affiliated, suspended Rodrigues and UPW's

State Executive Board members, placed UPW under "administratorship," and appointed an Administrator to oversee and run the union. Peter Trask served as the UPW Administrator until August 2003; his successor was Elizabeth Ho. The union was in administratorship for over a year and until elections for new UPW officers and executive board members were completed. The Administrator assumed all responsibilities over UPW matters, including all decision-making authority over union-sponsored welfare benefit plans such as the UPW-sponsored Mutual Aid Fund. The Administrator authorized this instant lawsuit against Rodrigues in 2003. See Declaration of Dayton Nakanelua, filed previously herein on March 18, 2004. Subsequently, after elections and termination of the administratorship, the newly elected Mutual Aid Fund Board of Trustees authorized and ratified continued pursuit of this lawsuit at a Trustees' meeting in May 2004. Ex. F, ¶ 7.

*Best Rescue Fall Out.*

In November 2003, the federal government filed an indictment against Mr. Hewitt in connection with the Mutual Aid Fund loans to Best Rescue, *USA v. Hewitt*, U.S. District Court for the District of Hawaii, No. 03-CR-552-ALL. Mr. Hewitt pled guilty and served time in a federal penitentiary.

The Best Rescue loan amounts were never repaid. The Mutual Aid Fund lost $1.1 million plus interest, except that the Mutual Aid Fund recently recovered, in October 2006, some amount from Hewitt's insurer in a confidential

settlement.

II.   SUMMARY JUDGMENT STANDARD

As set forth in Federal Rule of Civil Procedure 56(c), summary judgment shall be entered when:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and tat the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c) (2003).

In its motion for summary judgment, the moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact and that the court may rule on the issues as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)). Despite this burden, the moving party need not produce evidence negating the existence of an element for which the opposing party will bear the ultimate burden of proof at trial. See id. at 323.

Once the movant has met its initial burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial. See Fed. R. Civ. P. 57(e). The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant evidence at trial. See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987);

Fed. R. Civ. P. 56(e). Moreover, there is no genuine issue of fact "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citation omitted).

A material fact is one that may affect the decision, so that the finding of that fact is relevant and necessary to the proceedings. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the nonmoving party. See id. The evidence submitted by the nonmovant in opposition to a motion for summary judgment "is to be believed, and all justifiable inferences are to be drawn in [its] favor." Id. at 255.

In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law. See id. at 254. The court must assess the adequacy of the nonmovant's response and must determine whether the showing the nonmovant asserts it will make at trial would be sufficient to carry its burden of proof. See Celotex, 477 U.S. at 322.

Although highly fact-based cases are not generally suitable for summary judgment, the nonmoving party must demonstrate that sufficient evidence of a factual dispute exists to require a jury or judge to resolve the parties' differing

versions of the truth at trial.  In ruling on such a motion, this court may not make credibility determinations or weigh conflicting evidence.  See Musick v. Burke, 913 F.2d 1390, 1394 (9th Cir. 1990).

Rodrigues' Motion for Summary Judgment is based upon three arguments: (1) Rodrigues was not a fiduciary, (2) Rodrigues' conduct was not a breach of any fiduciary duties, and (3) this lawsuit was not properly authorized. Each of these arguments is addressed briefly below.

## III.   ARGUMENT

### 1.   Rodrigues Owed Fiduciary Duties to the Mutual Aid Fund.

[A] person is a fiduciary with respect to a plan to the extent [i] he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or [iii] he has any discretionary authority or discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S. § 1002 (21)(A).

"In determining the fiduciary status of a party under ERISA, courts must engage in a case-by-case analysis 'of whether that person performs any of the functions set forth in the statutory definition, the key concept of which is discretionary authority or control.' Useden v. Acker, 947 F.2d 1563, 1574 (11th Cir. 1991), cert. denied, 113 S.Ct. 2927 (1993) quoting Ronald J. Cooke, ERISA Practice and Procedure, § 6.02 at 6-5.  The state of mind of the potential fiduciary

