IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | | |
|---|---|---|
| STEVEN DE COSTA, in his representative capacity as Chairperson of the Board of Trustees of United Public Workers, AFSCME, Local 646, AFL-CIO, Mutual Aid Trust Fund, Real Party in interest United Public Workers Union, AFSCME, Local 646, AFL-CIO, | ) ) ) ) ) ) ) ) ) ) | CIVIL NO. 03-00598 DAE/LEK<br><br>MEMORANDUM IN SUPPORT |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| GARY W. RODRIGUES, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

MEMORANDUM IN SUPPORT

I.    Facts of the Case

In a complaint **filed October 23, 2003**, the **United Public Workers**,

AFSME Local 646, AFL-CIO, Mutual Aid Fund Trust (hereinafter "M.A.F."),

Plaintiff at that time, has sued Defendant Gary W. Rodrigues (hereinafter

"Rodrigues") exclusively for "all losses to the Mutual Aid Fund resulting from"

certain "loans" made to Best Rescue Systems, Inc. (hereinafter "Best Rescue").

All of the claims raised herein arise from Rodrigues' alleged breach of

fiduciary duties under the "Employee Retirement Income Security Act of 1974," as amended, 29 U.S.C. §1001 et seq. (hereinafter "ERISA"), i.e., 29 U.S.C. §1104(a)(1)(A), Count One; 29 U.S.C. §1105, Count Two, and; 29 U.S.C. §1106(a)(1)(D), Count Three, arising from loans made to Best Rescue Systems on November 24, 1998 (for $250,000), February 5, 1999 (for $200,000), April 26, 1999 (for $150,000), June 20, 1999 (for $250,000), August 24, 1999 (for $50,000), and November 22, 1999 (for $100,000), totaling $1.1 million.

Pursuant to its Declaration of Trust, the M.A.F. is administered by a board of seven trustees composed of certain officers of Local Union 646 of the United Public Workers, AFSME, AFL-CIO. These trustees are empowered to "invest or reinvest any part of the principal and income of the Trust, not required for current expenditures or reserves, in real and/or personal property." In addition, withdrawals of trust funds can only be made "upon co-signatures of at least two (2) trustees, or, if so authorized by the trustees, upon the signature of a corporate agent, administrator or officer of the trustees." Declaration of 501(c)(9) Trust by UPW Local 646, AFSME, AFL-CIO dated July 27, 1984, at Section 14(c) & 14(h), Exhibit 2, attached to Defendant's Concise Statement of Material Facts, filed March 28, 2007.

On or about May 12, 1994, Larry P. Weinberg, General Counsel, of the

2

United Public Workers' parent union, American Federation of State, County and Municipal Employees, AFL-CIO, informed Rodrigues that nothing limited the M.A.F. to investing it's funds in banks and savings and loans.  Exhibit 2, Defendant's Concise Statement of Material Facts in Support of Defendant's Renewed Motion for Summary Judgment.

Pursuant to the above, at its meeting on June 21, 1994, M.A.F.'s trustees authorized a minimum investment of $500,000.00 to be processed through "The Hewitt Company."  At the time he was retained by M.A.F., Mr. Hewitt was affiliated with Smith Barney, a well known and highly reputable investment firm, and came highly recommended on the basis of his investment services to other entities in Hawaii and elsewhere.  ¶¶4 & 5, Defendant's Concise Statement of Material Facts in Support of Defendant's Renewed Motion for Summary Judgment.

Although Plaintiff disputes whether its trustees ever approved them, loans of M.A.F.'s funds were made through The Hewitt Company to Best Rescue Systems on November 24, 1998 (for $250,000), February 5, 1999 (for $200,000), April 26, 1999 (for $150,000), June 20, 1999 (for $250,000), August 24, 1999 (for $50,000), and November 22, 1999 (for $100,000), totaling $1.1 million.

On or about September, 1999, when Best Rescue defaulted on payments

owned on their promissory notes, by letter dated December 15, 1999, Rodrigues

requested that all of M.A.F.'s investments in Best Rescue, including interest, be

returned.  ¶6,  Defendant's Concise Statement of Material Facts in Support of

Defendant's Renewed Motion for Summary Judgment.

On January 31, 2000, M.A.F. filed a lawsuit against Best Rescue for

defaulting on amounts owed on promissory notes aggregating $1,100,000 as of

December 31, 1999.  ¶7, Defendant's Concise Statement of Material Facts in

Support of Defendant's Renewed Motion for Summary Judgment.  Unbeknowst to

Rodrigues, a significant sum was recovered through a settlement of the litigation

for reasons and under circumstances that the Plaintiff has failed to explain.

In approximately December, 2002, Rodrigues retired from his office, and

the UPW was placed under the administratorship of UPW's parent union,

AFSCME.  During the administratorship Peter Trask was the UPW administrator

until August, 2003, and Elizabeth Ho succeeded him until February 21, 2004

following the completion of elections for new executive board members.  The

M.A.F. contends that Elizabeth Ho authorized the filing of the instant complaint

on behalf of the M.A.F. in November, 2003, although **the instant complaint was**

**filed on October 23, 2003**.  Declaration of Dayton Nakanelua, attached to

Plaintiff's Memorandum in Opposition to Defendant Gary W. Rodrigues' Motion

to Dismiss, Filed January 16, 2004.

