1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

STEVEN DE COSTA, in his ) CIVIL NO. 03-00598 DAE/LEK
representative Capacity )
as Chairperson of the )
Board of Trustees of )
United Public Workers, )
AFSCME, Local 646, )
AFL-CIO, Mutual Aid )
Trust Fund, Real Party )
in Interest United )
Public Workers Union, )
AFSCME, Local 646, )
AFL-CIO, )
)
        Plaintiff, )
)
    vs. )
)
GARY W. RODRIGUES, )
)
        Defendant. )
_____)

DEPOSITION OF DAYTON NAKANELUA
Taken on behalf of Defendant Gary W. Rodrigues at the
Law Office of Eric A. Seitz, 820 Mililani Street,
Suite 714, Honolulu, Hawaii, 96813, commencing at
9:42 a.m. on Tuesday, October 16, 2007.


REPORTED BY:   JOAN IZUMIGAWA, CSR No. 136
               Notary Public, State of Hawaii


EXHIBIT __1__

Page 2

1  APPEARANCES:

2  For Plaintiff:

3      CHARLES A. PRICE, ESQ.
       Koshiba Agena & Kubota
4      2600 Pauahi Tower
       1003 Bishop Street
5      Honolulu, Hawaii  96813
       Ph:  (808) 523-3900
6
   For Defendant:
7
       ERIC A. SEITZ, ESQ.
8      820 Mililani Street, Suite 714
       Honolulu, Hawaii  96813
9      Ph:  (808) 533-7434

10

11

12

13

14

15

16

17

18

19

20

21

22

23  Witness address:  c/o Charles A. Price, Esq.

24

25

---

Page 3

1                    I N D E X

2

3

4

5  EXAMINATION BY:

6      Mr. Seitz                        4

7

8

9  EXHIBITS FOR IDENTIFICATION:

10     Exhibit 7                       14

11     Exhibit 8                       41

12     Exhibit 9                       48

13

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 4

1              DAYTON NAKANELUA,
2  Being first duly sworn to tell the truth, the whole
3  truth, and nothing but the truth, was examined and
4  testified as follows:
5              EXAMINATION
6  BY MR. SEITZ:
7      Q. Please state your full name.
8      A. Dayton Mahoe Nakanelua.
9      Q. Can you give us a mailing address, please.
10     A. 1426 North School Street, Honolulu, Hawaii,
11 96817.
12     Q. Mr. Nakanelua, you've had your deposition
13 taken previously; is that correct?
14     A. I have had, yes.
15     Q. So you're familiar with the procedures that
16 we follow in depositions; is that correct?
17     A. Yes.
18     Q. Let me just go through a couple of those
19 procedures and rules so that the record is clear that
20 you understand them.
21         First of all, you do understand that the
22 testimony you're giving this morning is under oath;
23 is that correct?
24     A. Yes.
25     Q. You understand the necessity for clear,

---

Page 5

1  audible responses, as you've been doing, so we can
2  get a good record; is that right?
3      A. Yes.
4      Q. Also we want to try to avoid having 2 people
5  speak at the same time because that makes it
6  difficult for the court reporter.  So as you're
7  doing, please wait until I finish my questions before
8  you answer, and I'll do the same for you, okay?
9      A. Okay.
10     Q. Also I want to make sure that if I ask you a
11 question that you don't understand that you will ask
12 me to clarify it before you try to answer it.  Okay?
13     A. Okay.
14     Q. So we will assume when you do answer the
15 question that you have understood it.  Is that fair?
16     A. That's fair.
17     Q. Lastly, let me just tell you you have an
18 opportunity to read and correct your testimony if you
19 choose to do so when you get a transcribed version of
20 it.  However, you need to understand that if you do
21 make changes, somebody later can comment upon that
22 fact.  Do you understand that?
23     A. Yes.
24     Q. If you need to take a break at any time, let
25 us know and we'll go off the record, okay?

Page 6

1    A. Thank you.
2    Q. All right. Can you tell me what, if any,
3 documents or materials you have reviewed in
4 preparation for this deposition.
5    A. I reviewed my declarations. I reviewed the
6 declarations of George Yasumoto and Alison Leong, and
7 I reviewed some exhibits that were attached to
8 documents related to some court proceedings.
9    Q. Did you actually read any of the deposition
10 testimony of either Mr. Leong or Mr. Yasumoto? Did
11 you see any transcribed versions of their testimony?
12   A. I believe, Counsel, it's Ms. Leong.
13   Q. Yes.
14   A. No.
15   Q. How about Mr. DeCosta? Did you read
16 anything about his prior testimony?
17   A. No.
18   Q. Other than your attorney, Mr. Price, have
19 you had any conversations with anybody in preparation
20 for this deposition?
21   A. No.
22   Q. I want to go briefly through your
23 background. It's laid out in some of the
24 documentation, but just to clarify for this record,
25 can you just briefly describe for me your educational

Page 7

1 background starting from high school.
2    A. I'm a graduate of St. Louis School. I'm a
3 graduate of the University of Hawaii.
4    Q. What did you get your degree in at UH?
5    A. I have a business degree, majoring in
6 personnel and industrial relations.
7    Q. Have you ever received any graduate degrees?
8    A. No.
9    Q. Your employment, in addition to the UPW, has
10 also been with the state Department of Labor and
11 Industrial Relations; is that correct?
12   A. Yes.
13   Q. Any other notable employment other than
14 those 2 employers?
15   A. State of Hawaii Organization of Police
16 Officers, known as SHOPO; and formerly the state
17 Department of Personnel Services, which presently is
18 Department of Human Resources Development.
19   Q. When did you first begin employment with the
20 UPW?
21   A. I believe it was in 1982.
22   Q. Who hired you?
23   A. Gary Rodrigues.
24   Q. In what capacities did you work for UPW from
25 the time that you were first hired by Mr. Rodrigues

Page 8

1 in 1982 until you left to go work for the state?
2    A. I was initially the Oahu division director
3 and subsequently the administrative assistant to the
4 state director.
5    Q. In what year did you leave to become the
6 director of the state Department of Labor and
7 Industrial Relations?
8    A. That was in 1993.
9    Q. For how long did you occupy that position?
10   A. Until the end of Governor John Waihee's
11 second term of office, which I believe was December
12 of '96.
13   Q. After December of 1996 you went back to UPW;
14 is that correct?
15   A. No.
16   Q. Where did you go then?
17   A. I remained at the state Department of Labor
18 and Industrial Relations during the first term of
19 Governor Ben Cayetano.
20   Q. What position did you occupy?
21   A. Deputy director.
22   Q. How long did you remain there?
23   A. Until May of 1997.
24   Q. Then what was your employment after that?
25   A. I returned back to the UPW.

Page 9

1    Q. In what capacity?
2    A. I believe as the executive assistant to the
3 state director.
4    Q. Did you remain in that position until
5 Mr. Rodrigues retired?
6        MR. PRICE: Objection as to form, "retired."
7 Assumes facts.
8    Q. BY MR. SEITZ: Okay. Let's ask the question
9 this way. Until Mr. Rodrigues left his employment
10 with UPW, did you remain his executive director?
11   A. Yes.
12   Q. When Mr. Rodrigues left, what position did
13 you occupy at that point?
14   A. I believe the position was the same.
15   Q. Did you serve as the executive assistant to
16 the acting director during the period of time that
17 the UPW was administered by the international union?
18   A. The administrator did not, I believe, change
19 the title to my position so I believe it remained the
20 same.
21   Q. Then when did you become the state director
22 of UPW?
23   A. I was elected in 2003. We remained under
24 administratorship until early 2004. Once the
25 administratorship of AFSCME, our international union,

Page 10

1 was terminated, then the provisions of the UPW
2 constitution came into play. So it would be early
3 2004.
4    Q. Have you been reelected to that position
5 since you originally assumed it?
6    A. Yes.
7    Q. What year was that?
8    A. I was reelected in 2006.
9    Q. For how long of a term?
10   A. 3 years.
11   Q. That's the position that you currently hold;
12 is that correct?
13   A. State director of the UPW, yes.
14   Q. Until 2009?
15   A. Correct.
16   Q. When was the first time that you had any
17 official relationship or title with the mutual aid
18 fund trust?
19   A. I had no official relationship to the mutual
20 aid fund trust.
21   Q. Well, you do now, as administrator; is that
22 correct?
23   A. Correct.
24   Q. When did you assume that position, as
25 administrator to the mutual aid fund trust?

