1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

STEVEN DE COSTA, in his          ) Civil No.
representative Capacity as       ) 03-00598 DAE/LEK
Chairperson of the Board of      )
Trustees of United Public        )
Workers, AFSCME, Local 646,      )
AFL-CIO, Mutual Aid Fund         )
Trust, Real Party in Interest    )
United Public Workers Union,     )
AFSCME, Local 646, AFL-CIO,      )
                                 )
            Plaintiffs,          )
                                 )
      vs.                        )
                                 )
GARY W. RODRIGUES,               )
                                 )
            Defendant.           )
_____ )


DEPOSITION OF STEVEN DE COSTA
Taken on behalf of Defendant Gary W. Rodrigues at
the Law Office of Eric A. Seitz, 820 Mililani
Street, Suite 714, Honolulu, Hawaii, commencing at
9:30 a.m. on September 28, 2007, pursuant to
Notice.


Before:   WILLIAM T. BARTON, RPR, CSR NO. 391


EXHIBIT 5

Page 2

```
 1  APPEARANCES:
 2      For Plaintiff
            CHARLES A. PRICE, ESQ.
 3          Koshiba Agena & Kubota
            Suite 2600, Pauahi Tower
 4          1003 Bishop Street
            Honolulu, Hawaii 96813
 5          (808) 523-3900
 6      For Defendant
        Gary W. Rodrigues
 7          ERIC A. SEITZ, ESQ.
            820 Mililani Street, Suite 714
 8          Honolulu, Hawaii 96813
            (808) 533-7434
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                I N D E X
 2  EXAMINATION                      Page
    By Mr. Seitz                     4
 3
    STEVEN DE COSTA
 4  Deposition Exhibits              Marked
    1   Administrative Services Agreement  18
 5  2   May 23, 2004 Minutes         28
    3   May 12, 1994 letter          35
 6
 7
```
```
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

1    (Disclosure presented to Counsel.)
2         STEVEN DE COSTA,
3  Called as a witness by Defendant Gary W.
4  Rodrigues, having been first duly sworn, was
5  examined and testified as follows:
6         EXAMINATION
7  BY MR. SEITZ:
8    Q. Please state your full name.
9    A. Steven L. DeCosta.
10   Q. And Mr. DeCosta, what is your residence
11 address?
12   A. 128 Muluniu Avenue, Kailua, Hawaii.
13   Q. Have you ever had your deposition taken
14 before?
15   A. No.
16   Q. I'm sure your attorney has gone over
17 with you what happens in a deposition. But I just
18 need to go over a couple things for the record, to
19 make sure that it's clear that you've understood,
20 okay?
21   A. Yes.
22   Q. First of all, you understand the
23 testimony you're giving this morning is under
24 oath, correct?
25   A. Yes.

Page 5

1    Q. And as you're doing, we need to get
2  audible responses from you because the court
3  reporter is writing everything down.
4         So please continue to answer out loud as
5  opposed to gestures or nods or uh-huh
6  (affirmative), something like that, because then
7  the record will not be clear. Okay?
8    A. Okay.
9    Q. Also we want to make it easier for the
10 court reporter by not having more than one person
11 speak at a time. So I will wait until you finish
12 your answer. And I would appreciate if you would
13 wait until I finish my question before you answer,
14 that way it will be easier for him to get a
15 complete record.
16   A. All right.
17   Q. You will be given an opportunity to read
18 a transcript of these proceedings. And to make
19 any changes that you feel are necessary.
20        However, you have to understand that if
21 you choose to make any changes, that somebody
22 later can comment upon the fact that you changed
23 your testimony. Do you understand that?
24   A. Yes.
25   Q. And also, so that we get as good a

Page 6

1 record here as possible, I want to ask you to
2 please do not attempt to answer any question that
3 you don't understand.
4        So if I ask you a question which is
5 unclear, ask me to repeat it. If you don't
6 understand, I want to make sure before you answer
7 that you have understood what it is I'm asking,
8 okay?
9        A. Yes.
10       Q. If you need to take a break at any time,
11 we can do that. I don't imagine I will be more
12 than about two hours but I may even be less than
13 that. We'll see, all right?
14       A. Okay.
15       Q. What have you done to prepare for this
16 deposition? And by that I mean, first of all,
17 have you reviewed any documents or any records?
