1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

STEVEN DE COSTA, in his ) Civil No.
representative Capacity as ) 03-00598 DAE/LEK
Chairperson of the Board of )
Trustees of United Public )
Workers, AFSCME, Local 646, )
AFL-CIO, Mutual Aid Fund )
Trust, Real Party in Interest )
United Public Workers Union, )
AFSCME, Local 646, AFL-CIO, )
)
            Plaintiffs, )
)
      vs. )
)
GARY W. RODRIGUES, )
)
            Defendant. )
_____ )

DEPOSITION OF GEORGE YASUMOTO
Taken on behalf of Defendant Gary W. Rodrigues at
the Law Office of Eric A. Seitz, 820 Mililani
Street, Suite 714, Honolulu, Hawaii, commencing at
2:20 p.m. on September 28, 2007, pursuant to
Notice.

Before:    WILLIAM T. BARTON, RPR, CSR NO. 391

EXHIBIT __6__

Page 2

```
1   APPEARANCES:

2       For Plaintiff
            CHARLES A. PRICE, ESQ.
3           Koshiba Agena & Kubota
            Suite 2600, Pauahi Tower
4           1003 Bishop Street
            Honolulu, Hawaii 96813
5           (808) 523-3900

6       For Defendant
        Gary W. Rodrigues
7           ERIC A. SEITZ, ESQ.
            820 Mililani Street, Suite 714
8           Honolulu, Hawaii 96813
            (808) 533-7434

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
1               I N D E X

2   EXAMINATION                    Page
    By Mr. Seitz                    4
3
    GEORGE YASUMOTO
4   Deposition Exhibits            Marked
    6    Declaration of George Yasumoto    14
5
```

Page 4

1   (Disclosure presented to Counsel.)
2        GEORGE YASUMOTO,
3   Called as a witness by Defendant Gary W.
4   Rodrigues, having been first duly sworn, was
5   examined and testified as follows:
6        EXAMINATION
7   BY MR. SEITZ:
8        Q. Please state your full name.
9        A. George M. Yasumoto.
10       Q. And Mr. Yasumoto, what is your current
11  residence address?
12       A. 1524 Pensacola Street, Apartment 315.
13       Q. Honolulu 968 --
14       A. -- 22.
15       Q. Have you ever had a deposition taken
16  before?
17       A. Yes.
18       Q. How many times?
19       A. I think twice.
20       Q. Okay. I'm sure then from that
21  experience, and from whatever discussion you've
22  had prior to today, that you're aware of the
23  procedures that we follow at a deposition. But
24  let me, just so the record is clear, make sure you
25  understand certain things.

Page 5

1        First of all, do you understand that the
2   testimony you're giving today is under oath?
3        A. Yes.
4        Q. And I know you appreciate the fact that
5   we want to have a clear record. So for that
6   purpose I want you to continue to answer audibly
7   rather than with nods of the head or gestures so
8   we make sure we have an accurate record of what
9   your answers are, okay?
10       A. Okay.
11       Q. I will attempt to wait until you finish
12  your answers before I speak, and I'd like to
13  request that you also wait until I finish my
14  questions before you try to answer them so that we
15  only have one person speaking at a time because
16  that makes it easier for the court reporter.
17       A. Okay.
18       Q. Also, I want to make sure that you
19  understand the question. So if I ask you a
20  question that you don't understand, please ask me
21  to restate it or repeat it, and do not answer any
22  questions unless you fully understand them. Okay?
23       A. Okay.
24       Q. You will be given an opportunity, if you
25  choose to, to read a transcript of the testimony

Page 6

1 that you give today and to make corrections or
2 changes.
3       However, I need to advise you that if
4 you make any changes, somebody can later comment
5 upon that fact. Do you understand?
6    A. Okay.
7    Q. And last, I think we'll probably be
8 about two hours. If you need to take a break at
9 any time, let me know. We can go off the record.
10 If you want to just consult with counsel or if you
11 want to just get up and walk around, need to go to
12 the bathroom or whatever, we can do that. Just
13 let us know and we'll stop, and then we'll
14 continue again when you're ready, okay?
15    A. Okay.
16    Q. Would you please tell me. You say
17 you've had two prior depositions. When was the
18 most recent of those? How long ago?
19    A. I think it was in May.
20    Q. And in what kind of a case or matter was
21 that?
22    A. I believe it was this case.
23    Q. Okay. Now, we haven't taken your
24 deposition in this case, that I'm aware of. Who
25 was present at that deposition with you?

