1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STEVEN DE COSTA, in his representative Capacity as Chairperson of the Board of Trustees of United Public Workers, AFSCME, Local 646, AFL-CIO, Mutual Aid Fund Trust, Real Party in Interest United Public Workers Union, AFSCME, Local 646, AFL-CIO,<br><br>    Plaintiffs,<br><br>    vs.<br><br>GARY W. RODRIGUES,<br><br>    Defendant. | Civil No. 03-00598 DAE/LEK |

DEPOSITION OF ALISON LEONG

Taken on behalf of Defendant Gary W. Rodrigues at the Law Office of Eric A. Seitz, 820 Mililani Street, Suite 714, Honolulu, Hawaii, commencing at 11:40 a.m. on September 28, 2007, pursuant to Notice.


Before:    WILLIAM T. BARTON, RPR, CSR NO. 391


EXHIBIT 1

**Page 2**

1  APPEARANCES:
2    For Plaintiff
         CHARLES A. PRICE, ESQ.
3        Koshiba Agena & Kubota
         Suite 2600, Pauahi Tower
4        1003 Bishop Street
         Honolulu, Hawaii 96813
5        (808) 523-3900
6    For Defendant
     Gary W. Rodrigues
7        ERIC A. SEITZ, ESQ.
         820 Mililani Street, Suite 714
8        Honolulu, Hawaii 96813
         (808) 533-7434

**Page 3**

1              I N D E X
2  EXAMINATION                    Page
   By Mr. Seitz                     4
3
   ALISON LEONG
4  Deposition Exhibits           Marked
   4    June 21, 1994 Minutes      18
5  5    Declaration of Alison Leong 36

**Page 4**

1       (Disclosure presented to Counsel.)
2            ALISON LEONG,
3  Called as a witness by Defendant Gary W.
4  Rodrigues, having been first duly sworn, was
5  examined and testified as follows:
6            EXAMINATION
7  BY MR. SEITZ:
8     Q. Would you please state your full name.
9     A. Alison W.N. Leong.
10    Q. And, Ms. Leong, have you ever had your
11 deposition taken before?
12    A. No.
13    Q. Would you also please give us your
14 current residence address?
15    A. 308 Bates Street, Honolulu, Hawaii
16 96817.
17    Q. I'm sure that Mr. Price has told you
18 what happens at a deposition. But there are
19 certain things I want to go over with you on the
20 record so that the record is clear that we
21 explained them to you.
22    A. Okay.
23    Q. The first thing is that you understand
24 that the testimony you are giving this morning is
25 under oath; is that correct?

**Page 5**

1     A. That's correct.
2     Q. Secondly, as you've been doing, please
3  continue giving audible responses. Because the
4  court reporter is trying to take everything down,
5  and if you nod or say uh-huh (affirmative) or
6  something like that, he can't get a clear
7  response. Okay?
8     A. Okay.
9     Q. Also if you would wait until I finish my
10 question before you answer. And I will give you
11 the same courtesy, and that way we can avoid
12 having two people speak at one time which also
13 makes it difficult for the court reporter, okay?
14    A. Okay.
15    Q. Also, please only answer a question that
16 I ask of you if you've understood it. So if I ask
17 you something that's not clear or you don't
18 understand, ask me to repeat it. Don't try and
19 guess at the question because that way we also
20 will not get the kind of accurate record that we
21 need. All right?
22    A. Okay.
23    Q. You will be given an opportunity after
24 the conclusion of this deposition, you will be
25 sent a notice that tells you that you can read

Page 6

1 your testimony in a transcribed form, and then you
2 can make any changes or corrections if you choose
3 to do so.
4       But you also need to know that if you do
5 make any changes or corrections, that somebody
6 later may comment upon the fact that you changed
7 your testimony. Do you understand that?
8    A. Yes.
9    Q. Lastly, let me just simply say that any
10 time you need to go off the record, you want to
11 confer with Mr. Price or take a break for any
12 reason, just let me know and we can tell the court
13 reporter to stop, and we can take a break. Okay?
14   A. Okay.
15   Q. I would estimate we'll be here for about
16 two hours, give or take. But, you know, if you
17 need a break at any time just let us know, okay?
18   A. Okay.
19   Q. First of all let me ask you, did you
20 look at any documents or records or anything at
21 all before coming here to prepare for this
22 deposition?
23   A. The declaration.
24   Q. It's your declaration?
25   A. Yes. And George Yasumoto's.

Page 7

1    Q. Other than those two declarations, did
2 you look at anything else?
3    A. No.
4    Q. I assume you had some conversation with
5 Mr. Price before you came here. Did you talk to
6 anybody else about the deposition and what was
7 going to happen here?
8    A. No.
9    Q. Would you please tell me what your
10 educational background is, starting from high
11 school.
12   A. Where? McKinley High School.
13   Q. You graduated from McKinley High School?
14   A. Yes.
15   Q. What year did you graduate?
16   A. 1967.
17   Q. And after high school did you go on with
18 your education?
19   A. Yes.
20   Q. What did you do next?
21   A. I went to Hawaii Loa College at that
22 time which became Hawaii Pacific University.
23   Q. How long did you attend Hawaii Loa?
24   A. Four years.
25   Q. Did you get a degree?

