ORIGINAL

KOSHIBA AGENA & KUBOTA

JAMES E. T. KOSHIBA          768-0
CHARLES A. PRICE            5098-0
2600 Pauahi Tower
1001 Bishop Street
Honolulu, Hawaii 96813
Telephone No.: 523-3900
Facsimile No.: 526-9829
email: jkoshiba@koshibalaw.com
        cprice@koshibalaw.com

Attorneys for Plaintiffs

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

NOV 08 2007

at 3 o'clock and 30 min P M.
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STEVEN DECOSTA IN HIS REPRESENTATIVE CAPACITY AS CHAIRPERSON OF THE BOARD OF TRUSTEES OF UNITED PUBLIC WORKERS, AFSCME, LOCAL 646, AFL-CIO, MUTUAL AID FUND TRUST, REAL PARTY IN INTEREST UNITED PUBLIC WORKERS, AFSCME, LOCAL 646, AFL-CIO,<br><br>              Plaintiffs,<br><br>     vs.<br><br>GARY W. RODRIGUES,<br><br>              Defendant. | CIVIL NO. CV03-00598 DAE LEK<br><br>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT, FILED OCTOBER 24, 2007; CERTIFICATE OF SERVICE<br><br>HEARING:<br>DATE:     November 26, 2007<br>TIME:     10:30 a.m.<br>JUDGE:    Hon. David A. Ezra<br><br><br>(Trial Date: March 11, 2008) |

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S
RENEWED MOTION FOR SUMMARY JUDGMENT

Plaintiffs Steven DeCosta in his Representative Capacity as Chairperson
of the United Public Workers, AFSCME, Local 646, AFL-CIO, Mutual Aid Fund
Trust, Real Party in Interest United Public Workers, AFSCME, Local 646, AFL-CIO
("Mutual Aid Fund") respectfully requests that Defendant Gary W. Rodrigues'
("Rodrigues") Renewed Motion for Summary Judgment, filed October 24, 2007, be
denied for the following reasons:

1.    Rodrigues made and controlled investment decisions for the
Mutual Aid Fund. His role was not merely ministerial. He owed a fiduciary duty to
the Mutual Aid Fund.

2.    Rodrigues breached his fiduciary duties by imprudently loaning
$1.1 million to Best Rescue System, Inc. ("Best Rescue"), a small, under-capitalized,
start-up, developmental company in Florida. Rodrigues made and directed the loans
on behalf of the Mutual Aid Fund. He did so without adequate due diligence and
despite knowing that the investment advisor's advice was obviously tainted and
compromised. Rodrigues also failed to have investment guidelines in place at the
time of the loans and invested a large percentage of Mutual Aid Fund monies into
Best Rescue.

3.    This lawsuit against Rodrigues was properly initiated and

authorized by a duly appointed Administrator in 2003, and subsequently authorized and ratified by the Mutual Aid Fund's newly elected Board of Trustees in 2004.

4.    The Mutual Aid Fund is an ERISA plan established and maintained by the union, and it is not a governmental plan.

5.    The applicable statute of limitations is six years. Regardless, Rodrigues cannot meet his burden of showing that persons with the Mutual Aid Fund had actual knowledge of the material facts supporting Rodrigues' breaches of fiduciary duty more than 3 years before the lawsuit was filed.

6.    The former trustees of the Mutual Aid Fund are not indispensable parties.

I.    STATEMENT OF THE FACTS

*Introduction.*

The Mutual Aid Fund is an ERISA-governed employee welfare benefit plan. It is voluntary contribution plan that provides hospitalization benefits for participating employees and their dependents. All contributions to the Mutual Aid Fund are made by employees represented by UPW or UPW employees. The UPW State Director serves as the Mutual Aid Fund's Plan Administrator and various union officers or board members serve as trustees on the Mutual Aid Fund's Board of Trustees. While Rodrigues was the UPW State Director and Plan Administrator of the Mutual Aid Fund, he breached his fiduciary duties by imprudently and without

adequate due diligence causing the Mutual Aid Fund to make $1.1 million in unsecured loans from November 1998 through November 1999 to Best Rescue, a risky, small, under-capitalized, start-up company in Florida.