is not determinative. Thomas, Head & Greisen Employees Trust v. Buster, 24 F.3d 1114, 1119 (9th Cir. 1994), cert. denied 115 S.Ct. 935 (1995).  The exercise of discretionary authority can result in a person being deemed a fiduciary, regardless of whether the authority was actually formally granted. Cooke at § 6.02, 5-146. "An ERISA fiduciary includes anyone who exercises discretionary authority over the plan's management, anyone who exercises authority over the management of its asserts, and anyone having discretionary authority or responsibility in the plan's administration." Credit Managers Ass'n v. Kennesaw Life & Accident ins. Co., 809 F.2d 617, 625 (9th Cir. 1987). A person's actions, not the official designation of his role, determines whether he is a fiduciary. Acosta v. Pacific Enterprises, 950 F.2d 611, 618 (1991).

Here, Rodrigues made, authorized, and controlled the investment and loan decisions regarding Best Rescue. He did not consult with or obtain approval from the Trustees. He made loan commitments without their knowledge. To the extent he did ever seek approval from the union boards and welfare plan boards generally, they invariably and uncritically followed Rodrigues' recommendations and advice.  The Mutual Aid Fund Trustees did not question Rodrigues' recommendation regarding the Best Rescue loans, and Rodrigues did not seek their pre-approval as to any amounts or the terms of the loans. Rodrigues' role was not merely ministerial. In fact, Rodrigues exercised the full power and authority of the

Board.  He was the de facto Board, and the Trustees' roles had been reduced to merely ministerial figure heads.

### 2.   Rodrigues Breached His Fiduciary Duties.

29 USC § 1104(a) imposes on fiduciaries a "prudent man standard of care." More specifically, a fiduciary shall discharge his duties:

> (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so[.]

29 U.S.C. § 1104(a)(1)(B), (C).

Rodrigues' investment of MAF Trust monies in Best Rescue was not based upon reasonable due diligence and was imprudent.  Best Rescue had no revenue and was obviously a risky new company.  Hewitt's advice was obviously tainted and compromised by his financial affiliation with Best Rescue and known conflict of interest.  No investment policy was in place at the time of the loans.  The Best Rescue investment violated the prudent Investment Policy Statement guidelines that Rodrigues subsequently agreed to and signed the following year in March 2000, which prohibited investments in companies with a record of less than three years of continuous operation or investments in companies with which the investment manager had an interest.  Also, the Best Rescue investment, per the 1999 audited

Financial Statements, represented 45% of the Mutual Aid Fund's net assets ($2.4 million), which certainly violated the prudent diversification requirement of ERISA.

### 3. The Administrator Properly Authorized The Filing of This Lawsuit in 2003. The New MAF Board of Trustees Subsequently Authorized and Ratified in 2004.

The AFSCME-appointed Administrator assumed control over the union and its union-sponsored employee welfare benefit plans. The UPW Administrator authorized counsel to file the instant lawsuit on behalf of the Mutual Aid Fund in 2003. See Declaration of Dayton Nakanelua  previously filed herein on March 18, 2004. That decision to pursue Rodrigues was subsequently formally authorized and ratified when the Administrator was replaced by a new duly elected Board of Trustees for the Mutual Aid Fund in May 2004.  Ex. "F" ¶ 7.

## IV.   CONCLUSION

For the above reasons, Plaintiff requests that the Motion for Summary Judgment be denied.

DATED:  Honolulu, Hawaii, May 4, 2007.

_____
CHARLES A. PRICE
JAMES E. T. KOSHIBA
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED PUBLIC WORKERS, AFSCME, LOCAL 646, AFL-CIO, MUTUAL AID FUND TRUST, | ) ) ) | CIVIL NO. CV03-00598 DAE LEK |
| | ) | CERTIFICATE OF SERVICE |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| GARY RODRIGUES, | ) ) | |
| Defendant. | ) ) | |
| | ) | |

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the date noted below, a copy of the foregoing document was duly served upon the following by hand delivery, postage prepaid, addressed as follows:

ERIC A. SEITZ, ESQ.
820 Mililani Street, Suite 714
Honolulu, Hawaii 96813

Attorney for Defendant
GARY RODRIGUES

DATED:  Honolulu, Hawaii, May 4, 2007.


JAMES E.T. KOSHIBA
CHARLES A. PRICE
Attorneys for Plaintiff