On January 16, 2004 Rodrigues moved to dismiss the instant action, in relevant part, based on Rodrigues underlined undisputed claims - (1) that he never served as a fiduciary of the M.A.F. in connection with any of the investment decisions which form the bases for the claims alleged; (2) that all of the relevant investment decisions were made by the duly authorized Trustees and/or officers and Executive Board members of UPW, not by him, and; (3) that the instant suit was brought without prior authorization of the duly authorized Trustees of the M.A.F. ¶7, Affidavit of Gary W. Rodrigues, attached to Defendant Rodrigues' Motion to Dismiss filed January 16, 2004.

In response, Plaintiff argued that the instant suit was authorized by the AFSCME appointed Administrator of the M.A.F. after December 2002, and that Rodrigues is a "fudiciary" based on its claim that prior to December, 2002 Rodrigues "essentially controlled UPW and its union-sponsored welfare benefit plans." Declaration of Dayton Nakanelua dated March 18, 2004 at ¶8, attached to Plaintiff's Memorandum in Opposition to Defendant Gary W. Rodrigues' Motion to Dismiss, filed January 16, 2004.

By order filed April 6, 2004, this Court denied Rodrigues' motion to dismiss on the grounds that there were issues of material fact which the court could not

resolve "at this stage," without more evidence.

On March 6, 2007 Albert Hewitt's deposition was taken by telephone.  Mr. Hewitt testified, in relevant part, that although he only knew Rodrigues as the "administrator" of the M.A.F., **he assumed** that Rodrigues was authorized to make investment decisions for the M.A.F. although Rodrigues; (1)  never represented to him that he had such authorization; (2) he admittedly never talked to Rodrigues about it; and (3) he has no knowledge by whom or through what process such authorization may have been given to Rodrigues.  Exhibit 3, at pp. 30, 72-73, attached to Defendant's Concise Statement of Material Facts, filed March 28, 2007.

Based on the above, on March 28, 2007 Rodrigues moved for summary judgment on all of Plaintiff's claims.

In its opposition, Plaintiff, inter alia, revealed that Plaintiff's trustees, including **current** M.A.F. Trustee Alison Leong had actual knowledge of all of the essential facts of the transactions underlying the claims/violations asserted herein since February 1999.[1]

---

[1]    See, Exhibits A, F, and Declarations of Alison Leong and George Yasumoto dated May 2, 2007, attached to Plaintiff's Opposition to Defendant's Concise Statement of Material Facts, filed May 4, 2007.  See,  Montgomery v. Aetna Plywood, Inc., 956 F.Supp. 781 (NDIll 1996)(holding that actual knowledge is knowledge of the essential facts of the transaction or conduct constituting a violation).

Based on representations made in Plaintiff's opposition, Rodrigues replied that he is entitled to summary judgment on the grounds that ERISA plans, like the M.A.F. do <u>not</u> have standing as a matter of law to bring suit under ERISA, and sought dismissal of duplicative claims resulting from Plaintiff's admission that "the Mutual Aid Fund recently recovered, **in October 2006**, some amount from Hewitt's insurer in a confidential settlement," <u>inter</u> <u>alia</u>.[2]

Plaintiff then moved to strike Defendant's Reply, and  moved "to substitute Steven DeCosta, in his representative capacity as Chairman of the Board of Trustees of the M.A.F., as the real party in interest and party plaintiff,[3] which was granted by the Court on June 27, 2007.  Accordingly, on July 6, 2007 Rodrigues moved to withdraw his motion for summary judgment without prejudice which was granted by the Court on July 9, 2007.

Pursuant to a stipulated protective order filed July 31, 2007, Plaintiff disclosed the amount of its settlement of claims against Albert Hewitt via a copy of a settlement check **dated October 6, 2000**.  ¶9, Defendant's Concise Statement of Material Facts in Support of Defendant's Renewed Motion for Summary

---

[2]    See, Defendant's Reply to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, Filed March 28, 2007 (filed herein on May 11, 2007).

[3]    Plaintiff asserted that the motion to substitute or join Steven DeCosta was intended to moot the issue of Plaintiff's standing and jurisdiction raised in Defendant's Reply of May 11, 2008.  Plaintiff's Motion for Substitution of Real Party in Interest, filed May 15, 2007.

Judgment.

On September 28, 2007, Rodrigues took the depositions of Plaintiff, Steven

DeCosta, current M.A.F. Trustee Alison Leong, and former M.A.F. Trustee

George Yasumoto.

On October 16, 2007, Rodrigues took the deposition of Dayton Nakanelua.

Rodrigues now seeks summary judgment in his favor on all claims alleged

against him.

II.    Standard of Review

Because the defendant does not have the burden of proof at trial, a

defendant need only point to the insufficiency of the plaintiff's evidence to shift

the burden to the plaintiff to raise genuine issues of fact as to each claim **by**

**substantial evidence**.  Celotex Corp.  v. Catrett, 477 U.S. 317, 322, 106 S.Ct.

2548, 2552, 91 L.Ed.2d 265 (1986)( Summary judgment shall be granted against a

party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden

of proof at trial ... since a complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts

immaterial).