Page 11

1    A. 2004.
2    Q. Prior to 2004 did you have any official
3 responsibilities with respect to the mutual aid fund
4 trust?
5    A. No.
6    Q. Prior to 2004 did you attend meetings of the
7 mutual aid fund trust?
8    A. Yes.
9    Q. In what capacity?
10   A. Staff.
11   Q. Were you regularly in attendance at those
12 meetings during the period of time that you served as
13 executive assistant to Mr. Rodrigues?
14   A. Yes, until perhaps maybe 2000, 2001.
15   Q. What happened then?
16   A. I was not assigned by the state director to
17 attend those meetings.
18   Q. Do you know why that was?
19   A. No, sir.
20   Q. When you attended prior to 2000, 2001 as
21 staff, what were your responsibilities?
22   A. There were no specific responsibilities
23 assigned.
24   Q. Did you have any responsibilities for
25 preparing minutes?

Page 12

1    A. No.
2    Q. Or for promulgating and distributing the
3 minutes?
4    A. From time to time I may have assisted in
5 handing out or distributing minutes to those present.
6    Q. When you attended the meetings of the mutual
7 aid fund trust in that period of time prior to 2000,
8 2001, were you compensated for that service?
9    A. I was paid for the time spent with the
10 trustees if the meetings were during the week. I
11 always understood that our jobs were 27/7, and being
12 salaried, whatever the state director gave us
13 to -- assigned me to do, I would do it. So
14 generally, I would say, I was compensated.
15   Q. By whom?
16   A. By the local union.
17   Q. Did the mutual aid fund trust ever pay any
18 monies, to your knowledge, to the UPW for the staff
19 time that you or other UPW employees spent doing the
20 work of the mutual aid fund trust?
21   A. I guess my best response to that is that
22 there wasn't a direct compensation from the MAF trust
23 to individual employees but that the local union was
24 reimbursed in kind through an administrative service
25 fee paid by the MAF on a monthly basis to the local

Page 13

1 union.
2    Q. Do you know how much that service fee was?
3    A. I believe it's $2,000 a month.
4    Q. Let me show you what we previously have
5 marked as Exhibit 1 to the earlier depositions that
6 we took in this case, and let me ask you to take a
7 look at that document first. And when you've had a
8 chance to look at it, please let me know.
9        Have you ever seen Exhibit 1 before?
10   A. No.
11   Q. Do you know what it is?
12   A. I see the title, "Administrative Services
13 Agreement."
14   Q. Based upon your review of that agreement, is
15 that in fact the document by which UPW gets
16 reimbursed from the mutual aid fund trust for the
17 services of staff members of UPW?
18   A. I don't know, Counsel, if this document is
19 what is based upon the service fee, administration
20 service fee.
21   Q. Have you ever seen any other agreement
22 between UPW and mutual aid fund trust with respect to
23 reimbursement of UPW for staff services?
24   A. No.
25   Q. Let me show you what I'm going to ask the

Page 10 - Page 13

**Page 14**

1 court reporter to mark as Exhibit --
2      MR. SEITZ: We'll go off the record a
3 second.
4      (Discussion off the record.)
5            (Marked for identification:
6            Exhibit 7.)
7  Q. BY MR. SEITZ: Would you look at Exhibit 7,
8 please.
9      Have you had a chance to look at that?
10  A. I have.
11  Q. Have you ever seen Exhibit 7 before?
12  A. I don't recall this minutes for Friday, July
13 27, 1984.
14  Q. Were you working at UPW then?
15  A. Yes, I was.
16  Q. If there was any meeting on July 27, 1984,
17 of the mutual aid fund trust, do you know whether you
18 would in the normal course of your duties have
19 attended that meeting?
20  A. As I stated earlier, I attended the mutual
21 aid fund board trustees' meetings when I was assigned
22 to do so by the state director during the period of
23 my employment, but I don't recall this specific
24 meeting.
25  Q. Do you know when the mutual aid fund trust

**Page 15**

1 was first established?
2  A. I've seen documents, but I don't recall
3 specifically, Counsel, as to when it was first
4 established.
5  Q. Do you know when its basic documents,
6 including the trust document, were initially adopted
7 by the trustees?
8  A. Could you ask that question again, please.
9  Q. Yes. Do you know when the basic trust
10 documents, including the trust document itself, were
11 initially adopted by the first group of trustees?
12  A. I have reviewed that document. I don't
13 recall the specific date. I recall it being
14 established, I think as a 501(c), as of -- as a -- I
15 think a VEBA trust but -- I don't recall the date,
16 but it was sometime prior to 1984.
17  Q. You have read the basic trust documents?
18  A. I have had an opportunity to read the trust
19 documents, yes.
20  Q. Do you know how many trustees are provided
21 for in those documents?
22  A. I believe there were 6 trustees.
23  Q. How are those trustees selected?
24  A. I believe it's provided for in the -- I
25 believe it's provided for in the trust document, but

**Page 16**

1 I'm not certain. I would have to look at it again.
2  Q. Is it your recollection that the state
3 officers of UPW are, by virtue of the fact that they
4 are state officers, also trustees of the mutual aid
5 fund trust?
6  A. No.
7  Q. So there's no automatic requirement that
8 they serve in that capacity? Is that what your
9 recollection is?
10  A. Just based on your question initially, is
11 that not all state officers are trustees of the fund.
12  Q. How about the state president?
13  A. Yes.
14  Q. How about the state treasurer?
15  A. If I can correct that, sir.
16  Q. Yes.
17  A. State secretary-treasurer.
18  Q. Excuse me. I stand corrected.
19  A. Yes.
20  Q. How about any vice presidents of the union?
21  A. Our local union, as it's structured for
22 governance, has 5 vice presidents representing each
23 of our 5 divisions.
24  Q. Do they serve as -- also as trustees?
25  A. Yes.

**Page 17**

1  Q. So is it fair to say that in order to become
2 a trustee of the mutual aid fund trust, essentially
3 one has to be an officer of the local union? Is that
4 correct?
5  A. That is not correct.
6  Q. What is incorrect about that statement?
7  A. The officers of the trust, I believe, are
8 specific designated officers of the local union.
9 It's not any officer of the local union, sir.
10  Q. Okay. But my question to you was that in
11 order to become a trustee of the mutual aid fund
12 trust, a person has to be an officer of the UPW? Is
13 that correct?
14  A. Specific officers of the UPW.
15  Q. Okay. How many people have served as
16 administrators of the UPW mutual aid fund trust, as
17 far as you know, in the history of that organization?
18  A. As best as I know, 2.
19  Q. Who are those 2 people?
20  A. Henry Epstein and Gary Rodrigues.
21  Q. And yourself?
22  A. Presently, yes.
23  Q. So 3?
24  A. Correct.
25  Q. Is the administrator of the mutual aid fund

Page 14 - Page 17

Page 18

1  trust a trustee?
2    A. No.
3    Q. Does the administrator have the right to
4  vote on matters that are to be decided by the
5  trustees?
6    A. No.
7    Q. Under the trust documents themselves, the
8  trustees are the individuals who are vested with
9  making decisions affecting the mutual aid fund trust;
10 is that correct?
11   A. That's correct.
12   Q. They have the legal authority to make
13 decisions; is that right?
14   A. That's right.
15   Q. The trustees are the only ones who have the
16 obligations to make decisions with respect to that
17 trust under the terms of the documents; is that
18 correct?
19   A. Yes.
20   Q. Now let me show you what we've marked
21 previously as Exhibit 4 to the prior depositions in
22 this case.  This is a document which purports to be
23 minutes of a mutual aid fund trustees' meeting that
24 occurred on June 21, 1994.  Let me ask you to please
25 first look at that document and then let me know when

Page 19

1  you've had the opportunity to do so.
2    A. Okay.
3    Q. Have you ever seen Exhibit 4 before?
4    A. I don't recall.
5    Q. Do you recall that at some point back in
6  June of 1994 that the chairperson of the mutual aid
7  fund trust was Adaline Uhrle?
8    A. Yes.
9    Q. She was also the state president of UPW; is
10 that correct?
11   A. Correct.
12   Q. And that the vice chair was Frank Rapoza?
13 Do you recall that?
14   A. Only by reviewing these minutes.  And then
15 an election was held on this -- perhaps this day or
16 at a prior meeting and that Frank Rapoza was elected
17 as the vice chair.
18   Q. Do you know an individual by Frank Rapoza?
19   A. Yes.
20   Q. Do you know whether Frank Rapoza was an
21 officer of the union?
22   A. At some point in time, he was the vice
23 president of our Hawaii division.
24   Q. So would that have then made him eligible to
25 be a trustee of the mutual aid fund trust?