18       A. No.
19       Q. You've looked at nothing?
20       A. No.
21       Q. Did you speak with your attorney to
22 prepare for the deposition? Mr. Price?
23       A. Mr. Price? We went over. We didn't go
24 over extensively.
25       Q. I'm not going to ask you what you talked

Page 7

1 about. But you spoke with him?
2        A. Yes.
3        Q. Other than Mr. Price, did you talk with
4 anybody else about this deposition or about what
5 was going to happen here?
6        A. No.
7        Q. Would you please briefly tell me what
8 your educational background is, starting from high
9 school?
10       A. I graduated from Kailua High School in
11 1971. Then '71 to '73 I went to Honolulu
12 Community College. And then right after that I
13 went to the UH for six months. Then I think I
14 went back to school in the eighties for another
15 two years and went back to Honolulu Community
16 College.
17       Q. Along the way did you receive any
18 certificates or degrees?
19       A. Yes.
20       Q. What certificates or degrees?
21       A. Two year degree from Honolulu Community
22 College and another degree from Honolulu Community
23 College, electrical work.
24       Q. Okay. Both of them were in the
25 electrical field?

Page 8

1        A. No, one was just an associate of arts.
2        Q. And tell me how are you currently
3 employed?
4        A. I'm with the State Department of
5 Transportation. I'm at the Airport Maintenance
6 Division.
7        Q. How long have you worked with the
8 Airport Maintenance Division?
9        A. Fourteen years.
10       Q. And what is your position there?
11       A. I'm an electrician one.
12       Q. Prior to working at the airport for the
13 Airport Maintenance Division, how were you
14 employed?
15       A. I was with -- I was an electrical field,
16 in the contracting field with, I think was the HEW
17 union, Hawaii Electrical Workers.
18       Q. And when did you first become a member
19 of the UPW if you recall?
20       A. I started in 1975.
21       Q. What were you doing at that time?
22       A. I was working for the state at the state
23 hospital in Kaneohe.
24       Q. And have you maintained your membership
25 in UPW even though you were working outside state

Page 9

1 employment?
2        A. No, 19 -- in the, I think it was '82,
3 '84 I got out. I went to construction. Went
4 back to school.
5        Then in the last 14 years, whatever date
6 that was, that I went back to the union with the
7 state.
8        Q. When was the first time you held any
9 position with the union as a union steward or any
10 other position?
11       A. That's back in the 1970s. I was a shop
12 steward.
13       Q. And what other positions other than shop
14 steward have you held?
15       A. Shop steward, chief steward. Been on
16 Oahu division board. State Executive Board for
17 UPW.
18       Currently I'm on the -- I'm the UPW
19 state president. I'm also with the AFL-CIO
20 Executive Board.
21       Q. When did you first serve on the State
22 Executive Board of UPW?
23       A. Say about ten years ago. Roughly give
24 or take a few years, about ten years ago.
25       Q. Approximately 1997, 1998?

Page 10

1  A. Yes.
2  Q. And who chose you or elected you to be
3  on the State Executive Board?
4  A. The members. The members vote for us.
5  Q. So you were elected by the Oahu
6  division?
7  A. Yeah. The Oahu -- members of the island
8  of Oahu.
9  Q. And have you been on the Executive Board
10 consistently since you were first elected in about
11 1997, 1998?
12 A. Yes.
13 Q. And now you are the president; is that
14 correct?
15 A. Yes.
16 Q. Prior to being president have you held
17 any other offices on the Executive Board?
18 A. No.
19 Q. When were you elected president?
20 A. Four years ago.
21 Q. And who was the president just prior to
22 you?
23 A. I think it was his name was George
24 Yasumoto.
25 Q. And prior to George Yasumoto do you

Page 11

1  know who the president was?
2  A. Adaline Uhrle.
3  Q. When does your term as president
4  expire?
5  A. It's a three year term. So I was just
6  elected. This is my first year. So I believe
7  2009.
8  Q. So this is actually your second term --
9  first year of your second term; is that correct?
10 A. Yes.
11 Q. You also hold a position with a Mutual
12 Aid Fund Trust; is that correct?
13 A. Yes, sir.
14 Q. When did you first hold any position
15 with the Mutual Aid Fund Trust?