Page 7

1    A. Charlie Price.
2    Q. Anybody else?
3    A. I don't remember.
4    Q. And somebody --
5    A. Must have been somebody who took like
6 you.
7    Q. Somebody took live testimony from you on
8 that occasion?
9    A. Yes.
10    Q. And what did you testify about?
11    A. You'll have to ask me the questions --
12    Q. What were the subject matters, as best
13 you can recall?
14    A. About if we did the -- the MAF trustees
15 did --
16    Q. It had to do with the workers' Mutual
17 Aid Fund?
18    A. Mutual Aid Fund.
19    Q. Was this a deposition that was taken at
20 Mr. Price's office?
21       MR. PRICE: Let me interrupt one second.
22       (Whereupon, the witness and counsel
23 conferred.)
24    Q. Let's go back on the record. Is your
25 memory now a little refreshed as to at least the

Page 8

1 matter you initially talked about? That was just
2 a meeting with counsel?
3    A. Yes.
4    Q. Have you ever had a time when you've
5 been sworn in like you have been today, and you
6 testified with a court reporter present on any
7 other occasion?
8       If you don't recall, that's fine.
9    A. I don't recall.
10    Q. Okay. Would you tell me what your
11 educational background is?
12    A. High school.
13    Q. Where did you graduate from high school?
14    A. McKinley.
15    Q. What year was that?
16    A. 1964.
17    Q. Did you go on and obtain any education
18 beyond high school?
19    A. No.
20    Q. In preparation for this particular
21 deposition, did you look at any materials or read
22 anything?
23    A. Counsel showed me minutes of previous
24 Mutual Aid minutes.
25    Q. Anything else that you remember?

Page 9

1    A. That's all.
2    Q. Do you remember a declaration that you
3 made, a sworn statement, in this case?
4    A. Oh, yeah, okay.
5    Q. Did he go over that with you as well?
6    A. Yes.
7    Q. Okay. Anything else that you looked at
8 to prepare for the deposition?
9    A. No.
10    Q. Did you talk to anybody before you came
11 to this deposition, other than Mr. Price?
12    A. No.
13    Q. Did you talk to Dayton?
14    A. No.
15    Q. How are you currently employed? Are you
16 currently employed?
17    A. Yes.
18    Q. Where?
19    A. State of Hawaii Maui Hospital under
20 HHSC.
21    Q. How long have you been at the hospital
22 there?
23    A. Thirty-five years.
24    Q. What is your job?
25    A. I'm the building maintenance working

Page 6 - Page 9

Page 10

1 supervisor.
2    Q. How long have you been a member of the
3 UPW?
4    A. Thirty-five years.
5    Q. Ever since you've had a job with the
6 state?
7    A. Yes.
8    Q. What positions have you held in the UPW?
9    A. Steward, chief steward. Which changed
10 to Chairperson. And then it went back to chief
11 steward.
12       Oahu division -- a member of the Oahu
13 Division Board which is part of the State
14 Executive Board. State secretary/treasurer, and
15 president.
16    Q. Do you hold a position with UPW now?
17    A. No -- only steward. Chief steward.
18    Q. You no longer are on the State Executive
19 Board?
20    A. No.
21    Q. When did you serve as president?
22    A. I forget what year it was. But it was
23 a very, very short period. Only a couple of
24 months.
25    Q. Was that after the international union

Page 11

1 had taken over the local union and restored it?
2    A. Just prior to.
3    Q. Just prior. So were you serving as
4 president when Gary Rodrigues was still State
5 Director?
6    A. Yes.
7    Q. And that was just for some period of a
8 few months?
9    A. Yes.
10    Q. Prior to serving as president, when did
11 you serve as secretary/treasurer?
12    A. About '91 or '93.
13    Q. For how long did you serve as secretary/
14 treasurer?
15    A. Until just prior to the few months
16 before becoming president.
17    Q. So is it fair to say that you were the
18 secretary/treasurer in 1988 and 1999?
19    A. Yes.
20    Q. What were your duties as secretary/
21 treasurer of the union?
22    A. Take minutes and sign checks.
23    Q. Did you also sign checks for the Mutual
24 Aid Fund Trust?
25    A. Meaning?