Page 8

1    A. I have a bachelors in social science.
2    Q. Do you remember what year you received
3 that?
4    A. 1971.
5    Q. And after Hawaii Loa College did you go
6 back to school and have any other further
7 education?
8    A. I have an accounting background.
9    Q. Where did you take accounting courses?
10   A. It was the Kenway School of Accounting.
11   Q. Did you get any kind of certificate of
12 any sort for that?
13   A. Yes.
14   Q. When did you do that?
15   A. I think it was for a year in 1972.
16   Q. And do you hold any license of any sort
17 to perform accounting work?
18   A. No.
19   Q. Tell me if you would, how are you
20 currently employed?
21   A. I'm employed at Kapiolani Medical Center
22 for Women and Children as a health records
23 representative.
24   Q. And how long have you been employed at
25 Kapiolani?

Page 9

1    A. Twenty-six years.
2    Q. And what jobs have you held there? Have
3 you held the same job there essentially?
4    A. No. I started off as a general office
5 clerk. Then went to medical records. And was a
6 health records clerk. And then a health records
7 representative.
8    Q. And tell me if you would, how long you
9 have been a member of the United Public Workers
10 union?
11   A. I believe about 15 years.
12   Q. Did you join in connection with your
13 employment at Kapiolani?
14   A. Yes.
15   Q. Are you still a member today?
16   A. Yes.
17   Q. Have you held any positions with the UPW
18 as far as shop steward or any kind of other
19 officers or positions?
20   A. Yes.
21   Q. What other positions have you held?
22   A. Shop steward, secretary, and vice
23 president.
24   Q. Do you hold a position now?
25   A. Yes.

### Page 10

1  Q. What is your current position?
2  A. Vice president of the private sector
3  division.
4  Q. In that capacity do you also serve on
5  the State Executive Board?
6  A. Yes.
7  Q. How long have you served on the State
8  Executive Board?
9  A. Let's see. Probably about, I'd say ten
10 years.
11 Q. So going back to approximately 1997?
12 A. Uh-huh (affirmative).
13 Q. Yes?
14 A. Yes.
15 Q. And you also serve as a trustee of the
16 Mutual Aid Fund Trust; is that correct?
17 A. Yes.
18 Q. How long have you served in that
19 capacity?
20 A. For the ten years.
21 Q. So you have served in both capacities
22 the same amount of time?
23 A. I'd say probably eight of the ten.
24 Q. Eight of the ten years?
25 A. As a trustee.

### Page 11

1  Q. Okay. So you've been a member of the
2  State Executive Board for longer than you've been
3  a trustee of the Mutual Aid Fund Trust?
4  A. Yes.
5  Q. So that would put your membership on the
6  board of the Mutual Aid Fund Trust at some time
7  around 1998 or 1997?
8  A. Yes.
9  Q. Excuse me, '98 or '99?
10 A. Yes.
11 Q. Do you remember more precisely when you
12 joined the board and the Mutual Aid Fund Trust?
13 A. No.
14 Q. When you became a member of the Mutual
15 Aid Fund Trust Board, who was on the board at that
16 time, if you can recall?
17 A. The names you want?
18 Q. Yes.
19 A. Joseph Rodrigues. Joe Vegas.
20 Q. How about George Yasumoto?
21 A. Yes. And Adaline.
22 Q. Adaline Uhrle?
23 A. Uhrle.
24 Q. Anybody else you can recall?
25 A. No.

### Page 12

1  Q. When you first joined the board of the
2  Mutual Aid Fund Trust, what did you know about
3  that organization?
4  A. We -- it wasn't -- I guess there wasn't
5  joining it, you know, that was part of the vice
6  president's duty to be on.
7  Q. Let me ask you this. When you first
8  became a member of the board, what information had
9  been conveyed to you about that particular
10 organization, the Mutual Aid Fund Trust? What did
11 you know about it?
12 A. That it was -- the purpose of the Mutual
13 Aid was to -- there were funds that members put
14 into. And the funds were to be used for the
15 purpose of reimbursement for medical claims.
16 Q. This was a voluntary program that was
17 offered to UPW members?
18 A. Yes.
19 Q. And what did you understand to be your
20 role and responsibility as a trustee?
21 A. To administer or to meet about the fund
22 that we had for the members, in the members'
23 interests.
24 Q. Did anyone ever give you any kind of an
25 orientation or instruction about what your

### Page 13

1  obligations were as a trustee?
2  A. Not that I can recall.
3  Q. Did you ever see the trust documents
4  themselves which set up the Mutual Aid Fund Trust?
5  A. Not that I can recall.
6  Q. Did anyone ever talk to you about what
7  it meant to be a fiduciary?
8  A. After late -- after Gary left we were
9  given classes or had presentations of what
10 fiduciary duties. We had lawyers come in and talk
11 to us.
12 Q. Who were those lawyers?
13 A. Oh, I can't recall the name.
14 Q. And what do you remember them telling
15 you?
16 A. That our duties were to look at reports.
17 And that we did have an obligation to the
18 membership.
19 Q. Okay. Was Gary Rodrigues a trustee?
20 A. At that -- my assumption is yes.
21 Q. So it's your belief, as you sit here
22 today, that when you joined the board, Gary
23 Rodrigues was the State Director, but he also was
24 a trustee?
25 A. Yes.