*The Best Rescue Loans.*

Best Rescue was developing a product to rescue people out of high-rise buildings in the event of a fire or other emergency. Hewitt Deposition ("HD"), p. 16. Best Rescue signed six (6) promissory notes in favor of the Mutual Aid Fund and the Mutual Aid Fund in fact loaned Best Rescue the amounts reflected in the notes. The Notes' dates (and amounts) were as follows: November 24, 1998 ($250,000), February 5, 1999 ($200,000), April 26, 1999 ($150,000), June 20, 1999 ($250,000), August 24, 1999 ($50,000), and November 22, 1999 ($100,000), totaling $1.1 million. Exhibits "2" - "14".

Rodrigues made the loans through an investment advisor, Albert Hewitt. Mr. Hewitt always and only dealt with Rodrigues in connection with the Best Rescue loans and thought Rodrigues was the authorized representative. HD pp. 15, 17. Mr. Hewitt never met the Mutual Aid Fund Trustees made any presentations to the Board or provided written reports. HD, pp. 68, 69. During the time of the Best Rescue loans, Mr. Hewitt reported Best Rescue's status to Rodrigues on a monthly basis.

*Best Rescue was a New Company.*

At the time the loans were made, Best Rescue did not have a completed business plan, marketing plan, shareholder agreement, engineering certification, fire organization seal of approval, patent, product videos, or distributorship group agreements. HD, pp. 19-20, 41, 42, 49, 55-56. Best Rescue only had one product order, received in the Summer of 1999, for $30,000. HD, p. 44. The Mutual Aid Fund loans were used for continued development of the Best Rescue product. HD, p. 34.

*Mr. Hewitt's Financial Ties to Best Rescue.*

Mr. Hewitt had been hired by Best Rescue to obtain funding for the company. HD, p. 16. He controlled the Best Rescue account where the loan monies were placed. HD, p. 50, Ex. 2. He was paid a 5% loan origination fee out of the Mutual Aid Fund loans. HD, pp. 27, 35. The loan monies were also used to pay Mr. Hewitt's fee for management and consulting services he performed for Best Rescue. HD, pp. 28, 35. In addition, the loan monies were used to reimburse Mr. Hewitt for expenses and advances he previously paid on behalf of Best Rescue, including $57,000 in advances he was reimbursed for by Best Rescue in December 1998 out of the Mutual Aid Fund's first November 1998 $250,000 loan. HD, pp. 29, 35, 61.

*What Rodrigues Knew About Best Rescue and Hewitt.*

Rodrigues knew of Mr. Hewitt's financial ties to Best Rescue. HD, pp.

27-29. Rodrigues knew of the 5% loan origination fee, management and consulting fees, and reimbursements for advances. HD, p. 28, 29, 62. Rodrigues knew that Mr. Hewitt controlled the Best Rescue account. Ex. 1. Mr. Hewitt even signed the last November 1999 Promissory Note on behalf of Best Rescue that was delivered to Rodrigues. Ex. 13. Rodrigues knew that the initial loan monies were to be used to develop the Best Rescue product and that the loans were to be repaid from funding or capitalization from another source in early 1999. HD, p. 46, Ex. 1. That funding never was obtained, yet Rodrigues loaned additional Mutual Aid Fund monies thereafter. Mr. Rodrigues did not meet the principles of Best Rescue (other than Hewitt), did not visit its business, and did not do any due diligence regarding the company. HD, pp. 25, 55, 76. The loan documentation was prepared by Best Rescue's lawyer, and not prepared or reviewed by a lawyer on behalf of the Mutual Aid Trust. Rodrigues did not tell Hewitt that the Mutual Aid Fund was an ERISA-governed employee welfare plan. HD, p. 13. Hewitt and Rodrigues had previously abandoned initial thoughts of investing monies from a separate UPW Pension Fund to ERISA legal constraints. HD, p. 22, Ex. 1.