The mere existence of a scintilla of evidence is insufficient to create a

genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 & 255, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)(holding that a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.");  See also, T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)(holding that the nonmoving party may not rely on the pleadings but must present specific facts creating a genuine issue of material fact).  When the moving party has carried its burden, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."  Matsushita Elec. Indus. Co. V. Zenith Radio Corp., 475 U.S. 574, at 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

To be admissible for the purposes of summary judgment, declarations or affidavits must be based on personal knowledge, must set forth "such facts as would be admissible in evidence," and must show that the declarant or affiant is competent to testify concerning the facts at issue.  Declarations on information and belief are insufficient to establish a factual dispute for purposes of summary judgment.  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

III.    Arguments

A.     <u>The Mutual Aid Fund Trust is Exempt from Coverage Under ERISA.</u>

Pursuant to 29 U.S.C.S. §1002(1), an "employee welfare benefit plan" means "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing its participants or beneficiaries, through the purchase of insurance or otherwise, (a) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 302(c) of the Labor Management Relations Act, 1947 [29 USCS §186( c)] (other than pensions on retirement or death, and insurance to provide such pensions)."  <u>Id.</u>

"Employee welfare benefit plans," which are established or maintained for its employees by "any State or political subdivision thereof, **or by any agency or instrumentality of the above**," **are exempt from ERISA**.  29 USC §1003(b).[4]

_____

[4]        29 U.S.C.S. §1003(b), in relevant part, provides:

(**b**) **Exceptions for certain plans.**  The provisions of this title shall not apply to any

In the instant case, at his deposition taken on October 16, 2007,

Dayton Nakanelua, State Director, UPW, in relevant part, testified as follows:

Q.    Before we continue looking at Exhibit 4 which you have in
      front of you, let me ask you a number of questions with regard
      to the mutual aid fund trust itself.
      First of all, what is the purpose of that entity?

A.    The purpose of the - - it's a - - again, it's a VEBA[5] trust, and it
      is a trust that provide - - can provide benefits to those
      beneficiaries of the trust.

Q.    What kind of benefits?

A.    Health benefits.

Q.    Where do the monies come from that are invested into the
      trust?

A.    It's a voluntary benefit plan trust, so it is - - members of the
      local union can enroll into the mutual aid fund, and their
      benefit - - and their dependents up - - meeting certain eligibility
      criteria to participate as beneficiaries of the fund.

Q.    Once they enroll, they make monthly contributions; is that
      correct?

A.    Correct.

Q.    They authorize those monthly contributions to be deducted
      automatically from their pay and paid directly into the trust; is
      that correct?

---

employee benefit plan if -

          (1) such plan is a governmental plan (as defined in section 3(32) [29 USCS
§1002(32)]).

          Pursuant to, 29 USCS §1002(32), a "governmental plan" is defined, in relevant
part, as follows:

     The term "governmental plan" means a plan established or maintained for its employees
by the Government of the United States, by the government of any State or political subdivision
thereof, or by any agency or instrumentality of any of the forgoing. [....]

     [5]     A "VEBA Trust" is a voluntary employees' beneficiary association established to
provide benefits pursuant to IRS Code Section 501(c)(9).

A.  Yes.

Q.  In the case of state employees, that means that the state actually makes the contributions in behalf of the employees through a process of deductions from their salaries; is that right?

A.  Yes.

Q.  Am I correct that in terms of the beneficiaries who enroll in this particular mutual aid fund trust, there are a combination of both public and private employees?  Is that correct?

A.  Yes.

[....]

Q.  But to your knowledge, there has never been any definitive advice given, as long as you know, to the trust with respect to whether it is an ERISA trust in light of the fact that monies come on behalf of state employees.  Is that fair to say?  They have assumed that it's an ERISA trust, but there has never been any definitive determination one way or the other?  Is that fair?

A.  I believe that the professionals that we have been dealing with and their description and characterization of the trust, that it is a ERISA - covered benefit plan.

Exhibit 1, attached to Defendant's Concise Statement of Material Facts in Support of Defendant's Renewed Motion for Summary Judgment.

As noted by the court in <u>Feinstein v. Lewis</u>, 477 F.Supp. 1256 (S.D.N.Y. 1979), "ERISA was enacted primarily to curb abuses in the administration of private employee welfare and pension plans. [...] Plans established by state and local governments are generally excluded from coverage under ERISA because of concerns about federalism.  In summary of the major provisions of a predecessor bill, Senator Lloyd Bentsen commented that 'State and

12

local governments must be allowed to make their own determination of the best

method to protect the pension rights of municipal and state employees.[6]  These are

questions of state and local sovereignty and the Federal Government should not

interfere.' [...] Congress, in exempting governmental plans, was concerned more

with the governmental nature of public employees and public employers than with

the details of how a plan was established or maintained."  Id., 477 F.Supp. at

1260-2.  "In the instant case, the fact that members of Congress frequently referred

to "public employee plans" and public employee funds" in discussing the

governmental plan exclusion is a good indication that Congress had public

employees in mind rather than plans exclusively established and maintained by

governmental bodies.  Had Congress considered the issue before the Court, it

probably would have concluded that plans similar to the ones at issue herein are

indeed "governmental plans."  Id., 477 F.Supp. at n. 9.  In addition, "when

Congress has decided to extend coverage of ... federal labor legislation to public

employees, it has specifically amended the definition of employer to include states

and political subdivisions.  Another technique Congress has chosen in dealing

with employees in the public sector is to enact a separate statute and model it after

---

[6]      Compare, Chapter 87D, Haw. Rev. Stat., entitled "Voluntary Employees' Beneficiary Association Trusts," regulating the establishment and administration of "employee welfare benefit plan/s" for "any person employed by a public employer."