Page 20

1    A. Yes.
2    Q. How about George Yasumoto?  Was he the
3  secretary-treasurer, to your knowledge, of the union
4  back in 1994?
5    A. I believe that in 1994 that George Yasumoto
6  was the secretary-treasurer of the local union.
7    Q. During this period of time in June of 1994,
8  you were not working for the UPW; is that correct?
9  You were in state government?
10   A. Correct.
11   Q. Were you kept abreast of developments and
12 things that were occurring inside the UPW even though
13 you weren't working there?
14   A. From time to time if I saw Mr. Rodrigues,
15 he'd talk to me about what was happening, as well as
16 other staff.
17   Q. Look down, if you would, at, first of all,
18 the entry here for number 5.  "Audit Report."  You
19 see that?
20   A. Yes, I do.
21   Q. In your experience from attending a number
22 of meetings prior to your becoming administrator of
23 the mutual aid fund trust, were there regularly audit
24 reports prepared and provided to the trustees?
25   A. Annual audits generally were provided to the

Page 21

1  trustees of the mutual aid fund trust.
2    Q. Were those audits given to the trustees on a
3  regular annual basis?
4    A. My answer to that can be generally, yes.
5    Q. Were the trustees given the opportunity to
6  read the audit reports?
7    A. Generally on the day of the meeting,
8  trustees were provided a booklet and/or material that
9  they would be reviewing, and perhaps some of that
10 material would result in the board -- the trustees
11 taking some action.
12   Q. You see here that there was a motion -- And
13 it was seconded and carried -- that the audit report
14 on this particular occasion in Exhibit 4 on June 21,
15 1994, was accepted as printed.  Do you see that there
16 in the minutes?
17   A. Yes.
18   Q. Was that a normal procedure, that the
19 trustees would be asked to have someone file a motion
20 and second it and to vote whether to accept the audit
21 report?
22   A. The audit report would be explained by the
23 administrator and the administrator would make a
24 recommendation to accept the audit report, and the
25 trustees then would make a motion and approve.

Page 22

1   Q. That was the normal procedure that was
2  followed when an audit report was prepared annually;
3  is that correct?
4   A. Yes, and that's why when I look at this
5  audit report or this part of the minutes, I have some
6  problem with regards to the time period of June 30th,
7  '93, to December, which reflects a 6-month period,
8  and so it's not an annual audit.
9   Q. You'll see in paragraph 6 that there are
10 also financial reports that are referenced in the
11 minutes as having been provided to the trustees. Is
12 that correct?
13  A. Yes.
14  Q. Do you see, also, there that there was a
15 motion -- And it was seconded and carried -- to
16 accept the financial reports that had been provided
17 on that occasion? Do you see that reference in the
18 minutes?
19  A. Yes.
20  Q. Was that also the standard procedure, that
21 the trustees would be given financial reports and be
22 given the opportunity to either accept or reject
23 them?
24  A. As I testified earlier, the administrator
25 would explain the monthly financial reports that were

Page 23

1  included as part of the material that the trustees
2  received on the day of the meeting, and based upon
3  the recommendation of the administrator, there was
4  approval.
5   Q. That was the normal procedure that was
6  followed when financial reports were provided to the
7  trustees?
8   A. I would say generally, yes.
9   Q. The next item is an investment report which
10 it says was provided. To your knowledge, did you
11 ever attend meetings of the mutual aid fund trust
12 when investment reports were provided to the
13 trustees?
14  A. Yes, I was.
15  Q. If you look at the next paragraph, it
16 specifically says that the administrator explained a
17 letter from AFSCME regarding investments and a
18 request to authorize a minimum investment of $500,000
19 to be processed through The Hewitt Company. Do you
20 see that there?
21  A. I see that.
22  Q. Now, in there there is a reference to a
23 letter from AFSCME, and what I want to do is show you
24 what we previously have marked as Exhibit 3 in these
25 depositions. Let me ask you, if you would, please,

Page 24

1  to look at Exhibit 3 and read it to yourself and tell
2  me, if you can, if you've ever seen that document
3  previously.
4   A. Okay. Thank you.
5   Q. Do you recognize that letter?
6   A. No.
7   Q. Have you ever seen it before, to your
8  knowledge?
9   A. No.
10  Q. Do you know who the author of that letter
11 is?
12  A. Yes.
13  Q. What is his name?
14  A. Larry P. Weinberg.
15  Q. Who is Larry Weinberg?
16  A. I believe he's the general counsel for
17 AFSCME.
18  Q. Was he the general counsel back in that
19 period of time in 1994?
20  A. I believe that he was.
21  Q. Is he still?
22  A. Yes.
23  Q. Do you have occasion in your capacity as
24 state director to obtain legal advice from
25 Mr. Weinberg on various matters?

Page 25

1   A. I do but have not.
2   Q. You indicate -- you see in that letter that
3  the letter provides some legal advice --
4   A. Oh, let me clarify that.
5   Q. Sure.
6   A. I do have the opportunity to talk to
7  Mr. Weinberg and have had -- on occasion discussed --
8  sought advice and recommendations.
9   Q. The point I want to ask you about with
10 respect to this particular letter dated May 12, 1994,
11 is: Would it have been, in your opinion, unusual for
12 Mr. Rodrigues to solicit a legal opinion from
13 Mr. Weinberg with respect to matters pertaining to
14 the mutual aid fund trust?
15  A. "Would it have been" --
16  Q. Unusual.
17  A. I don't know.
18  Q. To your knowledge, is Mr. Weinberg qualified
19 to provide legal advice to the state director of a
20 union with regard to matters such as what are
21 contained in this particular letter?
22  A. I don't know specifically.
23  Q. Do you know if it would have been reasonable
24 for Mr. Rodrigues to rely upon legal advice from
25 Mr. Weinberg with respect to the authorities and

Page 26

1 duties of the mutual aid fund trust?
2      MR. PRICE: Objection. Calls for
3 speculation.
4      Q. BY MR. SEITZ: I'm asking for your opinion.
5      A. My opinion is that Mr. Weinberg is general
6 counsel to AFSCME primarily dealing with the business
7 of AFSCME. Personally I would seek out the advice of
8 a health and benefits attorney who specifically
9 practiced health benefit programs in the state of
10 Hawaii and/or even outside the state.
11      Q. Okay. But my question to you is: As you
12 sit here today --
13      A. Mm-hm.
14      Q. -- do you think it was unreasonable back in
15 1994 for Mr. Rodrigues to rely upon such advice from
16 Mr. Weinberg as was contained in that letter?
17      MR. PRICE: Objection. Calls for
18 speculation. Assumes facts.
19      You may answer.
20      A. I believe my response would still be the
21 same, Counsel: that in my view -- and I don't know
22 about Mr. Rodrigues' view. Apparently he did rely
23 somewhat on Mr. Weinberg's opinion. But again, if
24 you ask -- with that question my personal opinion is
25 that I would have sought out the advice and counsel

Page 27

1 of a attorney who specialized in health benefit
2 programs, trusts, and the best course of action to
3 take with regards to investments.
4      Q. BY MR. SEITZ: So presently -- in your
5 capacity as state director and administrator of the
6 mutual aid fund trust, is there such an attorney whom
7 you rely upon for advice of that nature now?
8      A. I have called from time to time for
9 discussion and for information to provide to the
10 trustees Mr. Paul Tom, a benefit plans consultant. I
11 have also worked with -- myself and -- with the
12 trustees with Mr. John Kiehl, who is an attorney
13 specializing, I believe, in benefit plan trusts.
14      Q. Have you ever consulted and utilized any
15 legal advice from Fred Altschuler?
16      A. No.
17      Q. Before we continue looking at Exhibit 4
18 which you have in front of you, let me ask you a
19 number of questions with regard to the mutual aid
20 fund trust itself.
21      First of all, what is the purpose of that
22 entity?
23      A. The purpose of the -- it's a -- again, it's
24 a VEBA trust, and it is a trust that provide -- can
25 provide benefits to those beneficiaries of the trust.