16 A. I believe it was this term.
17 Q. And when were you selected to be on the
18 Board of Trustees of the trust?
19 A. It comes automatically when you're the
20 state president. You become the Chairperson of
21 this committee.
22 Q. You've been the Chairperson since you
23 were first elected president?
24 A. Yes. Which is three years ago.
25 Q. Okay. Prior to being placed on the

Page 12

1  board of the Mutual Aid Fund Trust, had you had
2  any contact or familiarity with that entity? Did
3  you know anything about it?
4  A. When I'm on a state executive board.
5  Q. And how did you hear about the Mutual
6  Aid Fund Trust prior to being on the actual Board
7  of Trustees?
8  A. It's a thing that our members can sign
9  up to be MAF member. I think it's $1, $2 dollars
10 a month that you can put in from your paycheck,
11 and you can receive whatever benefits from the MAF
12 trust.
13 Q. Do you know when the trust was
14 established?
15 A. Not offhand.
16 Q. Do you know who was involved in
17 establishing it when it was first started?
18 A. No.
19 Q. What is the purpose of the Mutual Aid
20 Fund Trust?
21 A. The Mutual Aid Fund Trust deals with a
22 lot of hospitalization of our members.
23 Hospitalization. And they go into the hospital
24 and then after -- it allows you, I think $25, $30
25 per day it pays you from this trust.

Page 13

1  Q. Is it a voluntary participation?
2  A. Yes, it's voluntary.
3  Q. Prior to becoming the chairman of the
4  Board of Trustees, did anybody give you any
5  instructions or guidance as to what your duties
6  would be?
7  A. To be the Chairperson of this MAF?
8  Q. Yes.
9  A. Offhand -- the Chairperson comes with
10 the position of being a state president. So I
11 just -- we have an agenda, and we just conduct it
12 in the meeting.
13 Q. Did anyone ever give you any directions
14 or instructions or guidance about what it means to
15 be a trustee?
16 A. Offhand, no, I don't remember.
17 Q. Prior to becoming the Chairperson of the
18 Mutual Aid Fund Trust, had you ever been a trustee
19 of any organization before?
20 A. No.
21 Q. Do you know what the term "fiduciary"
22 means?
23 A. I've heard about it, yes.
24 Q. What is your understanding, as you sit
25 here today, about what that term means?

Page 14

1    A. Well, it was mentioned it was a
2 fiduciary -- everybody on the board has a
3 fiduciary responsibility about conducting the
4 meetings and the legality of it all, the legal
5 part of the paperwork and so forth.
6    Q. And do you know to whom you owe that
7 duty or obligation?
8    A. To our members.
9    Q. Have you ever received any instruction
10 of any sort from any lawyers or anybody else as to
11 what it means to be a fiduciary?
12    A. I believe we went through over it in a
13 couple of the meetings, but offhand I can't tell
14 you if we met with a lawyer or not.
15    Q. Have you ever read any of the documents
16 that formed the basis for the Mutual Aid Fund
17 Trust, the trust documents themselves?
18    A. Not recently.
19    Q. Did you read them at one time?
20    A. I can't remember.
21    Q. Do you know if they were provided to you?
22    A. The minutes of the meeting of the --
23    Q. Not the minutes but the trust documents
24 themselves.
25    A. I can't remember.

Page 15

1    Q. How often does the Mutual Aid Fund Trust
2 meet?
3    A. Maybe once every two to three months.
4 Usually after our general meeting. State
5 Executive Board meeting.
6    Q. And how many members are there on the
7 Mutual Aid Fund Trust board?
8    A. There's VPs from the different islands.
9 I think maybe from six to eight members.
10    Q. And when the Mutual Aid Fund Trust
11 meets, who actually conducts the meetings?
12    A. I do.
13    Q. And who prepares the agenda?
14    A. Our state director.
15    Q. And so that's Dayton Nakanelua?
16    A. Yes.
17    Q. Does anyone else provide any kind of
18 staffing function for the Mutual Aid Fund Trust?
19    A. You're asking does he bring in any other
20 staffing?
21    Q. Yes.
22    A. Usually, our administrative director of
23 the business office comes in.
24    Q. And who is that?
25    A. Jeanne Endo.

Page 16

1    Q. As long as you have been on the board,
2 has Jeanne Endo been attending meetings and coming
3 in as well?