Page 12

1    Q. As secretary/treasurer of UPW, did you
2 also sign checks for Mutual Aid Fund Trust?
3    A. I don't remember signing any. But I
4 think that would be part of my duties.
5    Q. Do you know in that period of time,
6 1998, 1999, who it was that would sign checks for
7 the Mutual Aid Fund Trust?
8    A. It would be Gary, Ada, and me.
9    Q. Gary, you, and --
10    A. Ada.
11    Q. Adaline Uhrle?
12    A. Yes.
13    Q. Did they have to be signed by multiple
14 signatures?
15    A. I believe it was two.
16    Q. When did you first become a trustee of
17 the Mutual Aid Fund Trust?
18    A. I think about the same time that I
19 became state secretary/treasurer.
20    Q. That would have been in the early 1990s?
21    A. Yes.
22    Q. When you became a member of the Board of
23 Trustees of the Mutual Aid Fund Trust, were you
24 given any orientation or instruction as to what
25 your duties were?

Page 13

1    A. No.
2    Q. Did anyone ever tell you what it meant
3 to be a trustee?
4    A. No.
5    Q. Did anyone ever tell you what it meant
6 to be a fiduciary?
7    A. No.
8    Q. When you became a member of the Board of
9 Trustees of the Mutual Aid Fund Trust, do you
10 remember who was the president at that time?
11    A. I think it was Ada.
12    Q. Did Ada ever talk to you about what your
13 responsibilities were as a member of that trust?
14    A. No.
15    Q. Did you have an understanding of what
16 the duties of a trustee were?
17    A. No.
18    Q. Did you understand what it meant to be a
19 fiduciary?
20    A. No.
21    Q. When you were on the Board of Trustees
22 of the Mutual Aid Fund Trust, was it your
23 understanding that Gary Rodrigues also was a
24 trustee?
25    A. Yes.

**Page 14**

1   Q. Did he vote on matters pertaining to the
2 trust?
3   A. I don't think he voted.
4   Q. Do you recall if he ever made motions or
5 seconded motions?
6   A. He made the recommendations.
7   Q. But he never made motions, did he?
8   A. I don't believe so.
9   Q. Why do you believe that he was a trustee?
10   A. I don't -- because he headed everything
11 in -- everything that we discussed came through
12 him.
13   Q. Let me show you what I have previously
14 marked here, in depositions we had earlier, as
15 Exhibit 1. Let me ask you to look at that
16 document, if you would. And let me know when
17 you're finished.
18      (Pause.)
19      (Whereupon, a declaration of George
20 Yasumoto was marked as Exhibit 6 for
21 Identification.)
22   Q. Have you had a chance to look at
23 Exhibit 1?
24   A. Yes.
25   Q. Have you ever seen it before today?

**Page 15**

1   A. No.
2   Q. Were you aware at any time that there
3 was some sort of an agreement between UPW and the
4 Mutual Aid Fund Trust by which UPW would be
5 reimbursed for the staff expenses that were
6 provided to it by UPW staff?
7   A. I don't understand the question.
8   Q. Well, the Mutual Aid Fund Trust did not
9 have its own staff, did they?
10   A. No.
11   Q. They relied upon UPW staff to do the
12 work of the fund; is that correct?
13   A. Uh-huh, yes.
14   Q. And the people, as far as you know, who
15 did most of that work were Gary Rodrigues,
16 correct?
17   A. Yes.
18   Q. And Jeanne Endo; is that right?
19   A. Believe so.
20   Q. And for some period of time, Dwight
21 Takeno; is that right?
22   A. I believe so.
23   Q. There may have been others as well as
24 that did work --
25   A. I don't know.