Page 14

1  Q. Who do you recall, when you joined the
2  board back in the late 1990s, was the
3  administrator for the -- to do the staff and
4  administrative work for the Mutual Aid Fund Trust?
5  A. Gary.
6  Q. Do you know any of the circumstances
7  under which he was compensated or UPW was paid for
8  services that he performed for the Mutual Aid Fund
9  Trust?
10 A. No.
11 Q. Have you ever seen an administrative
12 services agreement between UPW and the Mutual Aid
13 Fund Trust which governs the staff, that is
14 provided to the fund?
15 A. No.
16 Q. When you were starting out on the board
17 in whatever year in the late 1990s, who were the
18 staff people from the UPW who would come to
19 meetings?
20 A. Aside from Gary, it was -- I remember
21 Dwight being there.
22 Q. Dwight Takeno?
23 A. Yes.
24 Q. Anyone else?
25 A. I believe a secretary but I don't recall

Page 15

1  whom.
2  Q. Do you ever recall Jeanne Endo coming
3  back then?
4  A. No.
5  Q. How about Dayton Nakanelua?
6  A. No.
7  Q. If checks for funds belonging to the
8  Mutual Aid Fund had to be written, do you know who
9  was authorized to write checks back in the late
10 1990s?
11 A. No, I don't.
12 Q. Do you know the process by which it was
13 decided that monies would be expended or invested?
14 A. Could you repeat that?
15 Q. Do you know whether there was any
16 particular process by which decisions would be
17 made to expend or invest monies belonging to the
18 Mutual Aid Fund Trust?
19 A. Can you do it one more time?
20 Q. Sure. Was there any process that was
21 followed by the trustees to authorize the
22 expenditure or investment of monies?
23 A. No.
24 Q. Do you know who was authorized to write
25 checks?

Page 16

1  A. No.
2  Q. How often did the trustees of the Mutual
3  Aid Fund Trust meet?
4  A. It usually was after our State Executive
5  Board meetings which were normally quarterly.
6  Q. And typically, when you have a meeting
7  of the Board of Trustees of the Mutual Aid Fund
8  Trust, how long would that meeting take?
9  A. About 15 minutes.
10 Q. What would take place there?
11 A. We'd be given a booklet and review. And
12 Gary would say, this is what is happening or
13 happened.
14 Q. And in the booklet you would receive
15 annual audits; is that correct?
16 A. I can't recall. But, you know, it's
17 been a few years. So now we do. Whether at that
18 time I can't recall if that was -- there were some
19 financial reports.
20 Q. Would the board back then in the 1990s,
21 would you vote on matters?
22 A. Voted, yes. Yes.
23 Q. So if I understand correctly, Gary would
24 bring in a written report of some sort; is that
25 correct?

Page 17

1  A. It was typed.
2  Q. But it was Gary who would bring in that
3  report; is that right?
4  A. Into the booklet, yes.
5  Q. And that would be distributed to all the
6  trustees who were present, correct?
7  A. Correct.
8  Q. And there would be an opportunity to ask
9  questions about what was in the booklet?
10 A. Pretty much, yes.
11 Q. Have you ever heard of a person by the
12 name of Albert Hewitt?
13 A. Yes.
14 Q. Who is Albert Hewitt?
15 A. Our -- he was the investor for the some
16 kind of fire escape. I mean, his initial thing
17 was that Gary had told us that he is the fund, the
18 fund -- I can't remember what his title is
19 exactly.
20 Q. Were you aware that Albert Hewitt had
21 been providing financial advice to other unions
22 and organizations in Hawaii prior to having any
23 connection with the UPW?
24 A. No.
25 Q. Were you aware that Albert Hewitt was

Page 18

1  hired to provide consulting advice on the
2  investment of UPW pension funds?
3      A. Again, please.
4      Q. Were you aware that Albert Hewitt was
5  hired as a consultant to provide advice on the
6  investment of UPW pension funds?
7      A. Yes.
8      Q. And in addition to handling UPW pension
9  funds, Mr. Hewitt also was hired to provide
10 investment advice for the funds belonging to the
11 Mutual Aid Fund Trust. Are you aware of that?
12     A. Hired? I didn't know he was hired. I
13 just heard, you know, the name was given to us. I
14 didn't know there was any -- I mean as far as
15 hiring.
16     Q. Let me ask the court reporter to please
17 mark this --
18         MR. SEITZ: If you don't mind I will
19 mark these consecutive to the other.
20         (Whereupon, June 21, 1994 Minutes were
21 was marked as Exhibit 4 for Identification.)
22     Q. Ms. Leong, I'm going to show you what I
23 asked the court reporter to mark as Exhibit 4.
24 Would you just take a quick look at that, and then
25 I'm going to ask you some questions about it.

Page 19

1      A. Uh-huh (affirmative).
2         (Pause.)
3      Q. Have you had a chance to look at it?
4      A. Uh-huh (affirmative).
5      Q. Yes?
6      A. Yes.
7      Q. Is this a document that you've ever seen
8  before?
9      A. No.
10     Q. Now, if I were to represent to you that
11 these are minutes for a meeting of the Mutual Aid
12 Fund Trust trustees that was held on June 21,
13 1994, would you have any reason to disagree that
14 these are the minutes for such a meeting?
15        MR. PRICE: Objection. Lack of
16 foundation. You may answer.
17     Q. In other words, is there anything about
18 this document as you look at it, that suggests to
19 you that it is not what it purports to be?
20        MR. PRICE: Same objection.
21     A. No.
22     Q. If you look on page 2 you see the
23 minutes are signed by George Yasumoto, secretary.
24 Are you aware that George Yasumoto was the
25 secretary back in 1994?