*The Trustees' Involvement Regarding Best Rescue.*

Rodrigues first told the Mutual Aid Fund Trustees about Best Rescue in February 1999. See Ex. A. There were no Trustee meetings at all in 1998, the last previous meeting being June 1997. Ex. A. Rodrigues told the Trustees that Best

Rescue was a good investment.  Declarations of Leong and Yasumoto.  Trustee approval was not sought or obtained regarding Best Rescue, and no loan terms or total investment amounts were discussed, and there was no vote by the Trustees. Declarations of Leong and Yasumoto.  By the time Rodrigues first mentioned Best Rescue to the Trustees in February 1999, he had already agreed to loan and had the Mutual Aid Fund pay $250,000 to Best Rescue in November 1998 and signed the Security Agreement.  Compare Ex. A, Ex. 2, Ex. 3.

At the next Mutual Aid Fund Trustees' meeting, on June 19, 1999, the 1998 audited Financial Statements were provided to the Trustees, which noted that a total of $600,000 had been loaned to Best Rescue as of March 30, 1998.  Ex. B, Note 2.  Again, there was no vote or formal approval by the Trustees on any of these Best Rescue loans.  Declarations of Leong & Yasumoto.

*Rodrigues Calls the Loans.*

In December 1999, Rodrigues called the loans and demanded repayment.  Ex. 15.  Rodrigues explained to Hewitt that he did so because UPW's "parent" union, AFSCME, questioned the Best Rescue investment.  HD, p. 54.

In early 2000, Rodrigues replaced Hewitt with First Hawaiian Bank ("FHB") as the new Mutual Aid Fund investment advisor.  FHB presented an Investment Policy Statement, the first ever for the Mutual Aid Fund, and Rodrigues signed the FHB Agency Agreement, Fee Schedule, and Investment Policy Statement

on behalf of the Mutual Aid Fund in March 2000. Rodrigues subsequently presented these documents that he had already signed to the Mutual Aid Fund Trustees at their April 1, 2000 meeting. Ex. C.

In January 2001, the Trustees saw the 1999 audited Financial Statements discussing the $1.1 million Best Rescue loans and the default. Ex. D. In July 2001, the Trustees received the 2000 audited Financial Statements showing that the $1.1 million was uncollectible and was written off. Ex. E. None of these matters were presented to the Trustees for vote or approval. Declarations of Leong and Yasumoto.

*Rodrigues Is Replaced As Plan Administrator.*

On November 19, 2002, Rodrigues, was found guilty on charges of federal money laundering, embezzlement, and mail fraud in connection with other UPW-sponsored health, dental, and life insurance plans (not involving the Mutual Aid Fund or Best Rescue loans). Following the guilty verdict, AFSCME, the International Union with which UPW is affiliated, suspended Rodrigues and UPW's State Executive Board members, placed UPW under "administratorship," and appointed an Administrator to oversee and run the union. Peter Trask served as the UPW Administrator until August 2003; his successor was Elizabeth Ho. The union was in administratorship for over a year and until elections for new UPW officers and executive board members were completed. The Administrator assumed all

responsibilities over UPW matters, including all decision-making authority over union-sponsored welfare benefit plans such as the UPW-sponsored Mutual Aid Fund.   The Administrator authorized this instant lawsuit against Rodrigues.  The Complaint was filed on October 31, 2003.  See Declaration of Dayton Nakanelua, filed previously herein on March 18, 2004.[1]   Subsequently, after elections and termination of the administratorship, the newly elected Mutual Aid Fund Board of Trustees authorized and ratified continued pursuit of this lawsuit at a Trustees' meeting in May 2004.  Ex. F, ¶ 7.

*Best Rescue Fall Out.*

In November 2003, the federal government filed an indictment against Mr. Hewitt in connection with the Mutual Aid Fund loans to Best Rescue, *USA v. Hewitt*, U.S. District Court for the District of Hawaii, No. 03-CR-00552-SOM.  Mr. Hewitt was convicted of fraud in connection with an ERISA employee plan welfare benefit plan and served time in a federal penitentiary.

The Best Rescue loan amounts were never repaid.  The Mutual Aid Fund lost $1.1 million plus interest, except that the Mutual Aid Fund recovered, in October 2006, some amount from Hewitt's insurer in a confidential settlement.