(existing law).  Had Congress intended that states and political subdivisions be covered ..., it could have done so explicitly by means of one of these techniques. In the instant case, Congress did not expressly include states and political subdivisions in the definition of "employer" in ERISA. [...]  Accordingly, it is apparent that Congress intended through section 4(b)(1) [29 U.S.C.S. §1003(b)(1)] to exclude public employees from coverage."  Id., 477 F.Supp., at 1262.

Although the Mutual Aid Fund Trust characterizes itself as a 501(c)(9) Trust, without more, such designation does not draw the Mutual Aid Fund Trust within the coverage of ERISA.  ERISA OpLtr 84-38A, 84 WL 23407 (E.R.I.S.A.)(holding that a Trust determined by the Internal Revenue Service to be a "voluntary employee beneficiary association" within the meaning of section 501(c)(9) of the Internal Revenue Code, is a governmental plan exempt from coverage by ERISA).  Nor is the fact that employees of both public and private entities participate in the plan change the nature of the plan as "governmental plan."  Nowell v. Central Service Ass'n, 106 F.Supp.2d 888, 891 (S.D.Miss. 2000)("the fact of participation in a plan by some private entities will not place the plan outside of ERISA's definition of a governmental plan.").

Here the undisputed evidence shows that most of the beneficiaries of the M. A.F. are government employees for whom the government withholds

14

contributions through payroll deductions which it pays over directly to the M.A.F. Accordingly, the M.A.F. is "maintained by the government [of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing] for its employees" and therefore exempt from ERISA pursuant to 29 USC §1003(b).

      B.      Plaintiff's Claims are Barred by the three year limitations period in 29 U.S.C.S. §1113.

      ERISA's statute of limitations, i.e., 29 U.S.C. §1113[7], generally requires that an action for breach of fiduciary duties be filed no more than "three years after the earliest date on which the Plaintiff had actual knowledge of the breach or violation."  The Ninth Circuit has ruled that "the limitations period in an ERISA action begins to run **on the date that the person bringing the suit learns of the breach or violation**."  Landwehr v. DuPree, 72 F.3d 726, at 732 (9th Cir.

---

[7]      29 U.S.C. §1113 provides the following:

    No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part [29 USCS §§1101 et seq.], or with respect to a violation of this part [29 USCA §§1101 et seq.]. after the earlier of -
    (1)      six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
    (2)      three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

1995).  Where the application of this rule would frustrate the statutory purpose,

however, the Ninth Circuit Court has held that such a result would should not be

permitted.  Id., at 733, FN2 ("For example, defendant does not contend that other

beneficiaries knew of the violation far earlier than the plaintiffs, withheld the

information from them in order to prolong the period for filing.  We need not

consider what result we should reach in such a case.").

      Here the complaint filed on October 31, 2003, specifically alleges that

the violations herein arise from loans made to Best Rescue Systems in exchange

for promissory notes in Plaintiff's favor dated November 24, 1998 (for $250,000),

February 5, 1999 (for $200,000), April 26, 1999 (for $150,000), June 20, 1999

(for $250,000), August 24, 1999 (for $50,000), and November 22, 1999 (for

$100,000), totaling $1.1 million.  Ziegler v. Connecticut General Life Ins. Co., 916

F.2d 548, 550-1 (9th Cir. 1990)("In considering the ERISA statute of limitations,

we have previously stated that "[t]o apply the limitations period, we must first

isolate and define the underlying violation upon which ... [plaintiff's] claim is

founded. [...] "the culpability arises with the contract's creation" [citations

omitted]).

      Steven DeCosta, in his representative capacity as M.A.F.'s current

Chairman, became the named plaintiff in this case on or about **June 27, 2007**.

Pursuant to a strict application of the rule in <u>Landwehr</u>, <u>supra</u>, the three year

limitations period in 29 U.S.C.S. §1113(2) on the claims herein began to run "after

the earliest date on which [Mr. DeCosta] learned of the breach[s] or violation[s]."

<u>Id.</u>

At his oral deposition taken on September 28, 2007, Mr. DeCosta

testified, in relevant part, as follows:

> Q.    Do you have any knowledge about any decisions that were
> made with respect to an investment of funds in an entity called
> Best Rescue?
> A.    No.
> [....]
> Q.    As a member of the Board of Trustees of the Mutual Aid Fund,
> did you ever discuss and make decisions about suing Gary
> Rodrigues?
> A.    Right now?
> Q.    Yes. For this lawsuit.  Were you ever involved in any
> discussions about whether to sue Gary Rodrigues?
> A.    I believe we talked about it as being part of the Mutual Aid.
> Q.    And as you sit here today, can you tell me why Gary Rodrigues
> is being sued by the Mutual Aid Fund Trust?
> A.    I believe he was the state director at the time that the money
> was invested.
> Q.    And what did he do or fail to do, as you understand it, that
> would make him liable for a lawsuit?
> A.    I'm not sure.  I'm not a lawyer.  I couldn't answer that.
> [....]
> Q.    Do you have any recollection of anyone ever sitting down with
> the board and briefing you on the decisions that had been made
> to sue Mr. Rodrigues?
> A.    I believe we went through that when it was part of the MAF.
> Q.    And what were you told?  What is your recollection about what

you were told?