Page 28

1      Q. What kind of benefits?
2      A. Health benefits.
3      Q. Where do the monies come from that are
4 invested into the trust?
5      A. It's a voluntary benefit plan trust, so it
6 is -- members of the local union can enroll into the
7 mutual aid fund, and their benefit -- and their
8 dependents up -- meeting certain eligibility criteria
9 to participate as beneficiaries of the fund.
10      Q. Once they enroll, they make monthly
11 contributions; is that correct?
12      A. Correct.
13      Q. They authorize those monthly contributions
14 to be deducted automatically from their pay and paid
15 directly into the trust; is that correct?
16      A. Yes.
17      Q. In the case of state employees, that means
18 that the state actually makes the contributions in
19 behalf of the employees through a process of
20 deductions from their salaries; is that right?
21      A. Yes.
22      Q. Am I correct that in terms of the
23 beneficiaries who enroll in this particular mutual
24 aid fund trust, there are a combination of both
25 public and private employees? Is that correct?

Page 29

1      A. Yes.
2      Q. Since there are state employees and state
3 monies that are invested into the trust, has anyone
4 ever advised you, to your knowledge, or the mutual
5 aid fund trust as to whether or not this particular
6 entity qualifies as an ERISA trust?
7      MR. PRICE: Objection to the form of the
8 question in terms of assuming facts for the
9 characterization of state monies.
10      You may answer.
11      Q. BY MR. SEITZ: Let me withdraw the question
12 and ask it this way. In light of the fact that some
13 of the monies that are contributed on a monthly basis
14 are made through a mechanism by which the state
15 deducts them from state employees' salaries and pays
16 them directly into the trust, in light of that
17 circumstance, has anyone ever advised you as to
18 whether or not this particular entity is an ERISA
19 trust?
20      A. I personally, Counsel, have not sought
21 advice on that specific question. But with those
22 professionals that I have brought to the trustees to
23 discuss the trust agreement, the plan, that they have
24 described it as being subject to ERISA.
25      Q. But to your knowledge, there has never been

Page 30

1 any definitive advice given, as long as you know, to
2 the trust with respect to whether it is an ERISA
3 trust in light of the fact that monies come on behalf
4 of state employees. Is that fair to say? They have
5 assumed that it's an ERISA trust, but there has never
6 been any definitive determination one way or the
7 other. Is that fair?
8     A. I believe that the professionals that we
9 have been dealing with and their description and
10 characterization of the trust, that it is a
11 ERISA-covered benefit plan.
12     Q. What are the duties of the administrator of
13 the mutual aid fund trust?
14         MR. PRICE: Objection as to time.
15     Q. BY MR. SEITZ: What are your duties as
16 administrator?
17     A. I wish I had the plan -- the trust agreement
18 with me this morning. But basically, as the
19 administrator of the plan, it's to ensure that
20 benefit claims that are received are processed in
21 accordance with the plan; that beneficiaries receive
22 their benefits according -- as provided for in the
23 plan in a timely basis; to keep and maintain records
24 of the business of the MAF; to schedule meetings of
25 the mutual aid fund trustees; to review from time to

Page 31

1 time the plan summary or the plan description or the
2 specifics of the MAF plan with the trustees to see if
3 any amendments, changes, or additions should be made,
4 if things should be clarified; to provide reports to
5 the trustees at their meetings; to ensure that an
6 annual audit of the trust are completed in a timely
7 fashion for review and approval of the trustees; to
8 provide opportunities for education to the trustees
9 so that they can understand and appreciate their
10 duties and responsibilities and decision-making
11 authority and the consequences if they fail to meet
12 certain standards that they are held to as trustees;
13 and to give them the best assistance in making these
14 decisions either through written reports submitted by
15 myself or submitted jointly with professionals who
16 have the experience, the know-how, and the ability.
17 They have the skills, knowledge, and ability to best
18 advise the trustees in their decision making and the
19 constant reminder of the severity of those -- that
20 authority to make decisions.
21     Q. In your answer as to the duties that you
22 perform as administrator --
23     A. Mm-hm.
24     Q. -- is there anything different that you do
25 from what Gary Rodrigues did when he served as

Page 32

1 administrator?
2     A. I believe basically we do the same thing
3 except that materials upon which decisions will be
4 made by the trustees are provided them -- to them
5 days prior to that meeting so they have an
6 opportunity to review, evaluate, analyze, and so that
7 when they come to their trustee meetings, they are
8 prepared to discuss them and make decisions. In
9 addition to that, if there's a need for professional
10 consultants or legal counsel to be present, they are
11 present at the meetings, also.
12     Q. In your capacity as administrator, do you
13 make investment decisions with respect to mutual aid
14 fund monies?
15     A. We have an investment manager. The
16 investment manager follows an investment management
17 policy, and through the policy the investment manager
18 makes investment decisions.
19     Q. But am I correct that you are not
20 authorized, as administrator, to make decisions with
21 respect to investments?
22     A. Those decisions are made by the board of
23 trustees.
24     Q. As administrator, do you write checks in
25 behalf of the mutual aid fund trust?

Page 33

1     A. Can I clarify?
2     Q. Sure.
3     A. Checks are prepared by the administrative --
4 or our business office, and there are required
5 signatures to those checks. And generally the checks
6 are signed by the chair -- or the president and the
7 secretary-treasurer of the local union or the chair
8 and vice -- secretary of the MAF.
9     Q. So just for example --
10     A. I believe the document also provided that if
11 those 2 officers are not available, then the
12 administrator can sign as a second signature.
13     Q. But still, 1 of the officers is required to
14 sign because 2 signatures are required on every
15 check; is that right?
16     A. Correct.
17     Q. That has always been the case, as far as you
18 know; is that correct?
19     A. Correct.
20     Q. So if the board of trustees were to make a
21 decision to invest half a million dollars in some
22 sort of entity for the investment purposes of the
23 mutual aid fund trust, you, as administrator, would
24 not be able to write the check yourself for that
25 purpose; is that correct?

Page 34

1    A. As I said, generally it would be the state
2  president and the state secretary-treasurers,
3  officers of the MAF. They would sign those checks.
4    Q. Now, if you would, return again to Exhibit 4
5  which is in front of you.
6    A. Okay.
7    Q. If you look down at paragraph 8, you will
8  see, as I pointed out to you earlier, that apparently
9  there was some discussion at this particular meeting
10 in 1994 of making a minimum investment of $500,000 to
11 be processed through The Hewitt Company. My first
12 question to you is: Do you know a man by name of Al
13 Hewitt?
14   A. Yes.
15   Q. When did you first know of or encounter
16 Mr. Hewitt?
17   A. To my best recollection, perhaps in '97,
18 '98.
19   Q. Were you aware prior to that that Mr. Hewitt
20 had been hired to invest funds in behalf of at least
21 2 separate entities affiliated with the UPW?
22   A. No.
23   Q. Were you aware that he was handling the UPW
24 pension funds?
25   A. No.