4    A. Yes.
5    Q. In addition to those two people, you
6 also have an accountant who does regular audits;
7 is that correct?
8    A. Yes.
9    Q. And provides regular written audit
10 reports?
11    A. Yes.
12    Q. Are those distributed to the members of
13 the board?
14    A. Yes.
15    Q. And do you read them?
16    A. Yes.
17    Q. When you have a -- typically, when you
18 have a meeting of the board of the Mutual Aid Fund
19 Trust, what kind of items are on the agenda? What
20 do you discuss?
21    A. We discuss that account, and how much is
22 in there and where the money went to and how much
23 is left, and so forth.
24    Q. And do you vote on any matters?
25    A. Yes.

Page 17

1    Q. What kinds of matters do you vote on?
2    A. Whatever is on the agenda. I don't know
3 offhand.
4    Q. Since you've been the president, how
5 long, typically, is a meeting of the Board of
6 Trustees of the Mutual Aid Fund Trust?
7    A. I'd say about an hour.
8    Q. Since you've been there, have there ever
9 been any recommendations that have been brought to
10 the board by the state director, which the board
11 has rejected?
12    A. Offhand I can't remember. I can't
13 recall.
14    Q. Is it your impression, as you sit here
15 today, that when the state director makes
16 recommendation the board normally goes along with
17 it?
18    A. Well, with the information -- it's a
19 real democratic process. Everybody is allowed to
20 give their input, and so forth. And there's --
21 like I said, what are -- they are going to decide
22 on whatever information that is put upon them.
23 But it's a real open process.
24    Q. You were not on the Mutual Aid Fund
25 Trust Board of Directors, Board of Trustees when

Page 14 - Page 17

Page 18

1 Gary Rodrigues was the state director; is that
2 correct?
3    A. Yes, I wasn't on there.
4    Q. But you were on the Executive Board at
5 that time?
6    A. Yes.
7    Q. Are you aware of some agreement between
8 the Mutual Aid Trust and the UPW by which the UPW
9 provides staff to the Trust? Are you aware of any
10 such agreement?
11    A. No.
12    Q. Let me show you what I'm going to ask
13 the court reporter to mark as Exhibit 1 for the
14 purpose of this deposition.
15      (Whereupon, an Administrative Services
16 Agreement was marked as Exhibit 1 for
17 Identification.)
18    Q. Let me put this one before you. That
19 is the one we're going to have the court reporter
20 include in the record.
21      I want to ask you after you look at
22 that, is that a document that you've ever seen
23 before?
24    A. Not that I know of, no.
25    Q. Do you know if the Mutual Aid Fund Trust

Page 19

1 pays any money to UPW on a regular basis for
2 administrative services provided to the Trust by
3 UPW?
4    A. No.
5    Q. You're not aware?
6    A. No, I'm not aware.
7    Q. Do you know when Mr. Nakanelua or Ms.
8 Endo or any of her staff provides services to the
9 trust, whether the trust compensates them for the
10 time and expenses that they incur?
11    A. I don't think so. No. Because they are
12 part of the UPW staff.
13    Q. Is it your understanding that the UPW
14 staff provides services to the Trust without the
15 UPW being compensated for those services? Is that
16 your understanding?
17    A. I believe so it is.
18    Q. Look if you would at this document,
19 Exhibit 1 at section 2.
20    A. Section 2, okay.
21    Q. And it talks about an administrator of
22 the entity to which this refers which is the
23 United Public Workers Mutual Aid Trust.
24      And I want to ask you if, based upon
25 your experience, if Mr. Nakanelua does all of

Page 20

1 these things which are listed in section 2?
2      (Pause.)
3    A. What was your question again?
4    Q. My question to you is does this section,
5 A through I, describe in your experience what Mr.
6 Nakanelua does as the administrator for the fund?
7 Does he do all those things?
8    A. Offhand I can't tell you yes or no.
9    Q. Okay. Who handles the money that the
10 fund administers?
11    A. Our business office. And they have --
12 they have an account with a certain bank or
13 whatever that holds the account.
14    Q. And do you know who writes checks on
15 those funds?
16    A. When a person -- how it works when a
17 person takes out from the MAF, he has to bring
18 hospital documents from the doctor. Then he gets
19 reimbursed so many days from the business office.