**Page 16**

1   Q. But you know those people did work.
2      Do you know how they were reimbursed
3 for the time they spent working on matters
4 pertaining to the Mutual Aid Fund Trust?
5   A. No.
6   Q. Were you aware that the Mutual Aid Fund
7 Trust would reimburse UPW for the value of their
8 services that were expended on matters pertaining
9 to the Mutual Aid Fund Trust? You're not aware of
10 that?
11      In other words, when they would work on
12 -- although they were UPW employees, UPW would be
13 reimbursed when they worked on matters pertaining
14 to the trust. Were you aware of that?
15      MR. PRICE: Objection. Assumes facts.
16   Q. Do you understand what I'm saying?
17   A. No.
18   Q. Okay. The UPW is a separate entity from
19 the Mutual Aid Fund Trust; is that correct?
20   A. Yes.
21   Q. So if people worked for the Mutual Aid
22 Fund Trust and performed services for them, were
23 they ever paid by the Mutual Aid Fund Trust?
24   A. I don't know.
25   Q. As secretary/treasurer did you ever see

**Page 17**

1 any checks that were made out from the Mutual Aid
2 Fund Trust to UPW to reimburse UPW for services
3 that were provided to the trust?
4   A. I don't remember.
5   Q. Did you see the budgets for the Mutual
6 Aid Fund Trust every year?
7   A. I never really looked at it.
8   Q. Did you see the accounting reports --
9   A. No.
10   Q. Do you remember that there were audits
11 done every year?
12   A. Yes.
13   Q. Did you read those audits?
14   A. No.
15   Q. Let me ask you then with respect to the
16 Mutual Aid Fund Trust, do you know when that
17 entity was established?
18   A. No.
19   Q. Do you know how it was established?
20   A. No.
21   Q. Have you ever seen the documents by
22 which it was created?
23   A. No.
24   Q. What is the purpose of the Mutual Aid
25 Fund Trust?

De Costa v. Rodrigues                    Multi-Page™                    George Yasumoto
September 28, 2007

Page 18

1    A. I really don't know. All I know is Gary
2 said that you're the secretary for this trust, and
3 just take minutes.
4    Q. Okay. Did you attend meetings?
5    A. Yes.
6    Q. How often were the meetings held?
7    A. Rarely.
8    Q. Were they held every year?
9    A. I think so.
10    Q. Were they held more than once a year?
11    A. I'm not sure.
12    Q. When the meetings would be held, of the
13 Mutual Aid Fund Trust, how long did those meetings
14 last?
15    A. They could last maybe a minute. It
16 could last three to five. But it was really fast.
17    Q. So from one minute to three to five
18 minutes?
19    A. Sometimes I just got out my notebook and
20 the meeting was over.
21    Q. And what took place at those meetings
22 back in the nineties?
23    A. All I remember is elections. People
24 electing people for the positions of chair,
25 secretary.

Page 19

1    Q. Was there ever any discussion about how
2 to invest monies?
3    A. How to invest monies?
4    Q. The monies of the Mutual Aid Fund Trust.
5    A. For instance?
6    Q. Was there ever any discussion that we
7 wanted to put money into a certain bank account or
8 invest it into a certain stock?
9    A. Bank account? I think bank account.
10    Q. Was there ever any discussion about
11 hiring a financial advisor?
12    A. Yes.
13    Q. When did that take place?
14    A. I don't remember.
15    Q. Where were the monies that belonged to
16 the Mutual Aid Fund Trust held?
17    A. I don't know.
18    Q. Were they invested in some sort of
19 interest bearing accounts?
20    A. I believe so.
21    Q. But you don't know?
22    A. I don't remember.
23    Q. Did you ever meet a person by the name
24 of Albert Hewitt?
25    A. No.

Page 20

1    Q. Did you ever hear his name?
2    A. Yes.
3    Q. And do you have an understanding of who
4 Albert Hewitt is?
5    A. Yes.
6    Q. Who is he?
7    A. He invested money, I think. I forgot.
8    Q. Whose money did he invest?
9    A. Financial advisors. I forgot what it
10 was.
11    Q. Let me show you what we have previously
12 marked as Exhibit 4. And let me ask you if you'd
13 look at this, please, for a minute.
14        (Pause.)
15    A. I don't remember this. But that's my
16 signature.
17    Q. You don't recall Exhibit 4?
18    A. No.
19    Q. Do you know what it is?
20    A. It's --
21    Q. Let me ask you, first of all, just what
22 the document is? Do you recognize this as being
23 minutes for a meeting of the Mutual Aid Fund
24 Trust?
25    A. Yes.