Page 20

1      A. No.
2      Q. You're not aware of that?
3      A. No.
4      Q. Okay. Now, would you look at item
5  number 8 there on page 1. Were you aware back in
6  1994 that the Mutual Aid Fund Trust voted to place
7  investments of its funds with the Hewitt Company?
8      A. No.
9      Q. Okay. Let me then show you what I
10 previously have marked as Exhibit 3. And if you
11 would just take a quick look at that.
12        (Pause.)
13     Q. Have you had a chance to look at that?
14     A. Yes.
15     Q. Have you ever seen that exhibit before?
16     A. No.
17     Q. Do you know who the person is who wrote
18 that letter, Larry Weinberg?
19     A. He's the AFSCME attorney.
20     Q. Have you met Mr. Weinberg?
21     A. Not personally.
22     Q. But you're aware he's the general
23 counsel for the parent union, AFSCME, correct?
24     A. That's correct.
25     Q. To the best of your knowledge, you've

Page 21

1  never seen this particular exhibit, Exhibit 3
2  before?
3      A. No.
4      Q. Okay. When did you first hear of an
5  investment of Mutual Aid Fund Trust monies in an
6  entity known as Best Rescue?
7      A. I don't recall the exact date. But it
8  was in our meeting.
9      Q. And do you remember approximately when
10 that was?
11     A. No.
12     Q. Do you remember what you were told or
13 what you learned about Best Rescue when you first
14 heard that name?
15     A. Only that it was a company that was
16 going to manufacture these fire safety ladders or
17 something to that effect.
18     Q. Do you have any recollection that the
19 matter of an investment in Best Rescue was brought
20 to the Board of Trustees sometime in late 1998?
21     A. I'm not sure of that date. But I do
22 remember it.
23     Q. Do you recall that the board voted to
24 authorize the investment of Mutual Aid Funds in
25 Best Rescue?

Page 22

1 A. We did not vote.
2 Q. Is it your testimony here today, that if
3 there was any investment of monies belonging to
4 the Mutual Aid Fund Trust in Best Rescue, that
5 that was not based upon a vote of the trustees?
6 A. No.
7 Q. And you're sure of that?
8 A. Quite sure.
9 Q. Have you gone back and reviewed any of
10 the minutes or records of the Mutual Aid Fund back
11 in the 1998, 1999 time frame?
12 A. Yes.
13 Q. And have you looked to determine if
14 there are any records pertaining to the investment
15 of funds in Best Rescue?
16 A. Would you repeat that?
17 Q. Are there any minutes of any actions or
18 of any reports that were brought to the board,
19 pertaining to the investment of money in Best
20 Rescue?
21 A. Yes, there was a report.
22 Q. And was there any action taken on the
23 report?
24 A. Not to my knowledge.
25 Q. You were a trustee when that report was

Page 23

1 presented to the board; is that correct?
2 A. That's correct.
3 Q. Did you ask any questions about what was
4 in that report?
5     MR. PRICE: Objection as to in report.
6 Q. Well, when the report was presented to
7 the board, did you raise any questions about
8 anything pertaining to the subject matters of that
9 report?
10 A. I don't recall.
11 Q. Do you recall any trustee ever raising
12 any questions with Mr. Rodrigues about the
13 investment of Mutual Aid Fund monies in Best
14 Rescue?
15 A. No.
16 Q. When the report recommending the
17 investment was provided to the board, did you at
18 that time know of any reasons not to invest funds
19 in Best Rescue?
20     MR. PRICE: Objection. Assumes facts.
21 A. No.
22 Q. We've seen that there were a number of
23 occasions when money was transferred from accounts
24 belonging to the Mutual Aid Fund Trust to Best
25 Rescue for the purposes of investment.

Page 24

1 Do you know how those checks were
2 written or by whom they were authorized?
3 A. No.
4 Q. Did you ever question whether those --
5 in any way, at any meeting of the Mutual Aid Fund
6 Trust, did you ever question the propriety of
7 those checks?
8 A. No.
9 Q. To your knowledge did any other trustee?
10 A. No.
11 Q. At some point did you learn that that
12 turned out to be a bad investment, and that the
13 amount of $1.1 million was probably not going to
14 be able to be recovered from Best Rescue?
15 A. We were informed of that.
16 Q. Who informed you of that?
17 A. Gary.
18 Q. And what did he tell you, to the best of
19 your knowledge?
20 A. That -- would you do that question again?
21 Q. Sure. When you learned that the
22 investment of monies in Best Rescue had become
23 apparently a bad investment, what did Mr.
24 Rodrigues tell you?
25 A. He said it probably would be

Page 25

1 uncollectible.
2 Q. Did he tell you why?
3 A. Was it that Al Hewitt went through
4 bankruptcy or wasn't -- from what I can recall
5 that would be my answer.
6 Q. So your best recollection is that it had
7 to do with a bankruptcy in which Mr. Hewitt was
8 involved? Again, I'm only asking for your best
9 recollection.
10 A. Right. And, you know, so many years
11 have transpired.
12 Q. Do you recall when the board was
13 informed that this was probably a bad investment,
14 whether there was a request for authorization to
15 sue Mr. Hewitt or his companies to try and recoup
16 some of the monies?
17 A. Again, please.
18 Q. Do you recall that when you learned that
19 this was a bad investment, that there was also a
20 request for authority to initiate litigation to
21 try to recoup the investment?
22 A. No.
23 Q. You don't recall that?
24 A. No.
25 Q. Are you aware that a lawsuit was filed?