---

[1]Note that Mr. Nakanelua's Declaration stating "November 2003" is mistaken by 1 day.

## II.    SUMMARY JUDGMENT STANDARD

As set forth in Federal Rule of Civil Procedure 56(c), summary judgment shall be entered when:

> . . . the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and tat the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c) (2003).

In its motion for summary judgment, the moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact and that the court may rule on the issues as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)).  Despite this burden, the moving party need not produce evidence negating the existence of an element for which the opposing party will bear the ultimate burden of proof at trial.  See id. at 323.

Once the movant has met its initial burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial.  See Fed. R. Civ. P. 57(e).  The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant evidence at trial.  See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987); Fed. R. Civ. P. 56(e).  Moreover, there is no genuine issue of fact "where the record

taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citation omitted).

A material fact is one that may affect the decision, so that the finding of that fact is relevant and necessary to the proceedings. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the nonmoving party. See id. The evidence submitted by the nonmovant in opposition to a motion for summary judgment "is to be believed, and all justifiable inferences are to be drawn in [its] favor." Id. at 255.

In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.    See id. at 254. The court must assess the adequacy of the nonmovant's response and must determine whether the showing the nonmovant asserts it will make at trial would be sufficient to carry its burden of proof.    See Celotex, 477 U.S. at 322.

Although highly fact-based cases are not generally suitable for summary judgment, the nonmoving party must demonstrate that sufficient evidence of a factual dispute exists to require a jury or judge to resolve the parties' differing versions of the truth at trial. In ruling on such a motion, this court may not make

credibility determinations or weigh conflicting evidence. See Musick v. Burke, 913

F.2d 1390, 1394 (9th Cir. 1990).

Rodrigues' Renewed Motion for Summary Judgment is based upon six

arguments: (1) Rodrigues was not a fiduciary, (2) Rodrigues' conduct was not a

breach of any fiduciary duties, (3) this lawsuit was not properly authorized, (4) the

Mutual Aid Trust is not an ERISA plan, (5) the claims are barred by the statute of

limitations, and (6) the former Mutual Aid Fund trustees are indispensable parties.

Each of these arguments is addressed briefly below.

III.   ARGUMENT

### 1.    Rodrigues Owed Fiduciary Duties to the Mutual Aid Fund.

[A] person is a fiduciary with respect to a plan to the extent [i]
he exercises any discretionary authority or discretionary control
respecting management of such plan or exercises any authority or
control respecting management or disposition of its assets, . . . or [iii]
he has any discretionary authority or discretionary authority or
discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002 (21)(A).

"In determining the fiduciary status of a party under ERISA, courts must

engage in a case-by-case analysis 'of whether that person performs any of the

functions set forth in the statutory definition, the key concept of which is

discretionary authority or control.' Useden v. Acker, 947 F.2d 1563, 1574 (11th Cir.

1991), cert. denied, 113 S.Ct. 2927 (1993) quoting Ronald J. Cooke,   ERISA

-12-

Practice and Procedure, § 6.02 at 6-5. The state of mind of the potential fiduciary is not determinative. Thomas, Head & Greisen Employees Trust v. Buster, 24 F.3d 1114, 1119 (9th Cir. 1994), cert. denied 115 S.Ct. 935 (1995). The exercise of discretionary authority can result in a person being deemed a fiduciary, regardless of whether the authority was actually formally granted. Cooke at § 6.02, 5-146. "An ERISA fiduciary includes anyone who exercises discretionary authority over the plan's management, anyone who exercises authority over the management of its asserts, and anyone having discretionary authority or responsibility in the plan's administration." Credit Managers Ass'n v. Kennesaw Life & Accident ins. Co., 809 F.2d 617, 625 (9th Cir. 1987). A person's actions, not the official designation of his role, determines whether he is a fiduciary. Acosta v. Pacific Enterprises, 950 F.2d 611, 618 (1991).