A.    That we were trying to receive some of this money back.

Q.    And were you given any information as to why you were trying to receive it back from Mr. Rodrigues?

A.    Well, that's been a few years ago.  I can't remember offhand.

[....]

Q.    "UPW versus Gary Rodrigues."  That's this case; is that correct?

A.    Yes.

Q.    And it says under there, "$1.1 million loan to Best Rescue system."  Do you see that there?

A.    Yes.

Q.    Do you remember what Mr. Nakanelua reported to the board when he talked about that particular loan?

A.    No, I don't remember.

Q.    It says here that the "loan was approved without due diligence (risky company) by former trustees."  Do you see that?

A.    Yes.

Q.    What did Mr. Nakanelua say about that?

A.    I don't remember.

Q.    Did you ever ask?

A.    I might have.  But like I said, this is 2004.  We're in 2007 right now.  I can't remember.

Q.    Well, let me ask you this, Mr. DeCosta.  If in fact the loan was approved without due diligence, that it was a risky company, and that that action was taken by former trustees, why aren't they being sued?

A.    I'm not sure.  I couldn't say.

[....]

Q.    Do you recall voting to retify the actions to continue the lawsuit?

A.    No.

Q.    You don't recall.  Do you recall any reasons that were given why anybody voted to ratify the decision to continue the lawsuit against Mr. Rodrigues?

A.    I believe they voted because they wanted to see if they could have the money – get recovery of some of this $1.1 million.

18

Q.    As you sit here today, do you have any knowledge or any reason to believe that Gary Rodrigues had any responsibility for the investment that went bad that is the subject matter of this lawsuit?

A.    Only that he was the state director at the time. [...]

Exhibit 1, Defendant's Concise Statement of Material Facts in Support of Defendant's Renewed Motion for Summary Judgment, at pp. 23, 24-25, 28, 30-31, 34-35.

In light of the Plaintiff, Steven DeCosta's **complete lack of knowledge** of any of the breaches/transactions herein **at this juncture**, the strict application of the rule in <u>Landwehr</u> would effectively nullify the purpose of the three year limitation period because pursuant thereto the three year limitation period has not yet begun to run.

In addition to Mr. DeCosta himself[8] being in obvious breach of his own fiduciary duties under 29 U.S.C.S. §1104, "Fiduciary duties," evidence on the record shows that named fiduciaries of the M.A.F. knew of the violations far earlier,[9] and their withholding that information is just another[10] attempt by the

---

[8]    29 U.S.C.S. §1102(a)(2) defines a "fiduciary" as anyone "who is named in the plan instrument, or who pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan [...].

[9]    At his oral deposition taken on September 28, 2007, Plaintiff Steven DeCosta, in his representative capacity as Plaintiff's Chairman, testified that current trustee Alison Leong was serving as one of Mutual Aid Fund Trust's trustees back when Rodrigues was there. Deposition of Steven De Costa, at pp. 32-34.

M.A.F. to prolong the period for filing.  <u>Landwehr</u>, <u>supra</u>, at 733, FN2.

Minutes of the M.A.F. Trustees meetings on **February 19, 1999**

show that <u>current</u> M.A.F. trustees Alison Leong and Craig Yugawa knew of the

initial Best Rescue transactions nearly four years before any lawsuit was filed

against Rodrigues.  Accordingly, the three year limitations period commenced on

February 19, 1999, and expired on February 19, 2002.  Indeed, documents from

the M.A.F. Trustees meeting show that <u>current</u> M.A.F. trustees Alison Leong and

Craig Yugawa knew of all of the Best Rescue transactions up to December 31,

1998 by **June 19, 1999**, at the earliest.  ¶¶11, 12, Defendant's Concise Statement

of Material Facts in Support of Defendant's Renewed Motion for Summary

---

At her oral deposition taken on September 28, 2007, Alison Leong, trustee, testified that she served as a trustee of the Mutual Aid Fund Trust since 1998 or 1999 to present, and that Craig Yugawa also served as a trustee of the Mutual Aid Fund Trust from 1998 and 1999 to present.  Deposition of Alison Leong, at p. 10-11, 47.

[10]     Any claims by Plaintiff to the contrary should be examined closely in light of the apparent discrepancy between their earlier representations in their <u>March 18, 2004</u> opposition to Defendant's earlier motion to dismiss, i.e., "After Best Rescue defaulted under the terms of the loans, UPW pursued litigation in Florida against Best Rescue, its principals, and Hewitt to recover the loan amounts, but <u>no monies have been recovered</u>," and their <u>May 4, 2007</u> opposition to Defendant's motion for summary judgment, i.e., "except that the Mutual Aid Fund recently <u>recovered, in October 2006</u>, some amount from Hewitt's insurer in a confidential settlement," and their subsequent proffer of a copy of a settlement payment check dated <u>October 6, 2000</u>, which would indicate that Plaintiff did not obtain sufficient knowledge to trigger the three year statute of limitations in October 6, 2000, causing the three year filing period to expire on October 6, 2003.