Page 35

1    Q. At some point did you become aware that
2  Mr. Hewitt was the investment advisor with respect to
3  the monies of the mutual aid fund trust?
4    A. At some time?
5    Q. Yes.
6    A. Yes.
7    Q. That was in 1997?
8    A. '98.
9    Q. Okay. Do you know what Mr. Hewitt's
10 background is with respect to serving as an
11 investment counselor for other organizations or
12 entities in the state of Hawaii?
13   A. I do have knowledge that at some point,
14 Mr. Hewitt was also doing business, I believe perhaps
15 as a consultant, with Royal State -- Royal State
16 Company.
17   Q. Do you have any other knowledge of
18 Mr. Hewitt's clients or clientele in the state of
19 Hawaii?
20   A. No.
21   Q. Do you know how Mr. Rodrigues first met or
22 was introduced to Mr. Hewitt?
23   A. No.
24   Q. Do you know anything about Mr. Hewitt's
25 qualifications as an investment advisor?

Page 36

1    A. No.
2    Q. Do you have any reason as you sit here today
3  to believe that as of June 21, 1994, when, according
4  to these minutes, it appears that there was a motion
5  and it was seconded and carried to invest funds of
6  the mutual aid fund trust through Mr. Hewitt's
7  company, that that was an unreasonable decision of
8  the trustees?
9    A. I don't know.
10   Q. Let me before we -- let's go off the record.
11     (Discussion off the record.)
12     (Recess:  10:38 a.m. to 10:55 a.m.)
13   Q. BY MR. SEITZ: Mr. Nakanelua, when was the
14 first time that you ever heard of or received any
15 information pertaining to an investment in a company
16 by the name of Best Rescue?
17   A. It was subsequent to my return to the union
18 from the state labor department. Maybe about '99,
19 2000.
20   Q. Do you know the procedure that was followed
21 to invest monies of the mutual aid fund trust in Best
22 Rescue?
23   A. I don't know the procedure.
24   Q. Do you know if those investments, singular
25 or plural, in Best Rescue were authorized by the

Page 37

1  trustees of the mutual aid fund trust?
2    A. I recall it being discussed with the
3  trustees who were present at the meeting, but I don't
4  know about approval or authorization.
5    Q. Are you knowledgeable about when it first
6  appeared that that investment was going downhill?
7    A. As I believe I testified earlier, Counsel,
8  I've had an opportunity to review some exhibits that
9  were attached. And I believe, through my review,
10 perhaps in '99, 2000.
11   Q. Do you know what, if any, steps were taken
12 at that point, when there was a concern about that
13 particular investment, to try and recoup the monies?
14   A. I believe that our international union
15 representing the MAF and through legal counsel from
16 AFSCME would file a lawsuit.
17   Q. Do you know if Gary Rodrigues was involved
18 in any way in facilitating the filing of that
19 lawsuit?
20   A. I believe that in discussion with the
21 trustees that rather than the MAF as the entity
22 directly related to those investments that -- I
23 believe the recommendation was that it be handled by
24 the international union.
25   Q. Was the mutual aid fund trust the named

Page 38

1 plaintiff in that litigation?
2   A. I believe it was.
3   Q. Did the mutual aid fund trust authorize the
4 filing of a lawsuit?
5   A. Yes, they did.
6   Q. Eventually that lawsuit was settled; is that
7 correct?
8   A. The lawsuit that was filed by the
9 international union? Yes, that was settled.
10   Q. Did the mutual aid fund trust approve the
11 settlement?
12   A. Yes.
13   Q. Pursuant to that settlement an amount of
14 money was paid to the mutual aid fund trust in the
15 sum of $200,000; is that correct?
16   A. I believe the sum was 200,000, yes.
17   Q. Were you involved or present when there were
18 any discussions about whether or not to authorize
19 that settlement?
20   A. Yes.
21   Q. What were the reasons that the settlement
22 was accepted?
23   A. Well, based -- my recollection is that the
24 international representatives felt that the
25 settlement offer was the best way to resolve that

Page 39

1 suit. The basis for it was that, one, the legal cost
2 of continuing to proceed. Secondly, that in dealing
3 with the insurance company for Mr. Hewitt, because
4 both Mr. Hewitt -- well, Mr. Hewitt had declared
5 bankruptcy and so the -- his insurance company was
6 the only means in which -- was the means in which any
7 monies could be brought back to the MAF; and that the
8 insurance company's contention was that Mr. Hewitt
9 had committed intentional and/or criminal acts that
10 wasn't covered by the insurance policy and that
11 Mr. Hewitt was prosecuted by, I believe, the federal
12 government and pled guilty to some federal charges.
13   Q. Do you know what the amount of the insurance
14 policy was from which the settlement funds were
15 eventually paid?
16   A. I cannot recall specifically, Counsel.
17   Q. Was it in excess of a million dollars?
18   A. I cannot recall.
19   Q. Was the $200,000 that came from the
20 insurance company the limits of the applicable
21 insurance coverage?
22   A. I'm not certain.
23   Q. Isn't it true that it was significantly
24 less?
25   A. Than the -- excuse me.

Page 40

1   Q. Than the applicable insurance.
2   A. I'm not certain, Counsel.
3   Q. Was Mr. Rodrigues, Gary Rodrigues, ever
4 consulted in the process of deciding whether or not
5 to accept the settlement?
6   A. I can only speak for myself.
7   Q. Do you know whether he was consulted or not?
8   A. By myself?
9   Q. Yes.
10   A. He was not.
11   Q. At some point a decision was made to sue
12 Mr. Rodrigues in this particular case; is that
13 correct? Obviously.
14   A. Yes.
15   Q. Who made that decision?
16   A. In my recollection, it was a decision made
17 during the time that our local union was under
18 administratorship, so it would have been in 2002,
19 2003.
20   Q. So the question is: Who made the decision
21 to sue Mr. Rodrigues in this case? If you know.
22   A. Well, it was the MAF trustees that made the
23 decision.
24   Q. Who were the MAF trustees at that point in
25 time?

Page 41

1   A. I believe the president was Steven Rodrigues
2 (sic). The secretary-treasurer was Faye Hanohano
3 Kaawaloa. The vice president for Hawaii division was
4 Craig Yugawa. The vice president for Kauai division
5 was, I believe, Steven Perreira. The vice president
6 for Oahu division was Angel Santiago Cruz. The vice
7 president for the private sector division was Alison
8 Leong. Did I say five?
9   Q. Okay. I think so.
10      But let me have the court reporter mark this
11 document as the next exhibit in order, please.
12              (Marked for identification:
13              Exhibit 8.)
14      Mr. Nakanelua, you have in front of you what
15 we've marked as Exhibit 8. This is your declaration;
16 is that correct?
17   A. It is.
18   Q. This is one of the documents you said you
19 reviewed in preparation for this deposition; is that
20 right?
21   A. I did.
22   Q. Is that your signature on page 3?
23   A. It is.
24   Q. Did you sign it on or about March 18, 2004?
25   A. Yes, I did.

Page 42

1    Q.  Okay.  Now, look at page 2 of the
2  declaration.
3    A.  Mm-hm.
4    Q.  Just read that to yourself and see if that
5  refreshes your recollection as to how it was decided
6  and by whom to file the instant lawsuit against
7  Mr. Rodrigues.  Just read it to yourself.
8    A.  Okay.
9      Okay.
10    Q.  So let me ask you again.
11    A.  Mm-hm.
12    Q.  Do you remember specifically who it was who
13  made the decision to bring this lawsuit against Gary
14  Rodrigues?
15    A.  Well, as my declaration reflects, Counsel,
16  during the time that we were in the administratorship
17  of our international union and as reflected in
18  paragraph 5, the AFSCME-appointed administrator,
19  Elizabeth Ho, authorized the filing of the complaint.
20    Q.  Did you discuss that matter with Ms. Ho
21  before she did so?
22    A.  I believe Ms. Ho did discuss it with me.
23    Q.  What was the nature of that discussion?
24  What can you tell us about that discussion?
25    A.  Just basically what she planned to do.