20 The business office cuts the checks.
21    Q. Let me ask you about investments. If
22 some portion of the money from the Mutual Aid Fund
23 Trust is going to be invested and the board agrees
24 to a particular investment, who actually writes
25 the check?

Page 21

1    A. I don't know.
2    Q. Do you know whether the checks have to
3 be countersigned by any of the trustees?
4    A. I'm not sure. I don't know.
5    Q. Do you know if Dayton Nakanelua or
6 Jeanne Endo are allowed to write checks on funds
7 belonging to the Mutual Aid Fund Trust by
8 themselves?
9    A. I don't know. I can't answer that.
10    Q. When you make an investment decision as
11 a board currently under your leadership as the
12 chairman, can you describe for me the process by
13 which that decision is made?
14    A. What happens is the -- it brings up to
15 the MAF. And then we make -- we act on the
16 information that's given to us. And we vote on it.
17      Then after we take it -- we -- the next
18 thing we take it to the State Executive Board for
19 the final approval.
20    Q. Is it your understanding that investment
21 decisions pertaining to funds belonging to the
22 Trust have to be approved by the State Executive
23 Board?
24    A. Yes.
25    Q. And has that been going on as long as

Page 22

1 you can remember?
2    A. Under the new administration.
3    Q. When Mr. Rodrigues was there, were
4 decisions made by the Board of Trustees of the
5 Mutual Aid Fund Trust taken to the Executive Board
6 for approval?
7    A. I don't remember.
8    Q. What kind of information do you as a
9 board receive, speaking now about the Mutual Aid
10 Fund, what kind of information do you receive
11 about prospective investments to assist you in
12 making decisions?
13    A. Well, like I -- we haven't -- like I
14 say, we haven't really moved the money around, the
15 MAF. Usually it just stays there for our
16 employees, state, and city, county employees.
17    Q. So since you've been on the board there
18 have been no investment decisions. Is that fair
19 to say?
20    A. I don't remember any.
21    Q. Are you familiar with a person by the
22 name of Albert Hewitt?
23    A. I heard that name. But I'm not really
24 familiar with him.
25    Q. When you were on the Executive Board did

Page 23

1 you ever receive any reports or any information
2 about Mr. Hewitt?
3    A. I heard about his name. We might
4 have. But offhand, no. But I've heard about Mr.
5 Hewitt.
6    Q. Do you know anything about the process
7 by which Mr. Hewitt came to handle certain monies
8 for UPW and/or for the Mutual Aid Fund Trust?
9    A. No.
10    Q. Do you have any knowledge about any
11 decisions that were made with respect to an
12 investment of funds in an entity called Best
13 Rescue?
14    A. No.
15    Q. You were not on the board when any
16 investments were made?
17    A. I wasn't a -- the Mutual Aid. I was
18 just on the state executive.
19    Q. Going back down to your service on the
20 State Executive Board, do you recall any
21 discussion at any time about an entity by the name
22 of Best Rescue?
23    A. I might have. But offhand I couldn't
24 remember the date. I would have to check that
25 previous meetings of the State Executive Board.

Page 24

1 But offhand, no.
2    Q. As you sit here today, you don't have
3 any clear recollection of anything other than some
4 familiarity with that name?
5    A. I heard about the Best Rescue and Mr.
6 Hewitt but offhand I couldn't tell you the dates
7 and times.
8    Q. As a member of the Board of Trustees of
9 the Mutual Aid Fund, did you ever discuss and make
10 decisions about suing Gary Rodrigues?
11    A. Right now?
12    Q. Yes. For this lawsuit. Were you ever
13 involved in any discussions about whether to sue
14 Gary Rodrigues?
15    A. I believe we talked about it as being
16 part of the Mutual Aid.
17    Q. And as you sit here today, can you tell
18 me why Gary Rodrigues is being sued by the Mutual
19 Aid Fund Trust?
20    A. I believe he was the state director at
21 the time that the money was invested.
22    Q. And what did he do or fail to do, as you
23 understand it, that would make him liable for a
24 lawsuit?
25    A. I'm not sure. I'm not a lawyer. I

Page 25

1 couldn't answer that.