Page 21

1    Q. That occurred on June 21, 1994?
2    A. That's what it says.
3    Q. And look at the last page. Do you see a
4 signature there?
5    A. That's what I said. That's my signature.
6    Q. Okay. And normally, when you were on
7 the board as the secretary, did you prepare the
8 minutes?
9    A. No.
10    Q. Who prepared the minutes?
11    A. I don't know.
12    Q. Did you sign them and approve them?
13    A. Yes.
14    Q. And did you ever sign any minutes that
15 were not accurate?
16    A. Well, I had a lot of questions if it
17 was. But they said if it's not, then Gary
18 wouldn't pass it.
19    Q. Did you ever sign anything which you
20 knew to be inaccurate?
21    A. If I knew positively it was inaccurate?
22 No.
23    Q. Somebody else would type out the minutes
24 and then give them to you to sign?
25    A. Yes.

Page 18 - Page 21

POWERS & ASSOCIATES (808)536-2001

**De Costa v. Rodrigues**

George Yasumoto
September 28, 2007

Page 22

1  Q. Would you read them before you signed
2 them?
3  A. Usually.
4  Q. And is this particular document in the
5 normal form of the minutes for those meetings at
6 that time period?
7  A. I believe so.
8  Q. If you would look at paragraph number 8
9 on this particular exhibit, Exhibit 4.
10   Do you see that that pertains to an
11 investment to be processed through the Hewitt
12 Company? Do you see that?
13  A. Uh-huh (affirmative).
14  Q. Is that a yes?
15  A. I see it.
16  Q. And do you recall that there was a
17 discussion on June 21, 1994 at which time there
18 was a recommendation to invest funds of the Mutual
19 Aid Fund with Mr. Hewitt's company?
20  A. I don't remember.
21  Q. Do you see down below in that paragraph
22 it says "M/S/C"? Do you see that?
23  A. Uh-huh.
24  Q. Yes?
25  A. Yes.

Page 23

1   MR. PRICE: Just as a reminder, you have
2 to answer with a yes instead of uh-huh
3 (affirmative) to help the court reporter.
4   THE DEPONENT: I'm sorry.
5  Q. What does that mean, "M/S/C"?
6  A. Somebody made a motion, somebody
7 seconded.
8  Q. In this case the motion was made, as
9 indicated by the minutes, by Frank Rapoza?
10  A. Yes.
11  Q. Was Frank Rapoza a trustee?
12  A. I believe so at the time.
13  Q. It would have been seconded by Joe
14 Rodrigues?
15  A. Yes.
16  Q. And C means that the motion was carried;
17 is that right?
18  A. Yes.
19  Q. If these minutes are correct, does that,
20 in fact, state that on June 21, 1994 a decision
21 was made by the trustees to authorize the
22 investment of $500,000 with the Hewitt Company?
23  A. I guess.
24  Q. Do you remember how you voted on that
25 motion?

Page 24

1  A. I don't vote.
2  Q. You never voted?
3  A. I never did vote. Gary told me all my
4 job was just to take the minutes.
5  Q. You never voted?
6  A. I never voted.
7  Q. Did you ever voice objections?
8  A. No.
9  Q. Did you ever ask questions?
10  A. No. If I did, I would ask him if he'll
11 let me know about something ahead of time before
12 the meeting, then I would ask those questions at
13 that time.
14  Q. Let me also show you what we have
15 previously had marked as Exhibit 3. Would you
16 please take a look at that.
17   (Pause.)
18  A. Okay.
19  Q. Have you had a chance to look at that
20 exhibit?
21  A. Yes.
22  Q. Have you ever seen it before today?
23  A. No.
24  Q. You notice that this document, Exhibit 3
25 is signed by a man by the name of Larry Weinberg?