Page 26

1  A. Yes. Later.
2  Q. And was Gary still there when the
3  lawsuit was filed?
4  A. I don't believe so.
5  Q. Are you aware that the lawsuit was
6  settled?
7  A. No.
8  Q. Were you still on the board when the
9  lawsuit was settled?
10 A. Yes.
11 Q. Did you approve the settlement?
12 A. No -- I don't remember.
13 Q. Do you remember who had authority to
14 enter into a settlement of that lawsuit?
15     (Pause.)
16 A. No.
17 Q. Do you know why the lawsuit was settled?
18 A. Can you give me an idea of when that was?
19 Q. Assuming that there was a settlement
20 sometime in 2003, 2004 time frame, do you know why
21 a settlement of that lawsuit was entered into on
22 behalf of the Mutual Aid Fund Trust as opposed to
23 continuing the litigation?
24 A. I think at that time we went into
25 administratorship thinking in the best interests

Page 27

1  of the membership and where we were at.
2  Q. Okay. Is it your recollection that as a
3  result of that settlement that an insurance
4  company of Mr. Hewitt's paid $200,000?
5  A. Yes.
6  Q. And do you have any recollection of
7  having voted to accept that settlement and to
8  terminate the litigation based upon it?
9  A. No.
10 Q. Do you know if Mr. Rodrigues, Gary
11 Rodrigues, was in any way involved in the
12 litigation by which the Mutual Aid Fund Trust
13 attempted to recoup money from Al Hewitt or Best
14 Rescue?
15 A. Could you repeat that?
16 Q. Was Gary Rodrigues involved in any of
17 that litigation?
18 A. I wouldn't know.
19 Q. Do you know if he was consulted before
20 it was settled?
21 A. I don't know.
22 Q. Do you know who at the UPW was
23 responsible for monitoring the investment in Best
24 Rescue, to determine that Best Rescue was making
25 payments back to UPW on account of the loans that

Page 28

1  had been advanced to it?
2  A. I would -- it would be Gary.
3  Q. Do you have any information that
4  actually it was Jeanne Endo who was responsible on
5  a day-to-day basis for monitoring those
6  investments?
7  A. Overseen by Gary.
8  Q. Who was Jeanne Endo's boss when Gary was
9  still there, immediate superior?
10 A. Gary.
11 Q. Wasn't it Dayton Nakanelua? Didn't she
12 work for him?
13 A. Not how I understood it.
14 Q. Okay. At some point this lawsuit was
15 filed and Gary was sued over the loss of the
16 monies that were invested in Best Rescue. You're
17 aware of that?
18 A. I believe.
19 Q. At some point a lawsuit was filed on
20 behalf of the Mutual Aid Fund Trust against Gary
21 Rodrigues to recoup the monies that were lost in
22 Best Rescue. You're aware of that?
23 A. Yes.
24 Q. Do you know who made the decision to
25 initiate that lawsuit?

Page 29

1  A. I believe it was AFSCME.
2  Q. That was made during the period of time
3  that AFSCME was administering the fund?
4  A. Yes.
5  Q. And at some point were you involved in a
6  discussion and a decision to endorse that earlier
7  decision, to adopt that decision?
8  A. No.
9  Q. Do you recall any meeting or discussion
10 of the Board of Trustees in which the board was
11 asked to approve and to continue the litigation?
12 A. I can't recall.
13 Q. Let me show you what we previously
14 marked as Exhibit 2. And let me ask you, please,
15 to look at that particular document.
16     (Pause.)
17 Q. Do you recognize Exhibit 2?
18 A. Yes.
19 Q. What is Exhibit 2?
20 A. The minutes of the Mutual Aid trustees
21 meeting.
22 Q. On May 23, 2004?
23 A. Yes.
24 Q. And you attended that meeting; is that
25 correct?

**Page 30**

1  A. Yes.
2  Q. And do you see on page 2 under paragraph
3  7 it says "litigation"?
4  A. Uh-huh (affirmative).
5  Q. Yes?
6  A. Yes.
7  Q. And apparently the State Director, who
8  was Dayton Nakanelua at that point in time, made a
9  report to the board about this particular case,
10 UPW versus Gary Rodrigues; is that correct?
11 A. That's correct.
12 Q. And the first thing he reported was that
13 there had been a $1.1 million loan to Best Rescue
14 Systems which was made through Albert Hewitt and
15 Investment Advisors; is that right?
16 A. Yes.
17 Q. Then he said that the loan had been
18 approved without due diligence in a risky company
19 by the former trustees. Do you see that?
20 A. Yes.
21 Q. Is that, in fact, what Dayton reported?
22 Is that your recollection?
23 A. Yes.
24 Q. And then he goes on to say that the
25 former trustees had approved the $1.1 million as

**Page 31**

1  being uncollectible; is that right?
2  A. Approved is a rather strong word.
3  Q. Okay. What did he report to the board
4  at that particular time?
5  A. I don't recall. But reading it, you
6  know, at the time that it was presented that it
7  was uncollectible, we were just informed more than
8  us saying we approved that is.
9  Q. Then a motion was made by Yvonne Gaspar
10 to ratify the administrator's decision to file
11 this particular lawsuit against Gary Rodrigues and
12 to continue the litigation; is that right?
13 A. Yes.
14 Q. And the motion was seconded by Angel
15 Santiago-Cruz?
16 A. Yes.
17 Q. Then it was approved by the Board of
18 Trustees?
19 A. Yes.
20 Q. Did you vote on that motion?
21 A. I can't recall, but yeah.
22 Q. If you had abstained it would be written
23 in the minutes wouldn't it?
24 A. Correct.
25 Q. When it talks here about the loan being