Here, Rodrigues made, authorized, and controlled the investment and loan decisions regarding Best Rescue. He did not consult with or obtain approval from the Trustees. He made loan commitments without their knowledge. To the extent he did ever seek approval from the union boards and welfare plan boards generally, they invariably and uncritically followed Rodrigues' recommendations and advice. The Mutual Aid Fund Trustees did not question Rodrigues' recommendation regarding the Best Rescue loans, and Rodrigues did not seek their pre-approval as to any amounts or the terms of the loans. Rodrigues' role was not

-13-

merely ministerial. In fact, Rodrigues exercised the full power and authority of the

Board. He was the de facto Board, and the Trustees' roles had been reduced to

merely ministerial figure heads.

### 2. Rodrigues Breached His Fiduciary Duties.

29 USC § 1104(a) imposes on fiduciaries a "prudent man standard of

care." More specifically, a fiduciary shall discharge his duties:

> (B) with the care, skill, prudence and diligence under
> the circumstances then prevailing that a prudent man acting
> in a like capacity and familiar with such matters would use
> in the conduct of an enterprise of a like character and with
> like aims; (C) by diversifying the investments of the plan so
> as to minimize the risk of large losses, unless under the
> circumstances it is clearly prudent not to do so[.]

29 U.S.C. § 1104(a)(1)(B), (C).

Rodrigues' investment of MAF Trust monies in Best Rescue was not

based upon reasonable due diligence and was imprudent. Best Rescue had no

revenue and was obviously a risky new company. Hewitt's advice was obviously

tainted and compromised by his financial affiliation with Best Rescue and known

conflict of interest. No investment policy was in place at the time of the loans. The

Best Rescue investment violated the prudent Investment Policy Statement guidelines

that Rodrigues subsequently agreed to and signed the following year in March 2000,

which prohibited investments in companies with a record of less than three years of

continuous operation or investments in companies with which the investment

-14-

manager had an interest. Also, the Best Rescue investment, per the 1999 audited Financial Statements, represented 45% of the Mutual Aid Fund's net assets ($2.4 million), which certainly violated the prudent diversification requirement of ERISA.

> **3.     The Administrator Properly Authorized The Filing of This Lawsuit in 2003.   The New MAF Board of Trustees Subsequently Authorized and Ratified in 2004.**

The AFSCME-appointed Administrator assumed control over the union and its union-sponsored employee welfare benefit plans. The UPW Administrator authorized counsel to file the instant lawsuit on behalf of the Mutual Aid Fund in 2003. See Declaration of Dayton Nakanelua  previously filed herein on March 18, 2004. That decision to pursue Rodrigues was subsequently formally authorized and ratified when the Administrator was replaced by a new duly elected Board of Trustees for the Mutual Aid Fund in May 2004.   Ex. "F" ¶ 7.

> **4.     The Mutual Aid Fund Trust Is An Employee Welfare Benefit Plan Governed By ERISA.**

29 U.S.C. § 1002(1) defines an "employee welfare benefit plan" as "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employee or by an employee organization, or by both, to the extent such plan, fund, or program was established or is maintained for the purpose of providing its participants or beneficiaries, through the purchase of insurance or otherwise, (a) medical, surgical, or hospital care or benefits, or benefits in the event of sickness,

accident . . . ." "Governmental plans," meaning "plans established or maintained for its employees by the Government of the United States, by the government of any state or political subdivision thereof, or any agency or instrumentality of any of the foregoing" are exempt from ERISA. 29 U.S.C. § 1002(32).

The Mutual Aid Fund was established by UPW for the benefit of union members and UPW employees. UPW's membership includes employees of the State of Hawaii, the various island counties, and private entities. Neither the State nor the counties played any role in establishing or maintaining the Mutual Aid Fund. For the sake of convenience, Mutual Aid Fund beneficiaries who are public employees may authorize that their monthly contributions to the Mutual Aid Fund, together with their monthly contributions to other union-sponsored plans, be automatically deducted from their pay and be paid to UPW so that UPW can then deposit the monthly amount in the Mutual Aid Fund account. Authorization for an automatic payroll deduction for some beneficiaries does not turn the Mutual Aid Fund into a "governmental plan."