20

Judgment[11]; Exhibit B, independent auditor's report dated March 30, 1999, at

"Note 2 - Note Receivable," attached to Plaintiff's Opposition to Defendant's

Concise Statement of Material Facts, filed May 4, 2007.  Accordingly, at the

latest, the three year limitations period commenced on June 19, 1999 and **expired**

**on June 19, 2002**.

Documents connected with the M.A.F. Trustees meeting on January

20, 2001, show that **on January 31, 2000** the Mutual Aid Fund Trust filed a

lawsuit against Best Rescue arising from the transactions which form the bases for

Plaintiff's instant claims.  Thus, it is clear that current trustees Alison Leong and

Craig Yugawa knew of all of the transactions upon which Plaintiff's claims are

based by January 31, 2000.  ¶13, Defendant's Concise Statement of Material Facts

in Support of Defendant's Renewed Motion for Summary Judgment.  In that event,

the three year limitations period on any and all of the Mutual Aid Fund Trust's

claims commenced on January 31, 2000 and **expired on or about January 31,**

**2003**, and the Complaint **filed October 23, 2003** would be barred by the three year

statute of limitations in 29 U.S.C.S. §1113(2).

Even if the Court accepts Mr. DeCosta's **complete lack of**

---

[11]    According to the minutes of the Mutual Aid Fund Trust Trustees meeting on
February 19, 1999, Craig Yugawa was already serving as a trustee at that time and accordingly he
is also chargeable with knowledge of the bases for the claims alleged herein.

**knowledge** of any of the breaches/transactions alleged herein,[12] **at this juncture**

the Court should impute knowledge to current M.A.F. trustees Alison Leong and

Craig Yugawa and thereupon determine that Plaintiff's claims are barred by the

three year statute of limitations in 29 U.S.C.S. 1113(2).  Landwehr, supra, at 733,

FN2.

      C.     Plaintiff's Evidence is Insufficient as a Matter of Law to
            Establish that Rodrigues was a "fiduciary."

      In every case charging breach of a fiduciary duty under ERISA the

threshold question is not whether actions of some person employed to provide

services under an ERISA covered employee benefit plan adversely affected the

plan beneficiaries interests, but **whether that person was acting as a fiduciary**

**when taking the action/s which is/are the subject of the complaint**.  Pegram v.

Herdrich, 530 U.S. 211, 147 L.Ed.2d 164, 120 S.Ct. 2143 (2000).

---

[12]     See, 29 U.S.C.S. §1105(a), which provides:

    **(a) Circumstances giving to liability.**  In addition to any liability which he may have under any provision of this part [29 USCS §§1101 et seq.]. a fiduciary with respect to a plan shall be liable for the breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
        (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
        (2) if, by his failure to comply with section 404(a)(1) [29 USCS §1104(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
        (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

All of the claims herein hinge on a showing that Rodrigues acted as a "fiduciary" in connection with the actions and/or omissions alleged. See, 29 U.S.C. §1104(a)(1)(A), i.e., Count One; 29 U.S.C. §1105, i.e., Count Two, and; 29 U.S.C. §1106(a)(1)(D), i.e.,Count Three. The instant action is not based on Rodrigues being a named trustee pursuant to 29 U.S.C. §1102(a)(2), the threshold question here is whether there is "substantial evidence" showing that Rodrigues can be deemed a "fiduciary" on other grounds. Custer v. Sweeney, 89 F3d 1156 (4th Cir. 1996)(holding that the concept of "fiduciary" includes not only those named as fiduciaries in the plan instrument, or who pursuant a procedure specified in the plan, is identified as a fiduciary under 20 U.S.C. §1102, but includes any individual who de facto performs specified discretionary functions with respect to the management, assets, or administration of such plan under 29 U.S.C. §1002(21)(A)).

29 U.S.C. §1002(21)(A), in relevant part, provides that a person is a "fiduciary" to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets. Id. Accordingly, Plaintiff's claims are actionable only if Plaintiff can show that Rodrigues can be deemed a "fiduciary," i.e., that he exercised any discretionary

authority or discretionary control" with respect to the particular acts and/or

omissions alleged herein.  Schultz v. Texaco, Inc., 127 F.Supp 2d 443 (S.D.N.Y.

2001); Walker v. Brady, 917 F.Supp. 313, rev'd on other grounds, remanded 125

F.3d 114 (3rd Cir. 1997); Grindstaff v. Green, 946 F.Supp. 540, aff'd 133 F.3d 416

(6th Cir. 1998), reh, en banc, den. 1998 US App LEXIS 7745 (6th Cir. 1998);

Moench v. Robertson, 62 F3d 553 (3rd Cir. 1995), reh. en banc, den., 62 F3d 553

(3rd Cir. 1995)(holding that fiduciary status is not an all or nothing concept - a

court must ask whether a person is a fiduciary with respect to the particular

activity in question).