Page 43

1    Q.  Why did she plan to sue Mr. Rodrigues as
2  opposed to the trustees themselves?
3    A.  I can't speak for Ms. Ho, and I don't know
4  if that was covered in our -- I don't recall it being
5  specifically discussed.
6    Q.  Did she tell you why she thought
7  Mr. Rodrigues was responsible for the loss of this
8  investment?
9    A.  I don't recall specifically, Counsel.
10    Q.  How about Peter Trask?  Did you ever have
11  any conversations with him about this lawsuit and any
12  bases for it?
13    A.  Offhand I can't recall, but if you have
14  something that might refresh me, I would be able to
15  respond more clearly, more specifically.
16    Q.  Based on your knowledge of the union and the
17  union constitution, why was it that the mutual aid
18  fund trust was taken over by the international union
19  as opposed to just the union itself?
20      MR. PRICE:  Objection to the extent it calls
21  for a legal conclusion.
22    Q.  BY MR. SEITZ:  Go ahead.
23    A.  Again, I'm not an expert on this nor -- but
24  I can just, perhaps, answer as best as I know that
25  the international considered the MAF as a part of the

Page 44

1  local union.
2    Q.  Well, if in fact the MAF was an ERISA fund,
3  as you testified your belief was earlier --
4    A.  Yes.
5    Q.  -- then how is it that the union
6  international could take it over?  Because it was a
7  separate entity.
8      MR. PRICE:  Same objection.
9    Q.  BY MR. SEITZ:  Do you know?
10    A.  Not offhand.
11    Q.  Did anyone ever question the legality or
12  authority of the international union to take over the
13  mutual aid fund trust?
14      THE WITNESS:  I'm sorry.  I apologize.
15    Q.  BY MR. SEITZ:  Do you remember the question?
16  Let me restate it.
17    A.  Sure.
18    Q.  The question was:  To your knowledge, did
19  anyone question whether or not the international
20  union had authority to take over and operate the
21  mutual aid fund trust?
22    A.  I don't know if there was any formal
23  discussions between Ms. Ho and the international with
24  regards to that.  The mutual aid fund -- I mean, just
25  you asking me now, it needs to continue to operate.

Page 45

1  I believe that the officers of the local union had
2  been suspended by the international union during the
3  term of the administratorship.  That would have left
4  the MAF so -- I don't know.  That's just -- you
5  asking the question now.  I'm just guesstimating,
6  speculating.
7    Q.  To your knowledge, did any of the trustees
8  of the mutual aid fund trust contest the authority of
9  the international union to suspend their role as
10  trustees while the international union administered
11  the UPW and the MAF?
12    A.  I'm not aware of any discussion of that kind
13  between the officers of the trust -- MAF and the
14  international union.
15    Q.  In any event, according to your declaration
16  which we've marked as Exhibit 8, it's your
17  understanding that this particular lawsuit was
18  authorized by Ms. Ho when she was serving as an
19  employee of the international union and administering
20  the local union; is that correct?
21      MR. PRICE:  Objection.  That assumes facts
22  as to employment.
23    Q.  BY MR. SEITZ:  Okay.  In any event, when she
24  was serving as administrator under the direction of
25  the international union; is that right?

Page 42 - Page 45

Page 46

1 A. She was appointed by the international
2 president to serve as administrator.
3 Q. It was she who made the decision to file
4 this lawsuit?
5 A. As my declaration in 5 states, she
6 authorized it.
7 Q. It was she who determined who would be sued?
8 A. As my declaration reflects in item 5, yes.
9 Q. As you sit here today, you don't know why
10 the trustees who made the investment decisions or who
11 were acting when these decisions were made, you don't
12 know why any of them wasn't sued; is that correct?
13 Is that a fair statement?
14 A. You know, Counsel, this happened in 2003.
15 I'm trying best -- to answer as accurately and as
16 truthfully as I can. I believe that perhaps from
17 me -- I'm not certain -- or from others, including
18 the officers of the trust, that Mr. Rodrigues was the
19 administrator of the MAF trust fund; and with that he
20 had some responsibilities that perhaps was not
21 provided for as the administrator; and the view that
22 there was a high level of trust by members of the --
23 by trustees of the MAF, who would pretty much
24 rubber-stamp the recommendations of Mr. Rodrigues.
25 Q. Wasn't it the ultimate responsibility of the

Page 47

1 trustees themselves if an investment that was
2 authorized by the mutual aid fund trust went sour?
3     MR. PRICE: Objection. Calls for a legal
4 conclusion. Argumentative.
5     You may answer.
6 A. Again, sir? Could you repeat?
7 Q. BY MR. SEITZ: Yes. If an investment of MAF
8 funds went sour, wasn't the ultimate responsibility
9 for that with the trustees themselves?
10    MR. PRICE: Same objections.
11 A. I believe that the trustees were not
12 knowledgeable of their culpability in the event of
13 any investments that they authorized and went sour
14 would be their liability.
15 Q. BY MR. SEITZ: Why do you believe that?
16 A. Well, basically because when we had training
17 and education provided to them, some of them were
18 trustees prior to being provided this education and
19 information and fully became to appreciate their
20 authority, their responsibility, their -- as to their
21 decision making.
22 Q. Is it your understanding that merely because
23 they did not appreciate what their legal
24 responsibilities were that the trustees who may have
25 made bad investment decisions can be absolved of

Page 48

1 responsibility? Is that your understanding?
2     MR. PRICE: Objection. Assumes facts.
3 Calls for a legal conclusion.
4 A. That is not my understanding, but it may
5 have been theirs.
6 Q. BY MR. SEITZ: Do you know if there is any
7 insurance policy that covers the trustees with
8 respect to the exercise of their duties or failure to
9 perform their duties as trustees?
10 A. Yes.
11 Q. Was there an insurance policy covering the
12 mutual aid fund trustees back in 1998 to 2000?
13 A. No.
14 Q. There was no insurance?
15 A. Not that I'm aware of.
16    MR. SEITZ: Could you please mark this
17 document as the exhibit next in order.
18            (Marked for identification:
19             Exhibit 9.)
20 Q. BY MR. SEITZ: Did you want to clarify your
21 last answer or add something?
22 A. Yes, because again, I know that through the
23 international, we purchased a surety bond, but again,
24 not having that document before me or assistance of
25 legal counsel, I don't know the extent, scope, and

Page 49

1 coverage of that surety bond that we are required to
2 have and whether or not it would provide insurance to
3 those members of -- the trustees.
4 Q. Do you know if -- prior to filing this
5 lawsuit against Mr. Rodrigues if Ms. Ho or anyone
6 else made a determination whether there was potential
7 insurance coverage that would cover the loss of the
8 investment in Best Rescue?
9 A. I don't know if Ms. Ho investigated that
10 matter.
11     Okay.
12 Q. Would you please look at Exhibit 9 and tell
13 me if that's a document that you can identify.
14 A. It's a declaration of -- that I made on May
15 1st, 2007.
16 Q. Is that your signature on the last page?
17 A. It is.
18 Q. Did you sign it on or about May 1st, 2007?
19 A. Yes.
20 Q. Is this also one of the documents that you
21 reviewed before you came here today for your
22 deposition?
23 A. Yes.
24 Q. In the preparation of this particular
25 declaration, Exhibit 9, did you go through the

Page 46 - Page 49

Page 50

1 records of the mutual aid fund trust and review the
2 minutes and agendas and related documents of all the
3 meetings?
4    A. I believe I went through the records and
5 documents that was available to me, sir.
6    Q. At what point -- or what date did you start?
7    A. Well, for sure it would have been sometime
8 before May 1st of 2007. I cannot recall
9 specifically, Counsel. Maybe you can help me.
10   Q. Well, I don't know other than what you say
11 here. But you don't remember the starting date for
12 the documents that you reviewed? Is that fair to
13 say?
14   A. Again, could you repeat that question?
15   Q. You don't remember the starting date for the
16 documents that you reviewed in connection with your
17 preparation of this declaration; is that correct?
18   A. Well, I see here in number 2 February 19,
19 1999, as a document.
20   Q. So obviously you reviewed a document as of
21 February 19, 1999. Did you review any documents
22 prior to that date?
23   A. Yes. I'm sure.
24   Q. Do you remember how far back you went?
25   A. I don't know, but again, it was records that