2    Q. When the decision was made to sue Gary
3 Rodrigues, was there ever any discussion about
4 suing the trustees who were on the board when any
5 investment decisions were made for which Gary
6 Rodrigues is now being sued?
7    A. Not that I know of, no.
8    Q. Do you know of any reason why only Gary
9 Rodrigues was sued?
10    A. No.
11    Q. Are you familiar with a settlement that
12 was reached in connection with some of the matters
13 pertaining to this litigation with Mr. Hewitt or
14 his insurance company?
15    A. I might have heard about it. But I'm
16 not sure about the amount or dates and times.
17    Q. Did you ever vote whether to accept a
18 settlement?
19    A. I don't remember.
20    Q. When Mr. Rodrigues left his position as
21 state director, who was responsible for operating,
22 for the day to day operations and administration
23 of the Mutual Aid Fund Trust?
24    A. We were put on administrative shift by
25 our parent union.

Page 26

1   Q. And that's AFSCME; is that correct?
2   A. Yes.
3   Q. And do you know what the legal basis
4   was for taking over the Mutual Aid Fund Trust as
5   opposed to the local union itself?
6   A. No.
7   Q. Did anyone ever receive any
8   justification or authority from the union,
9   national union, for taking over the Mutual Aid
10  Fund Trust as opposed to administering UPW local
11  union itself?
12  A. No, sir.
13  Q. During the period of time that the
14  Mutual Aid Fund Trust was taken over and
15  administered by AFSCME, who was responsible
16  for operating the Mutual Aid Fund Trust, do you
17  know?
18  A. Usually the business office handles all
19  those transactions. But usually it depends on the
20  member. He brings in his paperwork and if -- once
21  he gets reimbursed he has to have all his
22  paperwork in order. Then he gets reimbursed by
23  the business office.
24      Whether that account was put on hold
25  under the receivership, I don't know. I wasn't

Page 27

1   part of the MAF group.
2   Q. When was the board reinstated, the Board
3   of Trustees of the Mutual Aid Fund Trust, when
4   were they reinstated after the receivership? Do
5   you know?
6   A. I think we were on the receivership for
7   about a year.
8   Q. When the board was reinstated were you
9   then on the board at that time, from the time that
10  it was reinstated?
11  A. That was after our state elections, I
12  believe.
13  Q. What was after your state elections?
14  A. After when we had our state elections
15  and the top officers were elected, asked them --
16  well, after that we were taken off the
17  administratorship.
18  Q. You were already the president of UPW
19  and then by virtue of that position, the
20  Chairperson of the Mutual Aid Fund Trust when
21  control over that entity was turned back to the
22  local union. Is that fair to say?
23  A. That's usually how it works, yes.
24  Q. When the responsibility for the Mutual
25  Aid Fund Trust was turned back to the union, was

Page 28

1   there ever a lawsuit pending against Mr. Rodrigues
2   in this case?
3   A. I'm not sure. I cannot tell you.
4   Q. Do you have any recollection of anyone
5   ever sitting down with the board and briefing you
6   on the decisions that had been made to sue Mr.
7   Rodrigues?
8   A. I believe we went through that when I
9   was part of the MAF.
10  Q. And what were you told? What is your
11  recollection about what you were told?
12  A. That we were trying to receive some of
13  this money back.
14  Q. And were you given any information as to
15  why you were trying to receive it back from Mr.
16  Rodrigues?
17  A. Well, that's been a few years ago. I
18  can't remember offhand.
19  Q. Let me ask the court reporter to mark
20  this, please, as Exhibit 2.
21      (Whereupon, May 23, 2004 Minutes were
22  marked as Exhibit 2 for Identification.)
23  Q. Let me ask you first, please, to look
24  at that document which consists of three pages,
25  and tell me if it is a document that you

Page 29

1   recognize?
2       (Pause.)
3   A. All right. Yeah, I recognize it.
4   Q. What is that document?
5   A. It's part of the MAF meeting at the Ala
6   Moana Hotel.
7   Q. To the best of your knowledge, is this a
8   true and accurate copy of the minutes of the
9   meeting that was conducted on May 23, 2004?
10  A. I believe it is.
11  Q. And at that time on May 23, 2004 was the
12  individual whose signature appears here the
13  secretary who was responsible for keeping the
14  minutes?
15  A. Yes.
16  Q. And you were the president; is that
17  correct?
18  A. Yes, sir.
19  Q. Now, if you look down at item 3 it
20  indicates that Jeanne Endo and Chip Uwaine were
21  both also present; is that correct?