Page 25

1  A. Yes.
2  Q. Do you know who Larry Weinberg is?
3  A. He was chief counsel for international.
4  Q. And have you ever met Mr. Weinberg?
5  A. Yes.
6  Q. Do you have any recollection that this
7 letter was given to the trustees of the fund back
8 in 1994 when there was a discussion about
9 investing monies?
10  A. No.
11  Q. When did you first hear of any
12 investment in a company by the name of Best Rescue?
13  A. About 1999.
14  Q. In the declaration that you prepared,
15 that you signed in connection with this case, you
16 state that the first time Mr. Rodrigues told the
17 board about investing in Best Rescue Systems was
18 in 1999.
19   On what do you base that statement?
20  A. I don't know. Just popped into my head.
21  Q. Okay. Do you not remember -- strike
22 that.
23   Let me put the question this way.
24   You have no recollection of attending a
25 board meeting at which the board was asked to

Page 22 - Page 25

Page 26

1  authorize that particular investment; is that fair
2  to say?
3     A. Authorize?  No.
4     Q. You never attended a meeting at which
5  that happened before the money was invested; is
6  that correct?
7     A. I don't remember anything like that.
8     Q. Okay.  Are you saying that you don't
9  remember?  Or are you saying categorically that it
10 didn't happen?
11    A. I don't remember.
12    Q. Have you talked to any of the other
13 trustees who were on the board at that time to see
14 if they remember whether that issue was discussed
15 prior to the investment being placed?
16    A. No.
17    Q. Do you remember the names of some of the
18 other trustees who were on the board with you back
19 in 1998?
20    A. From what you showed me, it must have
21 been Frank Rapoza, Joe Rodrigues, and Harold
22 Moniz.
23    Q. Okay.  Have you talked to Harold Moniz
24 to ask him whether he recalls --
25    A. No.

Page 27

1     Q. -- authorizing that investment?
2     A. No.
3     Q. Do you remember the name of a trustee
4  from Kauai who was on the board at that time?
5     A. I don't know who he was.
6     Q. Was Alison Leong on the board at that
7  time?
8     A. I believe so.
9     Q. When did you step down from the Mutual
10 Aid Fund Board of Trustees?
11    A. 2001, 2002.
12    Q. And that was the last time you served as
13 a trustee?
14    A. Yes.
15    Q. Were you involved in any discussions
16 about suing Gary Rodrigues over this matter of the
17 investment in Best Rescue?
18    A. No.
19    Q. Do you know why he was sued?
20    A. Do I know why?
21    Q. Yes.
22    A. No.
23    Q. Do you know what he did or failed to do
24 which warrants suing him?
25       MR. PRICE: Objection to the extent it

Page 28

1  calls for a legal conclusion.
2     Q. Just any facts.  Do you know of any
3  factual reasons why Gary Rodrigues should be sued
4  because he did something wrong or he failed to do
5  something that he should have done?
6        MR. PRICE:  Same objection.
7        (Pause.)
8     A. I don't know how to answer that.
9     Q. Well, as you sit there today, do you
10 personally know of anything that Gary Rodrigues
11 did that caused that particular investment to go
12 sour?
13       MR. PRICE:  Objection.  Same objections
14 as before.
15    A. I don't know how to answer that either.
16    Q. Okay.  I'm not sure I asked you this
17 earlier.  But let me ask you just to be sure.  Did
18 you ever meet Al Hewitt?
19    A. No.
20    Q. Did he ever come and personally report
21 to the State Executive Board while you were a
22 member?
23    A. I don't remember seeing the guy.  I
24 remember his name.
25    Q. Do you remember seeing any reports that

Page 29

1  he prepared as to his investment activities on
2  behalf of UPW or the Mutual Aid Fund Trust?
3     A. I don't think so.
4     Q. Were you aware that Mr. Hewitt, in
5  addition to doing work for the Mutual Aid Fund
6  Trust, was also handling investments for the UPW
7  pension fund?
8     A. Yes.  I remember that.
9     Q. Were you ever aware of any criticisms of
10 Mr. Hewitt's work as an investment advisor in
11 connection with the pension funds?
12    A. No.
13    Q. Are you aware that the pension funds
14 made a good return on their investments under Mr.
15 Hewitt's --
16    A. That's what Gary reported.
17    Q. Did you have any information to doubt
18 that is what happened?
19    A. No.
20    Q. With respect to the Mutual Aid Fund
21 Trust, where does the money come from that goes
22 into that trust?
23    A. It's one dollar -- I don't know if it
24 still is, one dollar per member or per family
25 member.  And if the family member landed in the