**Page 32**

1  approved with due diligence by former trustees,
2  you're one of those former trustees, aren't you?
3  A. Yes.
4  Q. And when it talks about the $1.1 million
5  as having been determined as uncollectible and it
6  refers to former trustees, that includes you,
7  correct, because you were on the board at that
8  time?
9  A. Are you saying we approved?
10 Q. Without reference to the word
11 "approved." But when the board was informed or
12 took any action with regard to understanding for
13 the first time that the loan was uncollectible,
14 the investment was uncollectible, you were one of
15 the board members at that time, weren't you?
16 A. Yes.
17 Q. Now, do you know why Gary Rodrigues is
18 being sued over that investment as opposed to the
19 trustees?
20 A. He basically ran the show, and what was
21 presented to us is what we accepted.
22 Q. Aren't the trustees the ones who are
23 responsible for running the Mutual Aid Fund Trust?
24 A. Not in the sense of running. He, as the
25 State Director, was running the show in

**Page 33**

1  everything.
2  Q. Isn't it your understanding that the
3  trustees had a responsibility to supervise any
4  decisions that were made about funds of the trust?
5  A. No.
6  Q. It wasn't your responsibility?
7  A. We weren't told that. And we -- it
8  would be -- this is what is presented.
9  Q. This was presented by Dayton Nakanelua;
10 is that right?
11 A. What we were given.
12    MR. PRICE: Objection. Vague.
13 Q. This report about the litigation and the
14 wisdom of continuing the litigation, that was all
15 based upon what was told to you by Dayton
16 Nakanelua; is that correct?
17 A. I don't think -- I don't see Dayton's
18 name on here.
19 Q. Who was the State Director on May 23,
20 2004?
21 A. Now I can't recall the dates of our
22 administratorship. And then Peter Trask was
23 there. I couldn't say that --
24 Q. Okay. So you're not sure who the State
25 Director was at that time; is that correct? You

### Page 34

1  don't recall the dates?
2  A. I would say it was Dayton, yes.
3  Q. Did anyone other than Dayton Nakanelua
4  make any recommendations to the trustees about
5  continuing the litigation against Gary? Was there
6  anyone else who made recommendations of that
7  nature?
8  A. I can't recall.
9  Q. As you sit here today, what did Gary
10 Rodrigues do or fail to do for which he's been
11 sued in this case?
12      MR. PRICE: Objection to the extent it
13 calls for a legal conclusion. You can give your
14 answer.
15 A. Would you repeat that?
16 Q. Yes. What did Gary Rodrigues do or fail
17 to do which provides a basis for suing him in this
18 case?
19      MR. PRICE: Same objection.
20 A. I believe it was that he didn't give us
21 proper -- he didn't give us proper either
22 paperwork or presentation of who this investor was
23 and to the extent of what we were going to do.
24 Q. Do you know if any of the trustees ever
25 asked for or demanded any more documentation?

### Page 35

1  A. I can't recall. More or less everything
2  was presented, this is what -- it was more after
3  the fact that it was done already. And then
4  presented to us.
5  Q. When the State Director, if it was Mr.
6  Nakanelua or somebody else, uses in parenthesis
7  these words "risky company," do you know why Best
8  Rescue is described as a risky company?
9  A. At this time, I guess, already he had
10 defaulted.
11 Q. But do you know anything about that
12 company that would have made it possible for
13 anyone to determine that it was a risky investment
14 back in 1998 or 1999 when the investments were
15 made?
16 A. No.
17 Q. Does the Mutual Aid Fund Trust receive
18 funds directly from the state on behalf of UPW
19 members?
20 A. I believe the way we do it is a payroll
21 deduction. That's how we do it in the private
22 sector. So I wouldn't know how it's handled
23 through the state.
24 Q. Do you have an understanding that state
25 employees also have a payroll deduction system?

### Page 36

1  A. I don't know if that's how it's done.
2  Q. In these minutes at the next paragraph,
3  paragraph 8, it says, "Trustees are governed by
4  federal law and need to do what's right for the
5  beneficiaries of the plan. Upcoming training will
6  be provided."
7       Was that upcoming training ever
8  provided?
9  A. Yes.
10 Q. What did it consist of?
11 A. The lawyer coming to us to explain what
12 our duties are.
13 Q. And you don't remember who that lawyer
14 was?
15 A. No.
16 Q. Let me hand you what I'm going to ask
17 the court reporter to mark as the next exhibit in
18 order, please.
19      (Whereupon, a Declaration of Alison
20 Leong was marked as Exhibit 5 for Identification.)
21 Q. I'm now handing you what he has marked
22 as Exhibit 5. That is your declaration that was
23 filed in this case; is that correct?
24 A. That's correct.
25 Q. And that's one of the documents that you

### Page 37

1  recently reviewed in preparation for this
2  deposition; is that right?
3  A. Yes.
4  Q. Now if you look at paragraph 2, you see
5  there it says, "Gary Rodrigues was the State
6  Director of UPW and the Plan Administrator of the
7  Mutual Aid Fund Trust."
8       Do you see that?
9  A. Yes.
10 Q. And I asked you earlier whether you
11 thought Mr. Rodrigues was a trustee. Does that
12 affect your opinion when you told me that you
13 believed he was a trustee? That he's the Plan
14 Administrator and not the trustee?
15 A. My understanding of trustee is all of
16 the vice presidents and the State Director.
17 Q. So you still believe that he was a
18 trustee?
19 A. Yes.
20 Q. Did Mr. Rodrigues vote on matters that
21 were voted upon by the board of the Mutual Aid
22 Fund Trust? Did he ever vote?
23 A. Not to -- not that I can recall.
24 Q. Did he ever make motions?
25 A. Not that I can recall.