**5.     Plaintiffs' Claims Are Not Barred By The Statute of Limitations.**

"The six-year time period reflects Congress' determination to impress upon those vested with the control of pension funds the importance of the trust they hold. Thus, Congress evidently did not desire that those who violate the trust could

easily find refuge in a time bar." <u>Brock v. Nellis</u>, 809 F.2d 753, 754 (11th Cir. 1987).

"Section 1113 sets a high standard for barring claims against fiduciaries prior to the

expiration of the section's six year limitations period . . . ." <u>Gluck v. Unisys Corp.</u>,

960 F.2d 1168, 1176 (3rd Cir. 1992). "Of course, a plaintiff may have constructive

knowledge of a breach before he actually knows of the breach, but section 1113 calls

for actual knowledge." <u>Gluck</u>, 960 F.2d, at 1176. "Indeed, the key to the ERISA

statute of limitations when it applies to these types of violations is not 'actual harm',

but rather 'actual knowledge' of the ERISA breach or violation. <u>Ziegler v.

Connecticut General Life</u>, 916 F.2d 548, 552 (9th Cir. 1990). "We hold that, under

29 U.S.C. 1113(2), 'actual knowledge of a breach or violation' requires that a

plaintiff have actual knowledge of all material facts necessary to understand that

some claim exists . . . .We disagree that mere knowledge of a transaction is always

enough. 'Actual knowledge of a breach or violation' requires knowledge of all

relevant facts at least sufficient to give the plaintiff knowledge that a fiduciary duty

has been breached or ERISA provision violated." <u>Gluck</u>, 960 F.2d, at 1177. "The

statute of limitations [under 29 U.S.C. § 1113] itself indicates a two-step analysis or

accrual of an ERISA action: first, when did the alleged 'breach or violation' occur;

and second, when did [plaintiff] have 'actual knowledge' of the breach or violation?"

<u>Ziegler</u>, 916 F.2d, at 550.

      Here, Rodrigues has the burden of showing "actual knowledge" of all

material facts supporting his breaches of fiduciary duty three years before the October 31, 2003 Complaint. The actual knowledge of the un-named fiduciary who initiated the suit, the AFSCME-appointed Administrator Elizabeth Ho, is what matters. Former trustees Leong's and Yugawa's knowledge is immaterial because they are not plaintiffs in this case. Regardless, at best, these former trustees' level of knowledge was of the Best Rescue loans themselves, but that is not the "actual knowledge" 29 U.S.C. § 1113(2) specifically requires. The mere fact that these former trustees had knowledge of the transactions at issue is insufficient to establish that they knew all of the material facts supporting that Rodrigues breached his fiduciary duties. In any event, the October 31, 2003 Complaint was filed within 3 years of July 21, 2001, the date that they were told that the Best Rescue investment would be charged off as uncollectible. See Ex. E.

      In order to invoke that the narrower three year statute of limitations, Rodrigues must show actual knowledge outside of the limitations period by the AFSCME Administrator of the following: (1) that Rodrigues failed to do adequate due diligence, (2) that Best Rescue was an under-capitalized start-up company with no real assets, product inventory, or sales, and (3) that Rodrigues' knew of Albert Hewitt's financial arrangement with Best Rescue resulting in Best Rescue paying Mr. Hewitt monies out of the Mutual Aid Fund loans. Rodrigues has failed to meet this showing. It was only through the litigation against Best Rescue, pursued by

AFSCME and its lawyers (not UPW or Rodrigues) that AFSCME learned of the facts implicating Rodrigues. The AFSCME-appointed Administrator thereafter timely authorized the filing of this lawsuit. The Complaint was filed within six years of knowing that Best Rescue loans would be written off as uncollectible.