Here the plan instrument expressly assigns the following powers to

invest M.A.F.'s funds to its trustees:

> Section 14.  Powers.  The trustees may:
> [....]
> (c) make withdrawals from such depositories only upon co-signatures of at least two (2) trustees, or, if so authorized by the trustees, upon the signature of a corporate agent, administrator or officer of the trustees;
> (d) pay out of the Trust any sums necessary to effectuate the purpose of the Trust, administer the Trust, and pay costs incurred in establishing the Trust;
> [...]
> (h) invest or reinvest any part of the principal and income of the Trust, not required for current expenditures or reserves, in real and/or personal property;
> [...]
> (n) delegate its investment powers to investment

counsellors (sic) acting as investment agents of the trustees, provided
that the purchase and sale of any securities by such agent shall be in
the name selected by the trustees.  The authority of such agents or
investment counsellors (sic) to purchase or sell securities shall be
evidenced by written authority executed by the trustees.  The trustees
shall require such agents to keep them currently informed as to the
nature and amount of the investments made for the Trust by them, and
shall have full authority to enter into appropriate agreements with
such agents setting forth their investment powers and limitations
thereon.  Such agents shall at all times be subject to the trustees'
instructions.  The trustees may at any time terminate the services of
such agents;

        [....]

        (u) delegate such of their powers to a corporate agent,
administrator, attorney, investment counsellor (sic), agent or employ
as in the discretion of the trustees, as they deem necessary and proper;

        [....]

        (v) adopt and promulgate rules and regulations, and do
all acts and execute all instruments necessary, to carry out the
purposes of the Trust herein.

See, Exhibit 2, attached to Defendant's Concise Statement of Material Facts, filed

March 28, 2007.

        No evidence has been adduced on the record showing that any of

these powers were delegated, contracted, and/or assigned in any way to Rodrigues

pursuant to the powers and procedures specified in the Trust Plan in Sections

14(n) or 14(u).[13]  In addition, there is no evidence showing that Rodrigues ever

---

[13]        Although minutes of Plaintiff's Board of Trustees Meeting on February 19, 1999
indicate that Rodrigues' "duties and powers" as Plaintiff's administrator were determined by the
trustees, there is no "evidence" showing that any of the discretionary powers alleged to have been
exercised by Rodrigues were ever delegated to Rodrigues.  Exhibit A, attached to Declaration of
Dayton Nakanelua.

paid out the loans to Best Rescue from M.A.F.'s funds pursuant to Section 14( c)

or (d) of the Trust Plan.

Minutes of the M.A.F. Trustees Meeting on June 21, 1994 show that

the M.A.F. trustees authorized The Hewitt Company to invest its funds at its

meeting on June 21, 1994.

> **8.    Investment:** After the Administrator explained the May 12,
> 1994 letter from AFSME regarding investments, a request was
> made to authorize a minimum investment of $500,000.00 to be
> processed thru The Hewitt Company, who invests the UPW
> Staff Pension Funds.  The Administrator further requested
> authorization to negotiate fees paid to The Hewitt Company.  A
> M/S/C by Frank Rapoza/Joe Rodrigues to approve the requests.

Exhibit 3, attached to Defendant's Concise Statement of Material Facts in Support

of Defendant's Renewed Motion for Summary Judgment.

In addition, there is evidence on the record showing that Plaintiff was

paying UPW "a monthly fee of $2,000 for processing member claims, rent,

computer maintenance, supplies and utilities."  Exhibit B, attached to Defendant's

Opposition to Defendant's Concise Statement of Material Facts, filed May 4,

2007, at Note 5.

Although Albert Hewitt has testified that **he assumed** that Rodrigues

was authorized to make investment decisions for the Fund, Rodrigues; (1)  never

represented to him that he had such authorization; (2) he admittedly never talked

26

to Rodrigues about it; and (3) he has no knowledge of by whom or through what process such authorization may have been given to Rodrigues. See, Exhibit 3, Transcript of Deposition of Albert Hewitt taken on March 6, 2007, attached to Defendant's Concise Statement of Material Facts, filed March 28, 2007, at pp. 30, 72-73; **Compare**, Rodrigues' Affidavit dated January 14, 2004, attached to Defendant Rodrigues' Motion to Dismiss filed January 16, 2004, at ¶(9) ("As administrator I merely carried out the directives of the duly selected Trustees, and I never acted without the authorization of the Trustees.").

Because the only "evidence" on the record shows that Rodrigues' role as Plan Administrator involved "processing member claims, rent, computer maintenance, supplies and utilities," this Court should determine that Plaintiff's evidence is insufficient as a matter of law to create a genuine issue of fact as to whether Rodrigues ever acted as a "fiduciary," i.e., Count I and III with respect to the particular acts and/or omissions alleged herein. Pohl v. National Benefits Consultants, Inc., 956 F2d 126 (7th Cir. 1992)(entering judgment for plan administrator where plan administrator merely performed ministerial duties and did not exercise discretion); Cf., Mertens v. Hewitt Assocs., 948 F.2d 607, 610 (9th Cir. 1991)(holding that a consultant who exercises no authority over a plan other than in the exercise of his "usual professional functions" is not a fiduciary);

Gelardi v. Pertec, 761 F.2d 1323 (9th Cir. 1985)(holding that plan administrator who performs only administrative functions does not exercise "fiduciary responsibilities under ERISA) .

      In addition, Rodrigues submits that there is no "evidence" on the record to support Plaintiff's claim that Defendant otherwise "controlled" the trustees of the Mutual Aid Fund in connection with the transactions upon which this action is based.