Page 51

1 I had available, perhaps. I cannot recall. That's
2 why I'm referring to this declaration.
3    Q. Okay. All right. Do you know when funds
4 were first provided to Best Rescue by the mutual aid
5 fund trust?
6    A. Yes.
7    Q. When were the first funds provided to Best
8 Rescue?
9    A. I believe in November 1998.
10   Q. Do you know if -- prior to those funds being
11 provided to Best Rescue if that investment was
12 discussed by the mutual aid fund board of trustees?
13   A. No.
14   Q. Do you know who signed the actual checks
15 that went to Best Rescue?
16   A. No.
17   Q. In the Exhibit 9 that you have in front of
18 you, look down at paragraph 7. That refers to
19 minutes for a meeting of February 23, 2004. I'm
20 going to ask you to look at those. We've previously
21 marked those as Exhibit 2 in this series of
22 depositions. I'm going to put that in front of you.
23 That is the meeting at which the trustees ratified
24 the decision to sue Gary Rodrigues in this case; is
25 that correct?

Page 52

1    A. As reflected in item 7 B, yes.
2    Q. You were not present at this particular
3 meeting, were you?
4    A. I was.
5    Q. Do the minutes indicate that you were
6 present?
7    A. Yes.
8    Q. Where do they indicate that?
9    A. Under 4, "Reports." A, "State Director."
10   Q. Okay. If you look at paragraph 3, "Roll
11 Call" --
12   A. Yes.
13   Q. -- they have a list of the people who were
14 in attendance, but your name is not there; is that
15 correct?
16   A. It says 8 present. I could have been
17 included as one of the 8.
18   Q. Do you have a specific recollection of
19 attending this meeting?
20   A. Yes.
21   Q. And of giving your own report, as indicated
22 in paragraph 4?
23   A. Yes.
24   Q. Were you present during the discussion of
25 item number 7 under your report, the litigation in

Page 53

1 this case?
2    A. Yes.
3    Q. Do you remember what the nature of the
4 discussion was with respect to whether or not this
5 lawsuit should continue?
6    A. Could you go again?
7    Q. Yes. What do you remember took place during
8 that discussion?
9    A. Basically that there was a pending lawsuit
10 filed against the former state director and
11 administrator of -- well, Gary; and that the lawsuit
12 involved monies from the MAF totaling approximately
13 $1.1 million to Best Rescue; and that this was made
14 through an investment advisor, Albert Hewitt, and --
15 the investment was made. There was some discussion
16 about the decision made by those trustees or allowing
17 that loan and the loan's being treated as
18 uncollectible. That was the discussion.
19   Q. Was there any discussion as to why only Gary
20 Rodrigues was being sued in this lawsuit?
21   A. No. I don't recall.
22   Q. Was Alison Leong present as one of the
23 trustees on the occasion of this particular
24 discussion?
25   A. Yes, she was.

Page 54

1    Q. Alison Leong had been on the board of
2  trustees of the mutual aid fund when the original
3  investment decisions were made; isn't that true?
4    A. Yes.
5    Q. Did anyone raise an issue as to whether it
6  was a conflict of interest for her to be present and
7  to participate in decisions as to this particular
8  lawsuit? Did that ever come up?
9    A. No.
10   Q. Under your report, paragraph 7, number 2, it
11 says, "Loan approved without due diligence (risky
12 company) by former trustees." Is that what it says?
13   A. Yes, it does.
14   Q. Can you interpret what you mean by that
15 particular statement that you reported to the board
16 of trustees.
17   MR. PRICE: Objection. Assumes facts.
18   Q. BY MR. SEITZ: Go ahead.
19   A. The discussion with regards to item number 7
20 was extensive. The choice of words used perhaps by
21 myself and others involved with the discussion may
22 have been inappropriate. I believe that the
23 secretary taking the minutes for this meeting as best
24 as possible captured the intent of the discussion,
25 and that was to approve the -- or ratify the

Page 55

1  administrator's -- Liz Ho's decision to file. Those
2  discussions were lengthy. And again, I believe that
3  the secretary of the MAF through those discussions
4  put together the minutes as best as she could to
5  reflect the discussion.
6    Q. When you say that -- I'm sorry. I didn't
7  mean to cut you off. Are you finished?
8    A. Sure. Yes.
9    Q. When you say the discussion was lengthy, how
10 long -- how much time was spent on the discussion of
11 this item, number 7, to the best of your
12 recollection?
13   A. It was quite long. In excess of, I believe,
14 hour half, 2 hours.
15   Q. Well, if you look, it says the meeting
16 started at 12:19 p.m. and that it adjourned at 1:00
17 p.m. So according to the minutes, the meeting was
18 only 40 minutes altogether.
19   A. Yeah, and the bulk of the meeting or the
20 majority of the meeting was for this issue.
21   Q. So all these other items did not require
22 much time, and the bulk of the 40 minutes, is your
23 testimony, was on the issue of suing Gary? Is that
24 your recollection?
25   A. Yes.

Page 56

1    Q. That certainly wasn't an hour and a half; is
2  that correct?
3    A. It felt like it.
4    Q. To your knowledge, since you've been
5  administrator, has there ever been any discussion of
6  amending the complaint in this case to sue the
7  trustees who were serving on the board of trustees of
8  the mutual aid fund when the Best Rescue investments
9  were made? Has that ever been considered?
10   A. No.
11   Q. Why not?
12   A. It goes, I believe, to what I have testified
13 earlier, Counsel: that the trustees during that
14 period of time had a high level of confidence and
15 trust in Mr. Rodrigues, that they believed that he
16 would -- he was doing the best for the beneficiaries
17 of the mutual aid fund. And with that, his
18 recommendations were basically rubber-stamped.
19   Q. Anything else?
20   A. No, sir.
21   Q. At this meeting on May 23, 2004, one of the
22 people present was Jeanne Endo; is that correct?
23   A. Her name is listed as being present at that
24 meeting, yes.
25   Q. Did she participate in the discussions that

Page 57

1  day?
2    A. No, except for where it was highlighted.
3    Q. Did she make any recommendations with
4  respect to the litigation or the validity of the
5  litigation?
6    A. No.
7    Q. When you came back to the UPW in the time
8  frame 1998, 1999, was Jeanne Endo working there then?
9    A. Yes.
10   Q. What was her position?
11   A. Accountant.
12   Q. Who was her supervisor?
13   A. It varied.
14   Q. Weren't you her supervisor for some portion
15 of time?
16   A. Yes.
17   Q. Was Jeanne Endo responsible for accounting
18 for and giving reports to you and to Gary Rodrigues
19 with respect to whether Mr. Hewitt was making the
20 regular payments that were required on the loan to
21 Best Rescue?
22   A. No. She reported that kind of business
23 directly to Mr. Rodrigues.
24   Q. But it was her responsibility to keep track
25 of those investments and to report if there were any

Page 58

1 problems with those investments, was it not?
2    A. Or other staff that Gary assigned for that
3 purpose.
4    Q. But isn't it true that Ms. Endo was the
5 person who had the responsibility of keeping track of
6 investments of this sort in that time period?
7    A. Not necessarily, sir.
8    Q. Irrespective of who specifically was
9 responsible, was it the duty of that person who had
10 the responsibility to report if there were any
11 failures of the company to make proper payments on
12 return for the loans?
13    A. Counsel, to that question I would respond in
14 the affirmative, but I'm not certain in -- with
15 regards to this investment as to whom Mr. Rodrigues
16 assigned that specific project or responsibility.
17    Q. Have you spoken personally with all of the
18 trustees who were on the board of trustees of the
19 mutual aid fund trust back in the time frame 1998,
20 1999 to determine what exactly happened that led up
21 to the investment of funds in Best Rescue?
22    A. Could you ask that question -- can I --
23    Q. Yes. Have you personally spoken to all of
24 the trustees who were on the board in that period of
25 time when the initial investment decisions were made