22  A. Usually they are at our meetings, the
23  two of them.
24  Q. If you look at the next item, paragraph
25  4, it says, "state director." Is that referring

Page 30

1  to Dayton Nakanelua?
2    A. So where are you at?
3    Q. The first page. Item 4, A. It says,
4  "state director."
5    A. Yes.
6    Q. That's referring to Dayton?
7    A. Yes, sir.
8    Q. Presumably, what that means is that
9  Dayton was handling these items on the agenda; is
10 that correct?
11   A. Yeah.
12   Q. So the first item was some item having
13 to do with the high degree of responsibility of
14 trustees; is that correct?
15   A. Yes.
16   Q. Can you amplify or explain to me what
17 was discussed under that topic?
18   A. I can't remember offhand. Just -- well,
19 from looking at it, it's just that -- he's just
20 telling us the responsibilities of being part of
21 the MAF group, the board.
22   Q. Okay. Then if you would look down at
23 number 7. It says, "litigation."
24   A. Yes.
25   Q. "UPW versus Gary Rodrigues." That's

Page 31

1  this case; is that correct?
2    A. Yes.
3    Q. And it says under there, "$1.1 million
4  loan to Best Rescue system." Do you see that
5  there?
6    A. Yes.
7    Q. Do you remember what Mr. Nakanelua
8  reported to the board when he talked about that
9  particular loan?
10   A. No, I don't remember.
11   Q. It says here that the "loan was approved
12 without due diligence (risky company) by former
13 trustees." Do you see that?
14   A. Yes.
15   Q. What did Mr. Nakanelua say about that?
16   A. I don't remember.
17   Q. Did you ever ask?
18   A. I might have. But like I said, this is
19 2004. We're in 2007 right now. I can't remember.
20   Q. Well, let me ask you this, Mr. DeCosta.
21 If in fact the loan was approved without due
22 diligence, that it was a risky company, and that
23 that action was taken by the former trustees, why
24 aren't they being sued?
25   A. I'm not sure. I couldn't say.

Page 32

1    Q. Then he goes on to say under this topic
2  item 3, "former trustees approved $1.1 million as
3  uncollectible."
4      Do you see that?
5    A. Yes.
6    Q. Do you know who those former trustees
7  were?
8    A. I believe he's talking about the former
9  trustees on the MAF board.
10   Q. Do you know who any of them were?
11   A. Offhand, no. I mean I could, yeah, I
12 could tell you the former state president was part
13 of the -- was one of the trustees.
14   Q. That's George Yasumoto?
15   A. Yeah, and usually it's all the VPs from
16 the different islands are part of the MAF board.
17   Q. Are there any members of the Board of
18 Trustees now, of the Mutual Aid Fund, who were
19 previously on the board when Gary Rodrigues was
20 there?
21   A. I believe private sector Alison Leong
22 is still part of that.
23   Q. How about George Yasumoto?
24   A. No.
25   Q. Anybody else?

Page 33

1    A. I believe she is the only one offhand.
2    Q. Was Alison Leong, according to these
3  minutes, was she present at this particular
4  meeting?
5    A. It seems like it because she approved
6  the agenda.
7    Q. And then you look at under 7 at b, do
8  you see that?
9    A. 7b.
10   Q. "Motion made to affirmatively ratify the
11 Administrator's decision to file the action
12 against Rodrigues and approve the continuation of
13 the litigation."
14     Do you see that?
15   A. Yes.
16   Q. Who made that motion, do you know?
17   A. No, I don't remember.
18   Q. If you look down below it says, "Yvonne
19 Gaspar, motion. Second --
20   A. Angel Santiago."
21   Q. Does that indicate that they made the
22 motion and seconded it respectively?
23   A. Yes.
24   Q. And then it was carried. Do you see
25 that?

Page 34

1    A. Yes.
2    Q. Do you know if Alison Leong voted on
3 that particular motion?
4    A. I'm not sure.
5    Q. There is no indication that she recused
6 herself, is there?
7    A. Yes, there is no.
8    Q. Did you vote on that particular motion?
9    A. Usually we'll vote but it doesn't
10 signify that I did or not.
11    Q. Do you recall voting to ratify the
12 actions to continue the lawsuit?