Page 26 - Page 29

Page 30

1 hospital, per day I think it was -- I forgot how
2 much it was. It was a certain amount of money.
3    Q. So the money was contributed by the UPW
4 members themselves?
5    A. Members, yes.
6    Q. And was it contributed through a payroll
7 deduction system?
8    A. Yes.
9    Q. So in the case of state employees, did
10 the state deduct that money and then pay it into
11 the fund?
12    A. I believe so.
13    Q. Was there ever any discussion that you
14 recall, that because the state was collecting and
15 paying the money, that those funds could not be
16 regulated by the federal government? Was there
17 ever any discussion about that?
18    A. I don't remember.
19    Q. Do you know what an ERISA fund is?
20    A. No. But I've heard about it.
21    Q. Do you know if the Mutual Aid Fund Trust
22 was an ERISA fund?
23    A. I'm not sure.
24    Q. Did you also sit on a state board that
25 dealt with deferred compensation?

Page 31

1    A. Yes.
2    Q. Who appointed you to that board?
3    A. I believe it was Gary.
4    Q. In fact,weren't you appointed by
5 Governor Cayetano? Wasn't it the governor that
6 had to make that appointment?
7    A. I guess. I don't know. I guess Gary
8 made the recommendation then.
9    Q. What did that board do? What was its
10 work?
11    A. Look over investments. And if companies
12 went bad the board would vote to, I guess, give
13 that company a chance.
14    Q. And these investments that you're
15 talking about, those were investments of state
16 funds that are held by the state as deferred
17 compensation for state employees; is that correct?
18    A. I don't know.
19    Q. In any event, you were responsible as a
20 member of that board for overseeing the
21 investments of those monies; is that correct?
22    A. I guess.
23    Q. And you were a trustee on that board; is
24 that right?
25    A. Yes, yes.

Page 32

1    Q. And when you -- how long did you serve
2 on that board?
3    A. I think four years.
4    Q. And during the period of time that you
5 served on the board, there were a number of
6 investment issues that came before the board;
7 isn't that correct?
8    A. Yes.
9    Q. And they involved reports that were
10 provided by staff members and lawyers and
11 accountants; is that right?
12    A. I believe so.
13    Q. Did you read them?
14    A. Some.
15    Q. Did you make decisions and vote on the
16 issues that were brought to the board?
17    A. I just basically listened. Because
18 everybody else over there were white collar
19 accountants and higher up. I was a blue collar
20 worker. I didn't understand all that.
21    Q. Did you ask questions?
22    A. I asked some.
23    Q. Are you telling us that you didn't vote
24 on the matters that the board was asked to decide?
25    A. I probably did.

Page 33

1    Q. As a member of the Mutual Aid Fund Trust
2 did you receive regular audit reports from the
3 firm, the CPA firm, that prepared them for that
4 organization?
5    A. Could you repeat the question?
6    Q. Yes. Do you remember that there was a
7 CPA firm, Wachi & Watanabe, that prepared annual
8 audits of the Mutual Aid Fund Trust?
9    A. I don't remember. But they must have.
10    Q. Did you read those audits?
11    A. No.
12    Q. They were given to you, however; is that
13 correct?
14    A. Yes, yes.
15    Q. And you had the opportunity to read them?
16    A. Yes.
17    Q. When you went to meetings as a member of
18 the Board of Trustees and Gary or somebody else
19 made a report, were you given the opportunity to
20 ask questions?
21    A. No.
22    Q. Did Gary prevent questions from being
23 asked?
24    A. I don't think so. Nobody questioned him.
25    Q. But you had the opportunity to ask

De Costa v. Rodrigues                    Multi-Page™                     George Yasumoto
                                                                    September 28, 2007

---

Page 34

1 questions if you wanted to?