Page 38

1    Q. He made reports?
2    A. Yes.
3    Q. You say here that during the years from
4  1998 to 2001 when you were on the board that the
5  board meetings were typically short, 15 minutes or
6  less; is that correct?
7    A. Yes.
8    Q. Isn't it true that the meetings were
9  often closer to or longer than an hour?
10   A. No.
11   Q. So if somebody else were to testify that
12 the meetings were longer than that, you would
13 disagree?
14   A. Yes.
15   Q. And you've told us that there was very
16 little in the way of questions or discussions,
17 you say in paragraph 3 here; is that correct?
18   A. That's correct.
19   Q. Why is that?
20   A. We took the report, what was presented
21 as it was, and we just trusted what was presented.
22   Q. Did Mr. Rodrigues refuse to allow
23 questions?
24   A. He didn't -- no, he didn't refuse.
25   Q. He wouldn't chair these meetings, would

Page 39

1  he? The meetings were chaired by the president,
2  right?
3    A. Well, at some point it was probably both
4  of them.
5    Q. When he was making his reports he would
6  direct the discussion; is that correct? Is that
7  fair to say?
8    A. Yes.
9    Q. Did he ever dissuade people from asking
10 questions?
11   A. I wouldn't think dissuade. But pretty
12 much took it, what was presented.
13   Q. To the extent that people did not ask
14 questions, members of the board, or engage in
15 discussion, that was their decision, wasn't it, as
16 to whether or not they were going to ask questions?
17   A. Yes.
18   Q. If you had questions, you could have
19 asked them, right?
20   A. Yes.
21   Q. Now, it says, "the board trusted and
22 relied on Mr. Rodrigues to invest the MAF trust
23 funds wisely;" is that right?
24   A. Yes.
25   Q. And that was based on past experience

Page 40

1  because most of the investments of the union, of
2  the pension fund, and other funds had been
3  invested successfully, correct?
4    A. Yes.
5    Q. And you also had received reports about
6  Mr. Hewitt's success in managing funds for the
7  union; isn't that right?
8    A. No.
9    Q. And you say here, "Mr. Rodrigues did not
10 ask for or obtain board approval for specific
11 investments and the board did not vote on specific
12 investments." That's what you say in your
13 declaration; is that correct?
14   A. Yes.
15   Q. So is it your testimony that the entire
16 time you were on the board during the period of
17 time that Mr. Rodrigues was there, there was never
18 any request for or decision made by the board
19 about investments? Is that your testimony?
20   A. Yes.
21   Q. Okay. And it's your testimony under
22 oath in this declaration that you and other
23 members of the board did not know about the
24 investment of any money in Best Rescue until 1999;
25 is that right?

Page 41

1    A. Yes.
2    Q. After the money had been already
3  invested; is that correct?
4    A. Yes.
5    Q. Have you discussed that recollection of
6  yours with other people who were on the board at
7  the time, to see whether they agree with you?
8    A. I may have.
9    Q. Who was the representative on the Best
10 Rescue board for Maui in that time period 1998,
11 1999? Do you remember?
12   A. You mean the MAF?
13   Q. Yes.
14   A. I believe it was Harold Moniz.
15   Q. Have you discussed with Harold Moniz
16 what his recollections are about whether this
17 matter of Best Rescue was presented to and decided
18 upon or voted upon by the board?
19   A. No.
20   Q. Who was the representative from Kauai at
21 that time?
22   A. If I can recall, it was Joe Vegas.
23   Q. Have you ever talked to Joe Vegas about
24 whether or not he recalls the matter having been
25 brought up to the Board of Trustees?

Page 42

1  A. No.
2  Q. If they were to testify that they
3  specifically recall the matter being presented to
4  the board and voted upon and approved by the
5  board, do you believe that they would be lying?
6  A. I think it's interpretation.
7  Q. Okay. Now, your testimony is that
8  between 1999 and 2001, if I read these paragraphs
9  correctly, that Mr. Rodrigues did not mention Best
10 Rescue again; is that correct?
11 A. What paragraph again?
12 Q. Reading paragraphs 5 and 6 together, you
13 talk about the fact that on July 19, 1999 there
14 was a meeting at which the -- I'm sorry, yes,
15 there was a meeting at which you received an audit
16 report.
17     Then the next time Mr. Rodrigues told
18 the board about Best Rescue was in 2001; is that
19 correct? That's what you say in paragraph 6,
20 right?
21 A. Yes.
22 Q. So I presume then from July 19, 1999
23 until sometime in 2001 there was no discussion
24 about Best Rescue; is that right?
25 A. Yes.