As for Steven De Costa, who was joined as a real party in interest plaintiff in June 2007, the 9th Circuit has viewed the necessity of joining or substituting current trustees of welfare plans as a merely procedural, not substantive, matter where the joinder of a current trustee does not change the allegations of the underlying Complaint. As noted in Local 159 v. Nor-Cal Plumbing, Inc., 185 F.3d 978, 982 fn. 4 (1999), the Ninth Circuit has allowed ERISA trust funds to bring ERISA suits where the issue of the trust funds' standing under ERISA has never been raised. Id. citing Pension Trust Fund for Operating Eng'rs v. Triple A Mach. Shop, Inc., 942 F.2d 1457, 1461 (9th Cir. 1991); Brick Masons Pension Trust v. Industrial Fence & Supply, Inc., 839 F.2d 1333, 1335 (9th Cir. 1988); Operating Eng'rs Pension Trust v. Cecil Backhoe Serv., Inc., 795 F.2d 1501, 1503 (9th Cir. 1986); and Laborers health & Welfare Trust Fund v. Kaufman & Broad, Inc., 707 F.2d 412, 415-16 (9th Cir. 1983). Here, after Rodrigues first raised the issue of standing and jurisdiction in his Reply Memorandum, filed May 11, 2008, the court allowed the Mutual Aid Fund to join Steve DeCosta as a real party in interest plaintiff in his capacity as a current trustee.

The Ninth Circuit Court of Appeals in the case <u>Motion Picture Industry</u> <u>Pension & Health Plans v. N.T. Audio Visual Supply, Inc.</u>, 259 F.3d 1063, after noting that the court lacked jurisdiction to hear an ERISA claim brought in the names of employee welfare plan entities as plaintiffs, granted the plans' *appellate* motion, filed after the appellate oral argument, to join two current members of the Board of Directors as fiduciary plaintiffs in order to establish jurisdiction. <u>Id.</u> at 1065 fn. 1; <u>see also</u> <u>Bowles v. Reade</u>, 198 F.3d 752, 761 (1999) (Ninth Circuit Court affirmed ERISA plans' amendment of complaint that added a trustee of the plans as a named party plaintiff in order to establish ERISA jurisdiction). Likewise, this Court should deem Steven DeCosta's joinder as necessary merely for procedural purposes. Regardless, Rodrigues has failed to show that Mr. DeCosta had sufficient actual knowledge so as to trigger the shorter 3 year statute of limitations.

### 6.    The Former Trustees Are Not Indispensable Parties.

Generally, plaintiffs are free to choose their defendants. The former trustees of the Mutual Aid Fund did not received any training about their role as trustees, did not control or vote on the Best Rescue investment, and were not given sufficient information about the investment. They relied upon and trusted Rodrigues. Regardless, to the extent that they have any alleged culpability, their absence does not expose Rodrigues to a risk of incurring multiple or inconsistent

obligations.    FRCP Rule 19 does not require that joint tortfeasors be joined as necessary parties.  See, e.g.,  Temple v. Synthes Corp., 498 U.S. 5, 7 (1990) (joint tortfeasors are not necessary authorities).

IV.    CONCLUSION

For the above reasons, Plaintiffs request that the Renewed Motion for Summary Judgment be denied.

DATED:  Honolulu, Hawaii, November 8, 2007.

_____
CHARLES A. PRICE
JAMES E. T. KOSHIBA
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| STEVEN DECOSTA IN HIS | ) | CIVIL NO. CV03-00598 DAE LEK |
| REPRESENTATIVE CAPACITY | ) | |
| AS CHAIRPERSON OF THE | ) | CERTIFICATE OF SERVICE |
| BOARD OF TRUSTEES OF | ) | |
| UNITED PUBLIC WORKERS, | ) | |
| AFSCME, LOCAL 646, AFL-CIO, | ) | |
| MUTUAL AID FUND TRUST, | ) | |
| REAL PARTY IN INTEREST | ) | |
| UNITED PUBLIC WORKERS, | ) | |
| AFSCME, LOCAL 646, AFL-CIO, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| GARY W. RODRIGUES, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the date noted below, a

copy of the foregoing document was duly served upon the following by hand

delivery, postage prepaid, addressed as follows:

ERIC A. SEITZ, ESQ.
820 Mililani Street, Suite 714
Honolulu, Hawaii 96813

Attorney for Defendant
GARY RODRIGUES

DATED:  Honolulu, Hawaii, November 8, 2007.

_____
JAMES E.T. KOSHIBA
CHARLES A. PRICE
Attorneys for Plaintiffs

-2-