      At his deposition, George Yasumoto, who formerly served as Secretary and President of the M.A.F., testified in relevant part, as follows:

> Q.    As a member of the Mutual Aid Fund Trust did you receive regular audit reports from the firm, the CPA firm, that prepared them for that organization?
>
> A.    Could you repeat the question?
>
> Q.    Yes. Do you remember that there was a CPA firm, Wachi & Watanabe, that prepared annual audits of the Mutual Aid Fund Trust?
>
> A.    I don't remember. But they must have.
>
> Q.    Did you read those audits?
>
> A.    No.
>
> Q.    They were given to you, however; is that correct?
>
> A.    Yes, yes.
>
> Q.    And you had the opportunity to read them?
>
> A.    Yes.
>
> Q.    When you went to meetings as a member of the Board of Trustees and Gary or somebody else made a report, were you given the opportunity to ask questions?
>
> A.    No.
>
> Q.    Did Gary prevent questions from being asked?

A.    I don't think so.  Nobody questioned him.

Q.    But you had the opportunity to ask questions if you wanted to?

A.    I guess, yes.

Exhibit 6, attached to Defendant's Concise Statement of Material Facts in Support

of Defendant's Renewed Motion for Summary Judgment, at pp. 33-34.

At her deposition, former and current trustee Alison Leong testified,

in relevant part, as follows:

Q.    And you've told us that there was very little in the way of questions or discussions, you say in paragraph 3 here; is that correct?

A.    That's correct.

Q.    Why is that?

A.    We took the report, what was presented as it was, and we just trusted what was presented.

Q.    Did Mr. Rodrigues refuse to allow questions?

A.    He didn't – no, he didn't refuse.

Q.    He wouldn't chair these meetings, would he?  The meetings were chaired by the president, right?

A.    Well, at some point it was probable both of them.

Q.    When he was making his reports he would direct the discussion; is that correct?  Is that fair to say?

A.    Yes.

Q.    Did he ever dissuade people from asking questions?

A.    I wouldn't think dissuade.  But pretty muchh took it, what was presented.

Q.    To the extent that people did not ask questions, members of the board, or engage in discussion, that was their decision, wasn't it, as to whether or not they were going to ask questions?

A.    Yes.

Q.    If you had questions, you could have asked them, right?

A.    Yes.

29

Exhibit 7, attached to Defendant's Concise Statement of Material Facts in Support

of Defendant's Renewed Motion for Summary Judgment, at pp. 38-39.

      At his deposition, Dayton Nakanelua current UPW State Director

testified, in relevant part, as follows:

> Q.    To your knowledge, since you've been administrator, has there
> ever been any discussion of amending the complaint in this
> case to sue the trustees who were serving on the board of
> trustees of the mutual aid fund when the Best Rescue
> investments were made?  Has that ever been considered?
>
> A.    No.
>
> Q.    Why not?
>
> A.    It goes, I believe, to what I have testified earlier, Counsel: that
> the trustees during that period of time had a high level of
> confidence and trust in Mr. Rodrigues, that they believed that
> he would - he was doing the best for the beneficiaries of the
> mutual aid fund.  And with that, his recommendations were
> basically rubber-stamped.
>
> Q.    Anything else?
>
> A.    No.
>
> [....]
>
> A.    Again, I testified to it.  If the trustees did make the decisions
> with regards to Best Rescue, it was based upon the advice,
> evaluation, report, communication, recommendation of
> Mr.Rodrigues and - and again, based on that very, very high
> regard and confidence and trust that each of those trustees had
> with Mr. Rodrigues and their view that he was doing the best
> he could for the MAF and its beneficiaries, that the decision, if
> made, when made would have been based upon that and
> rubber-stamping his recommendation.

Exhibit 1, attached to Defendant's Concise Statement of Material Facts in Support

of Defendant's Renewed Motion for Summary Judgment, at pp. 56, 59-60.

In light of the above, Rodrigues is entitled to summary judgment in his favor on all of Plaintiff's claims on the ground that there is no "evidence" on the record to support Plaintiff's claim that Defendant otherwise "controlled" the trustees of the Mutual Aid Fund[14] in connection with the transactions upon which this action is based. Cosgrove v. Circle K Corp., 884 F.Supp. 350 (DC AZ 1995)(granting summary judgment for CEO of plan sponsor where the record was devoid of any evidence of actions personally taken by CEO to control or unduly influence the Plan trustee's decisions, notwithstanding the fact that the CEO had signed the sales agreement upon which the plaintiff's ERISA claims were based ); Local Union No. 98, IBRW v. Garney Morris, Inc., 33 EBC 2175, 2004 WL 1151722 (E.D.Pa. 2004)(granting summary judgment to individual corporate officers who had not been determined to be fiduciaries where plaintiffs could not meet their burden of proof, i.e., by clear and convincing evidence, to support an alter ego theory to pierce the corporate veil.).

    D.    Indispensable Parties

As evident from the foregoing, the Plaintiff's failure to sue the M.A.F. trustees who actually made the decisions to invest M.A.F. funds is fatal because the trustees are indispensable parties. E.g., Rule 16, F.R.C.P.

---

[14]    Compare, note 13, supra.

IV.    <u>Conclusion</u>

For all of the reasons set forth above Defendant Rodrigues submits that the

instant motion should be granted.

DATED:    Honolulu, Hawai'i,   <u>October 24,  2007</u>          .

<u>   /s/ Eric A. Seitz</u>
ERIC A. SEITZ
LAWRENCE I. KAWASAKI
DELLA A. BELATTI

Attorneys for Defendant
Gary W. Rodrigues