Page 59

1 with respect to Best Rescue?
2    A. No.
3    Q. Are you aware of any of those trustees who
4 are prepared to testify that they are the ones who
5 actually made the decision to invest monies in Best
6 Rescue?
7    A. No.
8    Q. If any of those trustees were to tell you
9 that, that they, as board members, made the actual
10 decisions, would that affect your determination as to
11 whether or not Mr. Rodrigues should be sued in this
12 lawsuit?
13    MR. PRICE: Objection. Assumes facts.
14 Improper hypothetical.
15    You may answer.
16    A. My response to that question, Counsel, would
17 be no.
18    Q. BY MR. SEITZ: Why?
19    A. Again, I testified to it. If the trustees
20 did make the decisions with regards to Best Rescue,
21 it was based upon the advice, evaluation, report,
22 communication, recommendation of Mr. Rodrigues and --
23 and again, based on the very, very high regard and
24 confidence and trust that each of those trustees had
25 with Mr. Rodrigues and their view that he was doing

Page 60

1 the best that he could for the MAF and its
2 beneficiaries, that the decision, if made, when made
3 would have been based upon that and rubber-stamping
4 his recommendation.
5    Q. When was it first known to the UPW that the
6 investment of mutual aid fund trust funds in Best
7 Rescue was not a good investment? Do you know?
8    MR. PRICE: Objection. Overbroad. Calls
9 for speculation.
10    Q. BY MR. SEITZ: When did anybody at UPW know,
11 to your best knowledge, when this particular
12 investment was not working out?
13    A. I believe it would be the administrator.
14    Q. Okay. But in what time frame?
15    A. I wouldn't -- I would -- that would be
16 speculation.
17    Q. Do you know when the lawsuit was first filed
18 against Mr. Hewitt?
19    A. Again, based on review of exhibits and my
20 own declaration, in latter part of 2003.
21    Q. That was the lawsuit in this case.
22    A. Mm-hm.
23    Q. Do you know when a lawsuit was filed against
24 Mr. Hewitt?
25    A. 2000?

Page 61

1    Q. Okay. So certainly by that time, by 2000 --
2    A. And Counsel, that's just a guess on my part
3 again.
4    Q. Okay. Let's assume for the purposes of this
5 question that the lawsuit against Mr. Hewitt was
6 filed in 2000. Is it fair, then, to assume that by
7 that time, the UPW was on notice that this was not an
8 investment that was proceeding successfully? Is that
9 fair to say? Otherwise they wouldn't have sued him,
10 right?
11    A. Yes.
12    Q. Do you know when Mr. DeCosta was substituted
13 in as the proper plaintiff in this case?
14    MR. PRICE: Objection as to form.
15    Q. BY MR. SEITZ: Do you know when he first
16 became the plaintiff in this case?
17    MR. PRICE: Same objection.
18    A. Not specifically, Counsel.
19    Q. BY MR. SEITZ: Well, are you aware that that
20 was just earlier this year, 2007?
21    A. Perhaps.
22    Q. Are you able to give us any explanation why
23 it took from 2000, when UPW probably was on notice of
24 the problems with respect to this investment, until
25 2007 for a proper plaintiff to bring a claim against

Page 58 - Page 61

**Page 62**

1  Mr. Rodrigues?
2      MR. PRICE: Objection as to form.
3  Argumentative.
4      Q. BY MR. SEITZ: Do you have any --
5      A. I don't know the technicalities of these
6  legal proceedings, so no.
7      MR. SEITZ: Just give me one minute. I
8  think I may be done.
9      Q. BY MR. SEITZ: The meeting that I referred
10 to earlier that occurred in 2004, the minutes
11 indicate that Chip Uwaine was present, also, as a
12 staff representative?
13     A. Yes, he was.
14     Q. Did Mr. Uwaine participate in the discussion
15 at all?
16     A. I don't recall him being involved in any of
17 the discussion, but he was present.
18     Q. Since you have served as administrator for
19 the mutual aid fund trust, have you made
20 recommendations to the board of trustees with respect
21 to various courses of action and decisions?
22     A. Yeah. Yes.
23     Q. Has there ever been an occasion when they
24 have rejected any of your recommendations?
25     A. I can't recall. I don't believe so.

**Page 63**

1      Q. Does that indicate to you that the trustees
2  generally have confidence in the advice and
3  recommendations that you're giving them?
4      A. Yes, but not as a stand-alone.
5      Q. What do you mean by that?
6      A. As I testified earlier, I have made it a
7  part of the MAF program, a part of leadership for
8  those decision makers to provide them with education
9  through our outside, external auditors, with legal
10 counsel, with professional consultants to provide
11 them with their obligations as members -- trustees of
12 this trust, their responsibilities, the standards of
13 decision making, and -- and so on. So I believe that
14 the -- well, there is a -- hopefully that's the case,
15 a level of trust and confidence; that it is not
16 unlimited, it is not -- it is with restriction and,
17 like, no guarantee.
18     Q. Mr. Rodrigues hired investment consultants,
19 correct?
20     A. Yes.
21     Q. He had auditors prepare audits and reports
22 of those audits every year, correct?
23     A. Yes.
24     Q. Those were all available to the trustees, as
25 well, correct?

**Page 64**

1      A. They were made available. And the first
2  time the trustees would have the opportunity to
3  review that material was at the day of the meeting.
4      Q. But they did have the opportunity to review
5  them and ask questions if they chose to?
6      A. They did have an opportunity during that
7  meeting to review.
8      Q. If questions were not answered during the
9  course of the meeting, they had the opportunity
10 subsequently to raise questions, as well; isn't that
11 correct?
12     A. That could have been done, but that wasn't
13 the case.
14     MR. SEITZ: I have no further questions.
15 Thank you.
16     (Concluded: 11:47 a.m.)
17
18
19
20
21
22
23
24
25

**Page 65**

1  STATE OF HAWAII                    )
2  CITY AND COUNTY OF HONOLULU )
3      I, JOAN IZUMIGAWA, Notary Public in and for the
4  State of Hawaii, CSR No. 136, do hereby certify:
5      That on Tuesday, October 16, 2007, at 9:42 a.m.,
6  appeared before me DAYTON NAKANELUA, the witness
7  whose deposition is contained herein; that prior to
8  being examined, he was duly sworn to tell the truth,
9  the whole truth, and nothing but the truth in his
10 deposition;
11     That the deposition was reported by me in machine
12 shorthand at the time and place stated herein and was
13 thereafter reduced to writing under my supervision;
14 that the foregoing is a true and correct transcript
15 of the proceedings had.
16     I further certify that I am not attorney for any
17 of the parties hereto nor in any way interested in
18 the outcome of the pending cause.
19     Dated this _____ day of October 2007 at
20 Honolulu, Hawaii.
21
22
23     _____
24     Notary Public, State of Hawaii
25     My commission expires: August 18, 2010

De Costa v. Rodrigues                    Multi-Page™                    Dayton Nakanelua
                                                                    October 16, 2007

Page 66

1    I, DAYTON NAKANELUA, do hereby certify that I
2  have read the foregoing pages 1 through 64,
3  inclusive, and corrections, if any, were noted by me,
4  and the same is now a true and correct transcript of
5  my testimony.
6    Dated this _____ day of _____,
7  2007.
8
9         _____
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  Deposition taken:  October 16, 2007

Page 67

1        IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF HAWAII
3  DeCosta v. Rodrigues
4  Civil No. 03-00598 DAE/LEK
5  In Re:  Deposition of DAYTON NAKANELUA
6  Date Taken:  October 16, 2007
7  PAGE  LINE       CORRECTION      REASON
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20
21 _____       _____
22    Signature of witness      Date
23 Please be advised that the deponent signed the
24 deposition on _____ with the above-noted
25 corrections.

**POWERS & ASSOCIATES (808)536-2001**