13    A. No.
14    Q. You don't recall. Do you recall any
15 reasons that were given why anybody voted to
16 ratify the decision to continue the lawsuit
17 against Mr. Rodrigues?
18    A. I believe they voted because they wanted
19 to see if they could have the money -- get
20 recovery of some of this $1.1 million.
21    Q. As you sit here today, do you have any
22 knowledge or any reason to believe that Gary
23 Rodrigues had any responsibility for the
24 investment that went bad that is the subject
25 matter of this lawsuit?

Page 35

1    A. Only that he was the state director at
2 the time. Are you finished with this one?
3    Q. Yes. You are now the named plaintiff in
4 this case; is that correct?
5    A. Yes.
6    Q. When were you first approached to
7 become the named plaintiff?
8    A. A few months back.
9    Q. And what is your understanding about why
10 you are the named plaintiff?
11    A. Something about it was legally that they
12 couldn't have all these people on that. I would
13 be, since I'm the Chairperson of the committee.
14    Q. Prior to the time when you were
15 actually named as the lead plaintiff in this case
16 or named plaintiff, had there ever been any
17 discussion about naming you as the plaintiff
18 previously?
19    A. No.
20    Q. Let me then lastly show you what I'm
21 going to have the court reporter to mark as
22 Exhibit 3.
23    (Whereupon, a May 12, 1994 letter was
24 marked as Exhibit 3 for Identification.)
25    (Pause.)

Page 36

1    Q. Have you had a chance to look at it?
2    A. Just briefly.
3    Q. Have you ever seen this letter before?
4    A. I don't remember. I don't think so.
5    Q. Do you know who the author of the letter
6 is, Larry Weinberg?
7    A. Yes, I've met Mr. Weinberg. He's part
8 of AFSCME.
9    Q. He's the general counsel?
10    A. Yes.
11    Q. You've never seen this letter, to the
12 best of your recollection?
13    A. No.
14    Q. Is one of the things that Mr. Weinberg
15 does is to give legal advice to UPW and in this
16 case to the Mutual Aid Fund Trust? Is that what
17 his duties include?
18    A. I'm not sure. But we've used the
19 services in the past. Because they are our parent
20 union.
21    Q. You've used his services for what kinds
22 of things in the past?
23    A. He's come to our meetings, our state
24 convention meetings.
25    MR. SEITZ: Okay, Mr. DeCosta. I think

Page 37

1 I'm done. Thank you.
2    (Deposition concluded at 10:15 a.m.)

**POWERS & ASSOCIATES (808)536-2001**

Page 38

1    I, STEVEN DE COSTA, hereby certify that
2 I have read the foregoing typewritten pages; and
3 corrections, if any, were noted by me; and the
4 same is now an accurate and complete transcript of
5 my testimony.
6
7         Dated at_____Hawaii
8         this_____day of_____, 2007
9
10        _____
11        STEVEN DE COSTA
12
13
14 Signed before me this_____day
15 of_____, 2007.
16
17 _____
18 Witness to Deponent's Signature
19
20
21
22 Steven De Costa, et al. vs. Gary W. Rodrigues
23 Civil No. 03-00598 DAE/LEK, September 28, 2007
24 by William T. Barton, RPR, CSR.
25

Page 39

1         CERTIFICATE
2 STATE OF HAWAII      )
3                      )   SS.
4 COUNTY OF HONOLULU )
5    I, WILLIAM T. BARTON, RPR, Certified
6 Shorthand Reporter, State of Hawaii, do hereby
7 certify that on September 28, 2007 at 9:30 a.m.
8 there appeared before me STEVEN DE COSTA, the
9 witness whose deposition is contained herein; and
10 that prior to being examined was duly sworn; that
11 I am neither counsel for any of the parties
12 herein, nor interested in any way in the outcome
13 of this action;
14    That the deposition herein was by me taken
15 down in machine shorthand and thereafter reduced
16 to print via computer-aided transcription under my
17 supervision; that the foregoing represents a
18 complete and accurate transcript of the testimony
19 of said witness to the best of my ability.
20    Dated this 2nd day of October 2007 at
21 Honolulu, Hawaii.
22
23 _____
23    WILLIAM T. BARTON, CSR No. 391
24    Notary Public, State of Hawaii
25    My Commission expires August 7, 2009