2    A. I guess, yes.

3    Q. And you decided not to?

4    A. No.

5    Q. When did you leave the Board of Trustees

6 of the Mutual Aid Fund Trust?  When was the last

7 time you served?

8    A. 2001 or 2002.  I don't know.  I don't

9 remember.

10    Q. Were you a member of the Board of

11 Trustees up to the point in time where it was

12 taken over by AFSCME?

13    A. Yes.

14    Q. And were you given any explanation by

15 AFSCME as to the basis or authority on which

16 AFSCME took over the Mutual Aid Fund Trust?

17    A. No.

18    Q. Did anyone ever question whether AFSCME

19 had the authority to take over the Mutual Aid Fund

20 Trust at that time?

21    A. Everybody was relieved of their duties.

22    Q. Did anybody challenge that decision to

23 relieve them?

24    A. I don't know.

25    Q. Did you challenge it in any way?

---

Page 35

1    A. No.

2    Q. Was it your belief that AFSCME had the

3 authority to take over the Mutual Aid Fund Trust

4 in addition to the UPW?

5    A. I never thought about it.

6    Q. When you were on the Mutual Aid Fund

7 Trust back in the time period of 1998, 1999, was

8 somebody by the name of Craig Yugawa also a

9 trustee?

10    A. I don't know if he was a trustee at the

11 time.

12    Q. Was he a trustee at any time when you

13 were also on the board?

14    A. Yes.

15    Q. And you remember that Alison Leong was a

16 trustee as well?

17    A. Yes.

18    MR. SEITZ:  Okay Mr. Yasumoto, I think

19 that I'm done.  Let me just ask you -- actually

20 let me just ask you to make sure.

21    Q. Let me show you what we've marked as

22 Exhibit 6.  This is your declaration which you

23 signed on the next page; is that correct?

24    A. Yes.

25    Q. And that is your signature?

---

Page 36

1    A. Yes.

2    Q. And you signed on the date indicated?

3    A. I believe so.

4    MR. SEITZ:  Okay.  I have no further

5 questions.

6    (Deposition concluded at 3:00 p.m.)

---

Page 37

1        I, GEORGE YASUMOTO, hereby certify that

2 I have read the foregoing typewritten pages; and

3 corrections, if any, were noted by me; and the

4 same is now an accurate and complete transcript of

5 my testimony.

6

7        Dated at_____Hawaii

8        this_____day of_____, 2007

9

10    _____

11    GEORGE YASUMOTO

12

13

14 Signed before me this_____day

15 of_____, 2007.

16

17 _____

18 Witness to Deponent's Signature

19

20

21

22 Steven De Costa, et al. vs. Gary W. Rodrigues

23 Civil No. 03-00598 DAE/LEK, September 28, 2007

24 by William T. Barton, RPR, CSR.

25

---

**POWERS & ASSOCIATES (808)536-2001**

De Costa v. Rodrigues

Multi-Page™

George Yasumoto
September 28, 2007

Page 38

```
 1            CERTIFICATE
 2  STATE OF HAWAII        )
 3                         )  SS.
 4  COUNTY OF HONOLULU  )
 5      I, WILLIAM T. BARTON, RPR, Certified
 6  Shorthand Reporter, State of Hawaii, do hereby
 7  certify that on September 28, 2007 at 2:20 p.m.
 8  there appeared before me GEORGE YASUMOTO, the
 9  witness whose deposition is contained herein; and
10  that prior to being examined was duly sworn; that
11  I am neither counsel for any of the parties
12  herein, nor interested in any way in the outcome
13  of this action;
14      That the deposition herein was by me taken
15  down in machine shorthand and thereafter reduced
16  to print via computer-aided transcription under my
17  supervision; that the foregoing represents a
18  complete and accurate transcript of the testimony
19  of said witness to the best of my ability.
20      Dated this 2nd day of October 2007 at
21  Honolulu, Hawaii.
22      _____
23      WILLIAM T. BARTON, CSR No. 391
24      Notary Public, State of Hawaii
25      My Commission expires August 7, 2009
```

POWERS & ASSOCIATES (808)536-2001