Page 43

1  Q. Do you recall receiving financial audits
2  in which the issue of Best Rescue was discussed
3  during that time period?
4  A. We probably did receive a report. But
5  there was no discussion.
6  Q. And why wasn't there any discussion?
7  A. It was that we did this -- I mean the
8  investment was made, and then it was uncollectible.
9  Q. Did you have any questions about why the
10 investment was made, when you first heard about it
11 in 1999?
12 A. No, we just took -- I just took what he
13 had said and what he had presented. That it was
14 what already happened.
15 Q. As a trustee wasn't it your duty to ask
16 questions so that you could assure yourself that
17 this was a proper investment?
18 A. Yes. But I did not question, as I said,
19 everything was presented. And what he had
20 presented was what we took as he knew what, you
21 know, we follow his lead. And he's saying -- I
22 assume he did his research and it was a sound
23 investment.
24 Q. Currently, when the Board of Trustees
25 meets, over the last couple of years, is there any

Page 44

1  different procedure now than was followed back
2  when Gary was there?
3  A. Definitely.
4  Q. What's the difference?
5  A. We are given financial reports. We
6  review them more carefully. And discussion and
7  questions are pretty -- are very open. Board
8  members have changed. And we now find we're
9  questioning everything.
10 Q. You still receive reports from the State
11 Administrator; is that correct?
12 A. The State Administrator?
13 Q. Well, the administrator of the board who
14 is the State Director, right?
15 A. Yes.
16 Q. Still makes reports?
17 A. Yes.
18 Q. And he still makes recommendations; is
19 that correct?
20 A. Recommendations regarding?
21 Q. For actions by the board.
22 A. Yes.
23 Q. In the period of time in the last year
24 or two, have any recommendations or requests for
25 action by the State Administrator ever been

Page 45

1  rejected?
2  A. Yes.
3  Q. What kinds of things have been rejected?
4  A. Pay raises for the staff.
5  Q. I'm not talking about the State
6  Executive Board now. I'm talk about the Board of
7  Trustees of the Mutual Aid Fund.
8  A. Okay.
9  Q. Has Mr. Nakanelua ever made any
10 recommendations for action by the trustees that
11 the trustees have rejected?
12 A. No. Not lately. I mean, we haven't had
13 any definitive items.
14 Q. So in that respect the board functions
15 similarly to when Gary Rodrigues was there; is
16 that correct? The State Director makes
17 recommendations to the Board of Trustees, and the
18 Board of Trustees have adopted them; is that
19 right?
20 A. No.
21 Q. How is it different?
22 A. We do question. We, you know, take
23 these -- I mean, we have probably had said no to
24 certain things but I can't recall a specific item.
25 Q. And you've been attending meetings on a

### Page 46

1  quarterly basis; is that correct?
2      A. Yes.
3      Q. But as you sit here today, you cannot
4  recall any specific item that's been recommended
5  by Mr. Nakanelua which the board has rejected; is
6  that right?
7      A. Regarding the MAF?
8      Q. Yes.
9      A. No.
10     Q. I'm correct you can't recall anything?
11 Is that right?
12     A. I don't -- recent item?
13     Q. Yes.
14     A. We have -- no.
15     Q. Okay. So when Mr. Nakanelua made a
16 recommendation back in 2004 that the lawsuit
17 against Gary Rodrigues be continued, did anybody
18 question that recommendation?
19     A. I think we didn't question.
20     Q. Did anybody request information about
21 why the lawsuit was started in the first place?
22     A. No. Because basic -- we wanted to
23 recoup our money.
24     Q. Did anybody suggest that the lawsuit
25 should be broadened to include suing the trustees

### Page 47

1  who were on the board when the investments were
2  made?
3      A. No.
4      Q. And other than yourself, when this
5  meeting occurred back on May 23, 2004, were there
6  other people who were still trustees who had been
7  trustees back in '98 and 1999?
8      A. I believe the other person was Craig
9  Yugawa.
10     Q. Your recollection is that Craig Yugawa
11 was on the board when you first joined it, and
12 then was still on the board back in 2004; is that
13 correct?
14     A. Yes.
15     Q. Do you know when George Yasumoto left
16 the Board of Trustees?
17     A. When we went into administratorship.
18     Q. And he was not on the board again when
19 the board was reconstituted?
20     A. No.
21     MR. SEITZ: Okay. I think I'm done.
22     (Deposition concluded at 12:50 p.m.)
23
24
25

### Page 48

1      I, ALISON LEONG, hereby certify that I
2  have read the foregoing typewritten pages; and
3  corrections, if any, were noted by me; and the
4  same is now an accurate and complete transcript of
5  my testimony.
6
7      Dated at_____Hawaii
8      this____day of_____, 2007
9
10     _____
11     ALISON LEONG
12
13
14 Signed before me this____day
15 of_____, 2007.
16
17 _____
18 Witness to Deponent's Signature
19
20
21
22 Steven De Costa, et al. vs. Gary W. Rodrigues
23 Civil No. 03-00598 DAE/LEK, September 28, 2007
24 by William T. Barton, RPR, CSR.
25

### Page 49

1              CERTIFICATE
2  STATE OF HAWAII     )
3                     ) SS.
4  COUNTY OF HONOLULU )
5      I, WILLIAM T. BARTON, RPR, Certified
6  Shorthand Reporter, State of Hawaii, do hereby
7  certify that on September 28, 2007 at 11:40 a.m.
8  there appeared before me ALISON LEONG, the witness
9  whose deposition is contained herein; and that
10 prior to being examined was duly sworn; that I am
11 neither counsel for any of the parties herein, nor
12 interested in any way in the outcome of this
13 action;
14     That the deposition herein was by me taken
15 down in machine shorthand and thereafter reduced
16 to print via computer-aided transcription under my
17 supervision; that the foregoing represents a
18 complete and accurate transcript of the testimony
19 of said witness to the best of my ability.
20     Dated this 2nd day of October 2007 at
21 Honolulu, Hawaii.
22 _____
23     WILLIAM T. BARTON, CSR No. 391
24     Notary Public, State of Hawaii
25     My Commission expires August 7, 2009