A10118F
**ALBERT HEWITT  MARCH 6, 2007**

1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF HAWAII

3
    UNITED PUBLIC WORKERS,
4   AFSCME, LOCAL 646, AFL-CIO,
    MUTUAL AID FUND TRUST,
5
            Plaintiffs,          Civil No: CV03-00598 DAE LEK
6
    vs.
7
    GARY RODRIGUES,
8
            Defendant.
9   _____/

10

11

12

13                         DEPOSITION OF

14                         ALBERT HEWITT

15                       ORLANDO, FLORIDA

16                        MARCH 6, 2007

17

18

19

20

21  ATKINSON-BAKER, INC.
    COURT REPORTERS
22  (800) 288-3376
    www.depo.com
23
    REPORTED BY:  SUSAN WEISHAUPT, CSR
24

25  FILE NO.: A10118F

Page 1

A10118F
## ALBERT HEWITT  MARCH 6, 2007

1
2                    FOR THE DISTRICT OF HAWAII
3
4    UNITED PUBLIC WORKERS
     AFSCME, LOCAL 646, AFL-CIO,
5    MUTUAL AID FUND TRUST,
6            Plaintiffs,
7    vs.          Civil No: CV03-00598 DAE LEK
8    GARY RODRIGUES,
9            Defendant.
10   _____/
11
12
13
14
15        Deposition of ALBERT HEWITT, taken on behalf
16   of the Plaintiff, at 1802 North Alafaya Trail, Orlando,
17   Florida, 32826, commencing at 3:05 p.m., Tuesday, March
18   6, 2007, before Susan Welshaupt, CSR.
19
20
21
22
23
24
25
                                                    Page 2

1                      I N D E X
2    WITNESS:  ALBERT HEWITT
3    Direct Examination PAGE
4        By Mr. Price 6, 81
     Cross Examination
5
         By Mr. Seitz  64
6
7            E X H I B I T S
8              Plaintiff's
9    Letter Description                    Page
10   1 Letter dated 11/12/98 to Gary Rodrigues     7
       from Al Hewitt
11
12   2 Secured Promissory Note dated 11/24/98     24
13   3 Security Agreement              29
14   4 Secured Promissory Note dated 2/5/99     33
15   5 Letter dated 2/16/99 to Gary Rodrigues     36
       from Robert Hewitt
16   6 Secured Promissory Note dated 4/26/99     37
17   7 Letter dated 4/26/99 to Gary Rodrigues     39
       from Al Hewitt
18
19   8 Secured Promissory Noted dated 6/30/99     40
20   9 Letter dated 6/30/99 to Gary Rodrigues     42
       from Al Hewitt
21   10 Secured Promissory Note dated 8/24/99     43
22   11 Letter dated 8/24/99 to Gary Rodrigues     44
23   12 Letter dated 9/10/99 to Gary Rodrigues     18
       from Al Hewitt
24
25
                                                    Page 4

1    A P P E A R A N C E S :
2    For Plaintiff:  Telephonic Appearance
3    KOSHIBA, AGENA & KUBOT,
     By:  CHARLES A. PRICE, ESQ.
4    2600 Pauahi Tower
     1001 Bishop Street
5    Honolulu, HA  96813
6
7    For Defendant:  Telephonic Appearance
8    ERIC A. SEITZ, ESQ.
     Haseko Center
9    820 Mililani Street, Suite 714
     Honolulu, Ha 96813
10
11
12            - - - - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    Page 3

1    EXHIBITS  (Continued)
2    13 Secured Promissory Note dated 11/22/99     49     48
3    14 Letter dated 11/22/99 to Gary Rodrigues     52
       from Al Hewitt 51
4
5    15 Memo dated 12/15/99 to Al Hewitt from     53
       Gary Rodrigues 52
6    16 Best Rescue Systems, Inc. Transactions     58
       by Account  57
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    Page 5

2 (Pages 2 to 5)

A10118F
**ALBERT HEWITT   MARCH 6, 2007**

1    ALBERT HEWITT,
2    having first been duly sworn, was
3    examined and testified as follows:
4    DIRECT EXAMINATION
5    BY MR. PRICE:
6    Q.  Good afternoon, Mr. Hewitt.  Can you please
7    state your full name.
8    A.  Albert Hewitt.
9    Q.  You've had your deposition taken before, is
10   that correct?
11   A.  Yes.
12   Q.  I'm sorry, I'm not catching the answer.
13   A.  Yes.
14   Q.  Thank you.  You understand that the lawyers
15   will ask questions and you are to give sworn answers
16   under oath?
17   A.  Yes.
18   Q.  You understand that the questions asked and
19   the answers given are being taken down by the court
20   reporter?
21   A.  Yes.
22   Q.  Do you understand that the court reporter will
23   prepare a deposition transcript containing your answers
24   in today's deposition session?
25   A.  Yes.

Page 6

1    Q.  And do you understand that the deposition
2    transcript may be read to the judge in the trial in this
3    case in lieu of live testimony under certain
4    circumstances?
5    A.  Yes.
6    Q.  And do you understand that because your
7    answers today can be used in court, that it's important
8    that you treat this the same as if you're testifying in a
9    courtroom on a witness stand to a judge?
10   A.  Yes.
11   Q.  Do you understand that?
12   A.  Yes.
13   Q.  I'm sorry, I need you to repeat your answer.
14   A.  Yes.
15   Q.  How old are you?
16   A.  51 years old.
17   Q.  Where do you currently live?
18   A.  Orlando, Florida.
19   Q.  What is your home address?
20   A.  1539 Common Way Road.
21   Q.  Would you please take a look at Exhibit One.
22   Do you recognize this document?  I'm sorry, I'm not
23   catching the answer.
24   A.  I'm reading the document.
25   Q.  Is that your signature on page two of the

Page 7

1    document?
2    A.  Yes, it is.
3    Q.  What is this document?  I'm sorry, I need to
4    catch the answer, if you gave one.
5    A.  What was your question?
6    Q.  What is this document?
7    A.  I'm reading the document.
8    Q.  Okay.  Mr. Hewitt, if you could just let me
9    know when you're finished.
10   A.  Okay.  What is your question?
11   Q.  What is this document?
12   A.  This was a document that was sent to Gary
13   Rodrigues by myself indicating details regarding a
14   $250,000 loan from the Best Rescue Systems.
15   Q.  Was this letter sent on or about the date that
16   it's dated, November 12, 1998?
17   A.  Yes.
18   Q.  At the top it says The Hewitt Company, was
19   that your company?
20   A.  Yes.
21   Q.  What was The Hewitt Company?
22   A.  The Hewitt Company was a sole proprietorship
23   owned by myself.
24   Q.  In the letterhead it references you as the
25   senior managing director, were you the senior managing

Page 8

1    director for The Hewitt Company?
2    A.  Yes.
3    Q.  Were there any other directors?
4    A.  No.
5    Q.  Were there any other full-time employees?
6    A.  No.
7    Q.  When was The Hewitt Company formed?
8    A.  Pardon?
9    Q.  When was The Hewitt Company formed?
10   A.  1988.
11   Q.  And what did The Hewitt Company do?
12   A.  Provide financial advisory services.
13   Q.  What kind of licenses did you hold at that
14   time in November 1998?
15   A.  SEC, investment advisor license.
16   Q.  Did you hold a stock broker's license at that
17   time?
18   A.  Yes.
19   Q.  Did you hold a security dealer's license?
20   A.  No.
21   Q.  Were you affiliated with or registered with
22   anyone who did hold a security dealer's license?
23   A.  Yes.
24   Q.  At that time in November 1998?
25   A.  Yes.

Page 9

3 (Pages 6 to 9)

A10118F
ALBERT HEWITT  MARCH 6, 2007

Page 10

1   Q.  Who was that?
2   A.  Mayfield Securities.
3   Q.  The letter is addressed to Gary Rodrigues of
4   UPW, do you see that?
5   A.  Yes.
6   Q.  What was your understanding in November of
7   1998 of Gary Rodrigues' position or title with UPW?
8   A.  He was the executive director of the UPW.
9   Q.  Before 1998, approximately how long had you
10  known Mr. Rodrigues?
11  A.  Approximately eight years.
12  Q.  What was your involvement, if any, with UPW in
13  November of 1998?
14  A.  I managed the UPW Mutual Aid Fund and the UPW
15  Pension Account for the Local.
16  Q.  What was the source of the monies for the
17  pension account, if you know?
18  A.  Employee contributions.
19  Q.  In November of 1998, did you know what the
20  source of the funds was for the Mutual Aid account?
21  A.  No, not really.
22  Q.  Did Gary Rodrigues tell you at any time before
23  November of 1998 what the source of the Mutual Aid Fund
24  account was?
25  A.  I don't recall.

Page 12

1   A.  No.
2   Q.  Did you have any discussions with
3   Mr. Rodrigues at any time regarding written guidelines
4   for the Mutual Aid Fund Trust?
5   A.  No.
6   Q.  Before November of 1998 did Mr. Rodrigues tell
7   you that the Mutual Aid Fund trust was an employee
8   benefit plan?
9   A.  No.
10  Q.  Before November of 1998 did Mr. Rodrigues tell
11  you that the Mutual Aid Fund Trust was an employee
12  welfare plan?
13  A.  No.
14  Q.  I'm sorry, I didn't hear the answer, if it was
15  given.
16  A.  No.
17  Q.  Before November 1998 did Mr. Rodrigues
18  describe the purpose of the Mutual Aid Fund Trust?
19  A.  Yes.
20  Q.  What did he tell you the purpose was?
21  A.  The purpose was to provide a hospital -- a
22  supplemental hospital benefit to a select group of union
23  employees.
24  Q.  When, approximately, did he tell you that?
25  A.  I don't recall.

Page 11

1   Q.  In November of 1998 did you know what the
2   Mutual Aid Fund Trust was?
3   A.  No.
4   Q.  I'm sorry, I didn't hear the answer, if one
5   was given.
6   A.  No.
7   Q.  I'm sorry, was the answer no?
8   A.  Yes.
9   Q.  In November of 1998, did Mr. Rodrigues provide
10  to you a constitution of the Mutual Aid Fund Trust?
11  A.  No.
12  Q.  Did he provide to you in November of 1998 the
13  bylaws for the Mutual Aid Fund Trust?
14  A.  No.
15  Q.  Did Mr. Rodrigues provide to you, in November
16  of 1998, or any time before November of 1998, a plan
17  description for the Mutual Aid Fund Trust?
18  A.  No.
19  Q.  Did Mr. Rodrigues provide to you any written
20  documents relating to or describing what the Mutual Aid
21  Fund Trust was before November of 1998?
22  A.  No.
23  Q.  Did Mr. Rodrigues provide to you any written
24  investment guidelines for the Mutual Aid Fund Trust
25  before November of 1998?

Page 13

1   Q.  Was it before November of 1998?
2   A.  Yes.
3   Q.  Did Mr. Rodrigues tell you that the Mutual Aid
4   Fund Trust was an ERISA plan?
5   A.  No.
6   Q.  Did he tell you before November of 1998 that
7   it was a plan under the Employee Retirement Income
8   Security Act?
9   A.  No.
10  Q.  Now, all those questions that I asked you were
11  directed before November of 1998 and so I want to ask a
12  similar line of questioning all the way up until, ask at
13  any time, and let me just go through them very quickly.
14  Did Mr. Rodrigues at any time provide you with the
15  constitution, bylaws or a plan description for the Mutual
16  Aid Fund Trust?
17  A.  No.
18  Q.  Did he provide you at any time any written
19  investment guidelines for the Mutual Aid Fund Trust?
20  A.  No.
21  Q.  Did Mr. Rodrigues tell you at any time that
22  the Mutual Aid Fund Trust was an ERISA plan?
23  A.  No.
24  Q.  When you had dealings regarding the Mutual Aid
25  Fund Trust, who was your point of contact?

4 (Pages 10 to 13)

A10118F
## ALBERT HEWITT   MARCH 6, 2007

1    A. Mr. Rodrigues.
2    Q. Did you have any discussions with anyone else
3 that you understood was affiliated with the Mutual Aid
4 Fund Trust about the Mutual Aid Fund Trust?
5    A. No.
6    Q. Did you ever meet any board members of the
7 Mutual Aid Fund Trust?
8    A. No.
9    Q. Did you ever meet any trustees of the Mutual
10 Aid Fund Trust?
11    A. No.
12    Q. I'm sorry, I didn't hear the answer, if one
13 was given.
14    A. No.
15    Q. Did Mr. Rodrigues tell you that there was a
16 board for the Mutual Aid Fund Trust?
17    A. I don't recall.
18    Q. In your conversations with Mr. Rodrigues about
19 the Mutual Aid Fund Trust, did he ever tell you that he
20 needed to review matters with the board of the Mutual Aid
21 Fund Trust?
22    A. I don't recall.
23    Q. Did Mr. Rodrigues ever tell you that he needed
24 to get approval of the board before doing any acts on
25 behalf of the Mutual Aid Fund Trust?

Page 14

1    A. I don't recall.
2    Q. In November of 1998 did you have an
3 understanding as to who was in control of or in charge of
4 how the Mutual Aid Fund Trust monies were used?
5    A. I don't understand your question.
6    Q. Did you understand that Gary Rodrigues was the
7 person who was in charge of the Mutual Aid Fund Trust?
8    A. Gary Rodrigues was my point person.
9    Q. Did you have any understanding in November of
10 1998 that you needed the approval of anyone else besides
11 your point person, Gary Rodrigues, when dealing with
12 Mutual Aid Fund Trust monies?
13    A. Well, Gary Rodrigues was my point person, so I
14 had to accept what he told me to do.
15    Q. And just to clarify, did he tell you that he
16 needed the approval of anyone else when making use of
17 Mutual Aid Fund money?
18    A. I don't recall.
19    Q. The Exhibit One letter dated November 12, 1998
20 references Best Rescue Systems, do you see that?
21    A. Yes.
22    Q. I'm sorry, I didn't hear an answer if one was
23 given.
24    A. Yes.
25    Q. What was Best Rescue Systems?

Page 15

1    A. It was a start-up company that was developing
2 a product to get people out of high-rise buildings and
3 structures in the event of an emergency.
4    Q. When was that start-up company first formed?
5    A. I don't recall the exact date.
6    Q. As of November 1998, approximately how long
7 had Best Rescue been in existence?
8    A. I don't recall at this point.
9    Q. Would it have been more than a year or less
10 than a year?
11    A. I don't recall.
12    Q. Would it be fair to say that the company was
13 less than two years old as of November 1998?
14    A. I don't recall.
15    Q. You said that it was developing a fire rescue
16 product, is that correct?
17    A. Correct.
18    Q. As of November 1998 what was your involvement,
19 if any, with Best Rescue?
20    A. Financial advisory.
21    Q. And what do you mean by that?
22    A. I was hired by the company to look at
23 strategic alternatives for the company, including
24 obtaining funding.
25    Q. Did you approach Gary Rodrigues about

Page 16

1 obtaining funding for Best Rescue?
2    A. Yes.
3    Q. When?
4    A. Sometime prior to November 12, 1998.
5    Q. Describe your discussions with Mr. Rodrigues
6 regarding Best Rescue before November of 1998.
7    A. I showed Mr. Rodrigues some information
8 regarding the company that was prepared by the University
9 of Central Florida Business Development Center and we
10 both agreed that this would be a good idea for the state
11 of Hawaii, considering the number of high rises in
12 Honolulu.
13    Q. What was the Central Florida Business
14 Development Center?
15    A. It was a university-based incubator for small
16 businesses.
17    Q. Before November of 1998, did Best Rescue have
18 a completed business plan?
19    A. Repeat your question.
20    Q. Before November 1998 did Best Rescue have a
21 completed business plan?
22    A. Yes.
23    Q. I'm sorry, is your answer yes?
24    A. Yes.
25    Q. I'm looking for a document among the exhibits

Page 17

5 (Pages 14 to 17)

A10118F
## ALBERT HEWITT  MARCH 6, 2007

Page 18

1  that describes that the business plan had not yet been
2  completed and I'd like to show it to you, just to see if
3  that -- if you could please look at Exhibit 12. And I'm
4  looking at the first paragraph of page two of Exhibit 12.
5  Now, is Exhibit 12 a letter that you wrote to
6  Mr. Rodrigues dated September 10, 1999?
7      A. I'm reading the letter.
8      Q. Mr. Hewitt, just let me know when you've had a
9  chance to look at that.
10      A. Okay.
11      Q. Is this a letter that you wrote to
12  Mr. Rodrigues dated September 10, 1999?
13      A. Wait, I'm finishing reading the letter.
14      Q. I'm sorry.
15      A. I'm finished reading the letter. What's your
16  question?
17      Q. Is Exhibit 12 a letter that you wrote to
18  Mr. Rodrigues?
19      A. Yes.
20      Q. On September 10, 1999?
21      A. Yes.
22      Q. Now, on page two of that letter it talks about
23  finishing the business plan, in the first paragraph, can
24  you see that?
25      A. Yes.

Page 19

1      Q. Does this letter refresh your memory that at
2  least as of the date of this letter, September 10, 1999,
3  that the business plan for Best Rescue had not yet been
4  completed?
5      A. This was a revision of the original business
6  plan, a more thorough business plan.
7      Q. Was the more thorough business plan completed
8  as of September 10, 1999?
9      A. No.
10      Q. As of September 1999, had any marching plans
11  been completed?
12      A. No.
13      Q. As of September 1999, had the certification
14  process been completed?
15      A. It was in the final stages.
16      Q. What did the certification process entail?
17      A. It entailed engineers doing various tests for
18  product certification.
19      Q. And what was your understanding as to why
20  certification was necessary?
21      A. Because we were asking people to step out of a
22  window, or should I say the company was asking people to
23  step out of a window and be lowered to the ground in the
24  event of an emergency.
25      Q. Was the engineering certification necessary to

Page 20

1  ensure the safety of the product?
2      A. Correct.
3      Q. Is it correct, I'm looking at the bottom of
4  page two of Exhibit 12, that the product videos had not
5  yet been finished as of September 1999?
6      A. Correct.
7      Q. Is it correct that as of September 1999 Best
8  Rescue had not yet signed up distributors for the
9  product?
10      A. I don't recall.
11      Q. I'm looking at the last sentence in the second
12  paragraph on page two of this letter dated September 10,
13  1999 to Mr. Rodrigues. And is it correct, if you look at
14  that sentence, is that sentence correct when written,
15  that as of that date distributors had not yet been signed
16  up?
17      A. What I say in that sentence is the first
18  group, I'm not sure if one or two individual distributors
19  hadn't been signed by that point.
20      Q. As of September 1999, had Best Rescue received
21  sales orders for the product?
22      A. Yes.
23      Q. How many?
24      A. One.
25      Q. What was the value?

Page 21

1      A. Approximately $30,000.
2      Q. Was that the total amount of sales of product
3  up until September 1999 for the company?
4      A. To my knowledge.
5      Q. As of September 1999 had Best Rescue received
6  all patents for the various components of the product?
7      A. A patent was existingly pending.
8      Q. And had the patent yet been completed and
9  received?
10      A. No.
11      Q. Was Best Rescue, as of September 1999,
12  generating any other revenue other than the approximately
13  $30,000 in sales, that you recall?
14      A. No.
15      Q. Now, going back to Exhibit One, in November of
16  1998, at the time that you had written this letter, had
17  Gary Rodrigues agreed to fund $250,000 to Best Rescue?
18      A. I don't recall.
19      Q. The letter describes funds coming from the
20  pension account and from the Mutual Aid account. Were
21  any funds provided to Best Rescue from the UPW pension
22  account at any time?
23      A. No.
24      Q. Do you know why not?
25      A. Because of the ERISA nature of that account.

A10118F
## ALBERT HEWITT   MARCH 6, 2007

Q. And what about the ERISA nature of the account resulted in no funds being paid to Best Rescue from the pension account?

A. I don't recall the exact details.

Q. In this letter, Exhibit One, at the first bullet point it talks about moving funds from the pension account for the loan was discouraged by First Hawaiian due to legal constraints. Is the legal constraints referenced in that letter the ERISA issue that you just discussed?

A. I believe so.

Q. At the second or last paragraph of that letter it talks about upon recapitalization of the company in January when the other investors (DTRIC and Royal State Group) funds are expected, and then it goes on. Did you make any kind of presentation to DTRIC regarding Best Rescue?

A. Yes.

Q. Did DTRIC commit to providing funds to Best Rescue?

A. I don't understand your question.

Q. Did DTRIC commit or agree to provide funds to Best Rescue?

A. In word only.

Q. And what do you mean by that?

Page 22

A. There was no written documentation stating that they would commit funds.

Q. Did DTRIC ever provide funds to Best Rescue?

A. No.

Q. Were you ever told why DTRIC did not?

A. No.

Q. Did you make a presentation to Royal State Group about Best Rescue?

A. Yes.

Q. Did Royal State Group ever provide funds to Best Rescue?

A. No.

Q. Were you ever told why Royal State Group did not provide funds to Best Rescue?

A. No.

Q. The last sentence of the second to last paragraph on page two of the letter reads "a complete package on the company, including business plan, is being currently completed and will be forwarded to you next week". Was that business plan forwarded the following week?

A. I don't recall.

Q. Do you know if the business plan referenced in your letter here is the original business plan or are you referencing the more thorough business plan that was

Page 23

referenced in the September 1999 letter?

A. It would be the original business plan.

Q. If you could please look at Exhibit Two, titled Secured Promissory Note and after you've had a chance to look at that, my question will be, do you recognize this document?

A. I recognize this document.

Q. And was this a promissory note for $250,000 to be loaned by the UPW Mutual Aid Fund to Best Rescue?

A. Correct.

Q. Do you recognize the signature on the last page of the Secured Promissory Note?

A. Yes.

Q. Is that Mr. Kirkland's signature?

A. Yes.

Q. I'm sorry, I didn't hear the answer, if it was given.

A. Yes.

Q. Was there $250,000, in fact, funded?

A. Yes.

Q. The secured promissory note, and I'm looking at what is labeled Subparagraph B, has a date of demand of not prior to January 1, 1999, do you see that?

A. Yes.

Q. Prior to UPW Mutual Aid Fund making this loan,

Page 24

did you have any discussions with Mr. Rodrigues about what the monies would be used for by Best Rescue?

A. Yes.

Q. I'm, sorry, I didn't hear the answer if it was given.

A. Yes.

Q. What did you discuss?

A. I don't recall exactly.

Q. What was the money used for, generally?

A. Company purposes.

Q. Can you be a little bit more specific?

A. I don't recall the exact breakdown at this date.

Q. Before the first $250,000 loan was made, did Mr. Rodrigues visit Best Rescue's office or place of operations?

A. No.

Q. Did Best Rescue have an office in November of 1998?

A. I don't recall.

Q. Did Best Rescue have any full-time employees in November of 1998?

A. Yes.

Q. How many?

A. Approximately three or four.

Page 25

**ATKINSON-BAKER, INC. COURT REPORTERS**

A10118F
## ALBERT HEWITT   MARCH 6, 2007

1    Q.  Before the $250,000 loan was made, were those
2  employees being paid?
3    A.  I don't know.
4    Q.  Before the $250,000 loan was made, was Best
5  Rescue generating any revenue?
6    A.  I don't recall.
7    Q.  Before the $250,000 loan was made, did
8  Mr. Rodrigues meet with or talk to Mr. Kirkland, the
9  president?
10    A.  I don't recall.
11    Q.  Did Mr. Rodrigues ask you about Mr. Kirkland's
12  business experience?
13    A.  I don't recall.
14    Q.  Did Mr. Rodrigues, before making the $250,000
15  loan on behalf of the Mutual Aid Fund, ask to review Best
16  Rescue's financials?
17    A.  I don't recall.
18    Q.  Before this loan was made, did you tell
19  Mr. Rodrigues that Best Rescue was a start-up developing
20  company that was developing a product?
21    A.  Yes.
22    Q.  Did you tell Mr. Rodrigues that the company
23  had -- was not yet generating revenue?
24    A.  I don't recall.
25    Q.  Did you tell Mr. Rodrigues before this first

Page 26

1  loan in November of 1998 that the product was still in
2  the process of testing and certification?
3    A.  I don't recall.
4    Q.  Did you receive any kind of fee or payment in
5  connection with the first $250,000 loan?
6    A.  Yes.
7    Q.  What was the amount of your fee?
8    A.  Five percent of the money that came in.
9    Q.  How would you characterize that five percent?
10  Did you think of it as a commission, a finder's fee, a
11  loan origination fee; in your mind, what was the label
12  for the five percent?
13    A.  A loan origination fee paid by Best Rescue.
14    Q.  Did you tell Mr. Rodrigues, before the first
15  $250,000 loan was made, that you would be receiving a
16  five percent fee?
17    A.  I don't recall.
18    Q.  Did you tell Mr. Rodrigues at any time that
19  you would be receiving a five percent fee in connection
20  with Mutual Aid Fund loans?
21    A.  To my knowledge, I did.
22    Q.  How was the five percent fee arrived at with
23  Best Rescue?
24    A.  It was a negotiation between me and
25  Mr. Kirkland.

Page 27

1    Q.  In addition to the loan origination fee, did
2  you receive any other monies from Best Rescue?
3    A.  I don't recall.
4    Q.  Did you provide any kind of management
5  services to or consulting services to Best Rescue?
6    A.  Yes.
7    Q.  I'm sorry, I didn't hear the answer, if one
8  was given.
9    A.  Yes.
10    Q.  And did you receive a fee or compensation for
11  your management or consulting services to Best Rescue at
12  any time?
13    A.  Yes.
14    Q.  And did you tell Mr. Rodrigues that you were
15  receiving a management or consulting fee from Best
16  Rescue?
17    A.  Yes, to my knowledge.
18    Q.  And that management or consulting fee was in
19  addition to the five percent loan origination fee, is
20  that correct?
21    A.  Yes.
22    Q.  Did you advance any monies for expenses on
23  behalf of Best Rescue for which you were reimbursed?
24    A.  Yes.
25    Q.  Did you tell Mr. Rodrigues that you were being

Page 28

1  reimbursed by Best Rescue for any monies that you
2  advanced on behalf of Best Rescue?
3    A.  Yes.
4    Q.  Please look at Exhibit Number Two.  And after
5  you've had a chance to look at it -- I'm sorry, I believe
6  we have identified Exhibit Number Two.  If you could look
7  at Exhibit Three, please.  After you've had a chance to
8  look at it, my question will be, do you recognize this
9  document and what is it?
10    A.  I'm familiar with the document.
11    Q.  And was this the Security Agreement for the
12  Secured Promissory Note that was marked as Exhibit Number
13  Two?
14    A.  Yes.
15    Q.  And do you recognize the signature on page
16  five to be that of Robert Kirkland?
17    A.  Yes.
18    Q.  Are you familiar with Gary Rodrigues'
19  signature?
20    A.  No.
21    Q.  Looking at page six, do you know if that's
22  Gary Rodrigues' signature?
23    MR. SEITZ:  Objection, he answered he wasn't
24    familiar with it.
25  BY MR. PRICE:

Page 29

8 (Pages 26 to 29)

A10118F

**ALBERT HEWITT   MARCH 6, 2007**

1    Q.  Subject to that objection, can you answer the
2  question, please?  Do you know if that's Gary Rodrigues'
3  signature?
4    A.  To the best of my knowledge.
5    Q.  Underneath the signature on page six is
6  written the words "State Director and Administrator", do
7  you see that?
8    A.  Yes.
9    Q.  Did you ever have any discussions with
10  Mr. Rodrigues about the title Administrator of United
11  Public Workers Mutual Aid Fund?
12    A.  No.
13    Q.  On the last page of this document is Exhibit
14  B, Assets Subject to Security Interest, do you see that?
15    A.  Yes.
16    Q.  I'm sorry, I didn't hear the answer, if it was
17  given.
18    A.  Yes.
19    Q.  Number one is "all property, equipment and
20  assets comprising the business of Best Rescue Systems,
21  Inc." Did Best Rescue Systems, in November of 1998, did
22  they have office furniture and equipment?
23    A.  I don't recall.
24    Q.  Did it have any completed fire rescue products
25  at that time?

Page 30

1    A.  Yes.
2    Q.  Do you know how many?
3    A.  I don't recall.
4    Q.  Do you know the approximate value of Best
5  Rescue's fire rescue products and furniture, office --
6  furniture, fixtures and equipment as of November 1998?
7    A.  I don't recall.
8    Q.  Did Best Rescue have any accounts receivables
9  in November 1998?
10    A.  I don't recall.
11    Q.  Did Best Rescue have any registered trade
12  names, trademarks, service marks, logos or copyrights in
13  November 1998?
14    A.  I don't recall.
15    Q.  Do you know if it had any at any time?
16    A.  I don't recall.
17    Q.  Trademarks, service marks, logos or copyrights
18  that were registered.
19    A.  I don't recall.
20    Q.  Was the value of the assets subject to the
21  security interests listed in Exhibit B more than or less
22  than $250,000 as of November 1998?
23    A.  I don't understand your question.
24    Q.  The last page, "assets subject to security
25  agreement," items one through ten list various assets.

Page 31

1  And my question is, do you know if the value of those
2  assets, as of November 1998, was more than or less than
3  $250,000?
4    A.  I don't recall.
5    Q.  In November 1998, did you take any steps to
6  determine the value of the items listed on the Exhibit B
7  to this document, Assets Subject to Security Interest?
8    A.  I don't recall.
9    Q.  Do you know if Gary Rodrigues took any steps
10  to determine the value of the assets subject to security
11  interest?
12    A.  No.
13    Q.  To your knowledge, did Mr. Rodrigues have any
14  communications directly with anyone at Best Rescue at any
15  time?
16    A.  I don't recall.
17    Q.  To your knowledge, was any communications with
18  Best Rescue typically and usually through you between
19  Gary Rodrigues and Best Rescue?
20    A.  Typically.
21    Q.  I mean, for example, when these security
22  agreements and the secured promissory note were provided
23  to Mr. Rodrigues for signature, did you provide them or
24  did they come directly from Best Rescue, an attorney or
25  someone else?

Page 32

1    A.  All of the above.
2    Q.  Okay, do you know who prepared the security
3  agreement, who drafted it?
4    A.  An attorney hired by Best Rescue.
5    Q.  His name is?
6    A.  I don't recall.
7    Q.  And do you know if he communicated directly
8  with Mr. Rodrigues, either orally or in writing?
9    A.  I don't recall.
10    Q.  If you could please look at Exhibit Number
11  Four and after you've had a chance to look at it, my
12  question will be, do you recognize that document?
13    A.  I recognize the document.
14    Q.  Is that Mr. Kirkland's signature on the bottom
15  of page two of that document?
16    A.  Yes.
17    Q.  This is a $200,000 secured promissory note
18  dated February 5, 1999, is that correct?
19    A.  Yes.
20    Q.  Was the $200,000 referenced in this secured
21  promissory note, in fact, funded by United Public Workers
22  Mutual Aid Fund?
23    A.  Yes.
24    Q.  Between November of 1998 and the first secured
25  promissory note for $250,000 and the second secured

Page 33

A10118F

ALBERT HEWITT  MARCH 6, 2007

1 promissory note in February 1998 -- 1999, did you have
2 any discussions with Mr. Rodrigues about additional
3 funding for Best Rescue?
4     A.  I'm sorry, you just confused me.  Can you
5 repeat your question?
6     Q.  Yes.  Between the first promissory note in
7 November 1998 and the second promissory note in February
8 1999, did you talk to Mr. Rodrigues about additional
9 funding for Best Rescue?
10     A.  Yes.
11     Q.  What did you discuss?
12     A.  I don't recall exactly.
13     Q.  Did you explain why additional funds were
14 needed?
15     A.  Yes.
16     Q.  And what's your recollection as to why the
17 additional funds were needed?
18     A.  Continued development of the products.
19     Q.  And did you tell that to Mr. Rodrigues?
20     A.  To my knowledge, yes.
21     Q.  Now, for this loan and for any other loans we
22 discuss, did you receive a fee in connection with those
23 loans, as was true with the first loan?
24     A.  Yes.
25     Q.  What was the amount?

Page 34

1     A.  Five percent.
2     Q.  And did that apply for each and every loan
3 from the Mutual Aid Fund to Best Rescue?
4     A.  Yes.
5     Q.  In addition to the five percent loan fee, did
6 you also receive management and consulting fees from Best
7 Rescue?
8     A.  Yes.
9     Q.  In addition to the loan fee and the management
10 consulting fees, did you also receive reimbursement for
11 any advances you had made to or on behalf of Best Rescue?
12     A.  Yes.
13     Q.  Did you receive any kind of compensation from
14 UPW during this time period in late 1998 and early 1999
15 for managing the Mutual Aid Fund account?
16     A.  Yes.
17     Q.  And how was that compensation calculated?
18     A.  Based on assets the prior year.
19     Q.  Was it a percentage?
20     A.  Yes.
21     Q.  What was the percentage?
22     A.  Approximately one percent.
23     Q.  And was that -- did that percentage vary at
24 all during the course of the year based on number of
25 transactions or anything like that?

Page 35

1     A.  No.
2     Q.  I'm sorry, I didn't hear the answer, if one
3 was given.
4     A.  No.
5     Q.  At the time that this second loan of $200,000
6 was made in February of 1999, did you have any
7 discussions with Mr. Rodrigues up until that time as to
8 the total amount that the UPW Mutual Aid Fund would be
9 providing to Best Rescue?
10     A.  I don't recall.
11     Q.  I'm sorry, I didn't hear the answer, if it was
12 given.
13     A.  I don't recall.
14     Q.  Did you have any discussions before any loans
15 were made about something to the effect that Best Rescue
16 will need a million dollars and that will be funded over
17 a course of a year; was there any specific funding plan
18 that was discussed before the loans were made?
19     A.  No.
20     Q.  If you could please look at Exhibit Number
21 Five.  My question would be, is that your signature on
22 this document?
23     A.  Yes.
24     Q.  Is this a letter that you sent to
25 Mr. Rodrigues on or about February 16, 1999?

Page 36

1     A.  Yes.
2     Q.  What was the purpose of the letter, generally?
3     A.  It was tied to Exhibit Four.
4     Q.  I'm sorry, did you say Exhibit Three?
5     A.  Exhibit Four.
6     Q.  Exhibit Four is the promissory note, is that
7 correct?
8     A.  Correct.
9     Q.  And then Exhibit Three is the original
10 security agreement that's referenced in this February 16,
11 1999 letter?
12     A.  Yes.
13     Q.  And was the purpose of this letter just to
14 simply point out that instead of doing a new security
15 agreement, that these new funds would also be covered by
16 that original security agreement?
17     A.  Correct.
18     Q.  If you could please look at Exhibit Six.  And
19 my question will be, do you recognize that document?
20     A.  Yes.
21     Q.  Is that Mr. Kirkland's signature on page two
22 of Exhibit Six?
23     A.  Yes.
24     Q.  And this is a $150,000 secured promissory note
25 dated April 26, 1999, is that correct?

Page 37

10 (Pages 34 to 37)

A10118F
## ALBERT HEWITT   MARCH 6, 2007

1    A.  Correct.

2    Q.  I'm sorry, I didn't hear the answer, if it was

3  given.

4    A.  Yes.

5    Q.  Was this $150,000, in fact, funded by the UPW

6  Mutual Aid Fund?

7    A.  Yes.

8    Q.  Before this $150,000 was paid, did you have

9  any discussions with Mr. Rodrigues as to what the monies

10  would be used for?

11    A.  Yes.

12    Q.  What did you discuss?

13    A.  I don't recall exactly.

14    Q.  Approximately how often or how many times

15  would you talk to Mr. Rodrigues about Best Rescue from

16  the time of the first loan in November of 1998 until this

17  time in April of 1999?

18    A.  To my recollection, at least monthly.

19    Q.  And were these meetings -- did you ever meet

20  with him in person?

21    A.  Yes.

22    Q.  And what do you recall Mr. Rodrigues asking

23  you about Best Rescue, generally, in these meetings?

24    A.  I don't recall exactly.  Of course, the

25  purpose of our meetings was to provide a progress report.

Page 38

1    A.  Yes.

2    Q.  And was the purpose of this letter the same as

3  the other letter, which was to indicate that this

4  additional loan was covered by the original security

5  agreement?

6    A.  Yes.

7    Q.  If you could please look at Exhibit Eight.  Do

8  you recognize that document?

9    A.  Yes.

10    Q.  Is that Mr. Kirkland's signature on that

11  document?

12    A.  Yes.

13    Q.  This is a $250,000 secured promissory note

14  dated June 30, 1999, is that correct?

15    A.  Yes.

16    Q.  Were these funds, $250,000, in fact, funded

17  and paid to Best Rescue?

18    A.  Yes.

19    Q.  In connection -- I think I asked this before.

20  Is it correct that in connection with all loans, that you

21  received a five percent loan origination fee?

22    A.  Yes.

23    Q.  Did you continue from April 1999 to June 1999,

24  during that period, continue to meet or talk with

25  Mr. Rodrigues about Best Rescue?

Page 40

1    Q.  And did you, as you mentioned in other

2  meetings, discuss that the company was using the monies

3  to develop the product?

4    A.  Correct.

5    Q.  If you could please look at Exhibit Seven.  Is

6  that your signature on Exhibit Seven?

7    A.  Yes.

8    Q.  Is that Mr. Kirkland's signature on Exhibit

9  Seven?

10    A.  Yes.

11    Q.  I'm sorry, I didn't hear the answer, if it was

12  given.

13    A.  Yes.

14    Q.  And this is a letter from you to Mr. Rodrigues

15  dated April 26, 1999, is that correct?

16    A.  Yes.

17    Q.  And did you send the letter on or about that

18  date?

19    A.  Yes.

20    Q.  And the third secured promissory note, is that

21  the Exhibit Six you looked at?

22    A.  Yes.

23    Q.  And the letter references the original

24  security agreement and is that the original security

25  agreement that was marked as Exhibit Three?

Page 39

1    A.  Yes.

2    Q.  And was that typically on a monthly update?

3    A.  At least, yes.

4    Q.  Before this loan of $250,000, did you have any

5  discussions with Mr. Rodrigues about the purpose of the

6  funds?

7    A.  Yes.

8    Q.  What did you discuss?

9    A.  We were -- a progress report, what was going

10  on.  Approximately at this time I recall the

11  certification was getting in the full force and a lot of

12  the money was being used for trade shows to get -- for

13  trade shows to get acceptance by the fire and rescue

14  community.

15    Q.  When you say acceptance, was Best Rescue

16  seeking any kind of certification from or seal of

17  approval from any fire rescue organization?

18    A.  Yes, seal of approval.

19    Q.  And who would give that seal of approval?

20    A.  I don't recall the exact organizations at this

21  point.

22    Q.  Was it more than one organization?

23    A.  Yes.

24    Q.  And were those seal of approvals ever

25  obtained?

Page 41

**ATKINSON-BAKER, INC. COURT REPORTERS**

11 (Pages 38 to 41)

1 (800) 288-3376

A10118F
ALBERT HEWITT  MARCH 6, 2007

1    A.  Verbally.
2    Q.  In writing, is that correct?
3    A.  I said verbally.
4    Q.  Okay, I just want to define that.  Did Best
5  Rescue ever receive any written certification or seal of
6  approval from any fire rescue organization?
7    A.  No.
8    Q.  When you say verbally, from whom, which
9  organization or organizations?
10    A.  I don't remember the exact names of the
11  organizations, but many demonstrations were conducted
12  before senior fire personnel.
13    Q.  And when you say verbally, they would say that
14  they liked the product?
15    A.  Yes.
16    Q.  If you could look at Exhibit Number Nine.  And
17  is that your signature on Exhibit Nine?
18    A.  Yes.
19    Q.  Is that Mr. Kirkland's signature on Exhibit
20  Nine?
21    A.  I can't hear you, you broke up.
22    Q.  Is that Mr. Kirkland's signature also on
23  Exhibit Nine?
24    A.  Yes.
25    Q.  And it's a letter from you to Mr. Rodrigues

Page 42

1  dated June 30, 1999, is that correct?
2    A.  Yes.
3    Q.  And the $250,000 for the secured promissory
4  note is the Exhibit Eight that we just looked at, is that
5  correct?
6    A.  Yes.
7    Q.  And the security agreement referenced in your
8  letter is the original security agreement which was
9  marked as Exhibit Three, is that correct?
10    A.  Correct.
11    Q.  And this letter served the purpose -- same
12  purpose as the other letters that we looked at?
13    A.  Yes.
14    Q.  Would you please look at Exhibit Ten.  Is that
15  Mr. Kirkland's signature on page two?
16    A.  Yes.
17    Q.  Do you recognize this document?
18    A.  Yes.
19    Q.  I'm sorry, I didn't hear the answer, if given.
20    A.  Yes.
21    Q.  Is this $150,000 secured promissory note dated
22  August 24, 1999?
23    A.  Yes.
24    Q.  And did UPW Mutual Aid Fund, in fact, pay and
25  fund the $150,000 referenced in this note?

Page 43

1    A.  Yes.
2    Q.  Between June of 1999 and August of 1999 did
3  you continue to have update meetings with Mr. Rodrigues
4  regarding Best Rescue?
5    A.  Yes.
6    Q.  And do you have any specific recollection as
7  to what was discussed regarding this $150,000 loan?
8    A.  Continued progress reports, the developmental
9  phase was continuing, certification was continuing, the
10  demonstrations were continuing, they were close to
11  getting their first order.
12    Q.  When did Best Rescue get their first order?
13    A.  Sometime that summer of '99.
14    Q.  Was that the $30,000 in sales that you
15  referenced earlier?
16    A.  Correct.
17    Q.  Would you please look at Exhibit 11.  Do you
18  recognize this document?
19    A.  Yes.
20    Q.  Is that Mr. Kirkland's signature on the bottom
21  of this document?
22    A.  Yes.
23    Q.  My copy does not have your signature on it.  I
24  assume yours is the same.  Is there a signature for you
25  on your copy of Exhibit 11 in front of you?

Page 44

1    A.  No, there's no signature, my signature is not
2  here.
3    Q.  Do you know if this letter was sent to
4  Mr. Rodrigues on or about August 24, 1999?
5    A.  I would assume yes.
6    Q.  Now, as of this time, the total amount loaned
7  by the UPW Mutual Aid Fund was a million dollars, is that
8  correct?
9    A.  Correct.
10    Q.  And the 150,000 fifth secured promissory note
11  is the Exhibit Ten that we just looked at, is that
12  correct?
13    A.  Correct.
14    Q.  And the security agreement is the Exhibit
15  Three, the original security agreement in November of
16  1998, is that correct?
17    A.  Correct.
18    Q.  If you could please look at Exhibit 12.  I
19  think we looked at this earlier, but after you've had a
20  chance to read it again, if you could let me know.
21    A.  I'm fine.
22    Q.  And is that your signature on page two of this
23  document?
24    A.  Yes.
25    Q.  And this is a letter from you to Mr. Rodrigues

Page 45

12 (Pages 42 to 45)

A10118F
## ALBERT HEWITT   MARCH 6, 2007

1  dated September 10, 1999, is that correct?

2      A.  Yes.

3      Q.  Did you send this letter on or about the date

4  it shows, September 10, 1999?

5      A.  Yes.

6      Q.  As of September 1999, had Mr. Rodrigues

7  expressed any concerns to you about the loans to Best

8  Rescue?

9      A.  I don't recall.

10      Q.  We had seen the first promissory note had a

11  demand date of no earlier than January 1st, 1999, do you

12  recall that?

13      A.  Yes.

14      Q.  And the note and the letter that we looked at

15  earlier talked about how there would be capitalization of

16  Best Rescue expected at sometime in 1999, do you recall

17  that, generally?

18      A.  Yes.

19      Q.  Did Best Rescue ever receive the expected

20  funding or capitalization from any other source other

21  than UPW Mutual Aid Fund?

22      A.  No.

23      Q.  Did you, during the course of 1999, take steps

24  to try to secure funding from sources other than the

25  Mutual Aid Fund?

Page 46

1      A.  Yes.

2      Q.  Can you describe for us generally what you

3  did?

4      A.  I contacted a number of venture capital funds

5  and there was interest.

6      Q.  Then is it correct that no one ultimately made

7  a commitment and actually funded additional monies to

8  Best Rescue other than the UPW Mutual Aid Fund?

9      A.  Correct.

10      Q.  Did any of those venture capitalists that

11  expressed interest undertake any due diligence of Best

12  Rescue to determine whether or not they should invest

13  monies in the company?

14      A.  Some.

15      Q.  I'm sorry, I didn't hear the answer, if one

16  was given.

17      A.  Yes, some.

18      Q.  Do you recall any names?

19      A.  No, I don't.

20      Q.  What due diligence steps did they take that

21  you recall?

22      A.  Company visit, discussions with Mr. Kirkland.

23      Q.  At any time prior to September of 1999, did

24  Mr. Rodrigues visit Best Rescue's operations?

25      A.  No.

Page 47

1      Q.  At any time before September of 1999, to your

2  knowledge, did Mr. Rodrigues meet with Mr. Kirkland?

3      A.  Clarify your question.

4      Q.  To your knowledge, before September 1999, did

5  Mr. Rodrigues meet with Mr. Kirkland?

6      A.  I don't believe so.

7      Q.  Do you know if he spoke to Mr. Kirkland on the

8  phone prior to September 1999?

9      A.  I don't know that.

10      Q.  This letter references in the very first

11  bullet point, interest checks for two periods.  Was Best

12  Rescue paying interest on the UPW Mutual Aid Fund loans?

13      A.  Yes.

14      Q.  There's a reference here to a one million

15  dollar total capitalization from UPW pension fund.  Do

16  you see that?

17      A.  Yes.

18      Q.  I'm sorry, I didn't hear the answer, if given?

19      A.  Yes.

20      Q.  As of September 1999, was the possibility of

21  the UPW investing or loaning money to Best Rescue still a

22  possibility?

23      A.  Yes, to my knowledge.

24      Q.  Were there any concerns expressed about the

25  issue that you talked about earlier, which was that there

Page 48

1  were legal constraints regarding ERISA and the pension

2  account?

3      A.  I don't recall the details regarding that.

4      Q.  I'm looking at page two of the letter.  Is it

5  correct that as of September 1999 the business plan and

6  the shareholder agreement had not yet been completed?

7      A.  Yes.

8      Q.  Is it correct that as of September 1999 the

9  total sales for the company was $30,000?

10      A.  Yes.

11      Q.  As of September 1999 the company was still

12  finishing market development?

13      A.  Yes, and certification.

14      Q.  Is it correct that as of September 1999 the

15  product was still undergoing testing and certification?

16      A.  Yes.

17      Q.  If you could please look at Exhibit 13.  Is

18  that your signature on page two of Exhibit 13?

19      A.  Yes.

20      Q.  The previous secured promissory notes that we

21  looked at were signed by Mr. Kirkland, this one is signed

22  by you.  What was the reason for the change?

23      A.  A management turmoil at the company.

24      Q.  Did you hold a management position with Best

25  Rescue at this time in November of 1999?

Page 49

A10118F

ALBERT HEWITT   MARCH 6, 2007

1    A.  No.
2    Q.  Were you ever an employee of Best Rescue?
3    A.  No.
4    Q.  Were you continuing to provide management or
5  consulting services to Best Rescue in November of 1999?
6    A.  Yes.
7    Q.  This references a $100,000 secured promissory
8  note dated November 22, 1999, is that correct?
9    A.  Yes.
10    Q.  Was that amount, in fact, funded by the UPW
11  Mutual Aid Fund?
12    A.  Yes.
13    Q.  Did you at any time have control over the
14  account in which the UPW Mutual Aid Fund loans were
15  placed?
16    A.  Yes.
17    Q.  And during what period of time did you have
18  control over that account?
19    A.  From November 1998 when the first funding
20  occurred.
21    Q.  Did that last all the way up until this time
22  in November of 1999?
23    A.  Yes.
24    Q.  And were you the person that had to authorize
25  disbursements from that account?

Page 50

1    A.  Yes.
2    Q.  The previous letter that we looked at that was
3  dated September 10, 1999 discussed a total capitalization
4  of one million dollars from the UPW Mutual Aid Fund.
5  This document, Exhibit 13, is concerning an additional
6  $100,000.  Did you have any discussions with
7  Mr. Rodrigues between September 1999 and November 1999 as
8  to why an additional $100,000 was needed?
9    A.  Yes.
10    Q.  What did you discuss?
11    A.  I discussed the management turmoil.
12    Q.  And what about the management turmoil related
13  -- how did that relate to the additional 100,000?
14    A.  More funds were needed, we were almost ready
15  for total capitalization.
16    Q.  When you say almost ready for total
17  capitalization, was that total capitalization from UPW
18  Mutual Aid Fund or from another source?
19    A.  That was from not only the Mutual Aid Fund,
20  but also additional sources.  The certification was
21  ending at that point by three engineers and the marketing
22  plan had been completed and the business plan was in the
23  final stages of completion.  The company at that point
24  was ready -- was, to my knowledge, ready to begin full
25  force marketing.

Page 51

1    Q.  If you could look please at Exhibit 14.  This
2  is a letter from you to Mr. Rodrigues, is that correct?
3    A.  Yes.
4    Q.  Is that your signature?
5    A.  Yes.
6    Q.  And did you send this letter on or about the
7  date, November 22, 1999?
8    A.  Yes.
9    Q.  It references a sixth secured promissory note,
10  and that's the Exhibit 13 that we just looked at, is that
11  correct?
12    A.  Yes.
13    Q.  And it references an original security
14  agreement.  Is that the original Exhibit Three security
15  agreement that we marked and talked about previously?
16    A.  Yes.
17    Q.  And is it correct that as of November 22, 1999
18  UPW Mutual Aid funds total loan amount was 1.1 million?
19    A.  Yes.
20    Q.  And that total amount was, in fact, funded, is
21  that correct?
22    A.  Yes.
23    Q.  And is it correct to say that generally the
24  1.1 million went to developing the product, the fire
25  rescue product?

Page 52

1    A.  And corporate purposes.
2    Q.  And how would you define corporate purposes?
3    A.  Salaries, material expenses, marketing
4  expenses, et cetera.
5    Q.  And after November 1999, did the total
6  revenues for the company continue to be $30,000?
7    A.  I'm sorry, repeat your question.
8    Q.  After -- let me restate it.  As of November
9  22, 1999, were the total sales revenues for Best Rescue
10  still $30,000?
11    A.  I don't recall.
12    Q.  Do you recall any other sales other than that
13  one sale that resulted in the $30,000 order?
14    A.  I don't recall.
15    Q.  Could you please look at Exhibit 15.  And do
16  you recognize this document?
17    A.  Yes.
18    Q.  This document references a telephone
19  conversation -- well, first of all, this is a memo from
20  Mr. Rodrigues to you dated December 15, 1999, is that
21  correct?
22    A.  Yes.
23    Q.  And did you receive this memo on or about that
24  date?
25    A.  Yes.

Page 53

14 (Pages 50 to 53)

A10118F
## ALBERT HEWITT   MARCH 6, 2007

Q. The memo references a telephone conversation on Friday, December 10, 1999, do you see that?

A. Yes.

Q. What happened in that conversation?

A. If I recall, that conversation was between myself and Gary Rodrigues and he was stating to me that the parent union, AFSCME, had questions regarding the Best Rescue investment and that they were going to exercise the right to call in the investment or call in the loan.

Q. Was it your understanding that Mr. Rodrigues was calling in the loan because the parent AFSCME was requesting that he do so?

A. Yes.

Q. What was your response in that telephone conversation?

A. Shock.

Q. Why?

A. Because I didn't quite understand what was going on.

Q. What did you tell Mr. Rodrigues in that conversation?

A. I told him then I would do the best I could to liquidate the investment by finding another investor to come to the table.

Page 54

Q. Were you ever able to find another investor to come to the table?

A. No.

Q. To your knowledge, did Best Rescue ever pay the $1.1 million to the UPW Mutual Aid Fund?

A. No.

Q. Did Best Rescue Systems, Inc. ultimately file for bankruptcy?

A. I don't know.

Q. Do you know if Mr. Kirkland ultimately filed for bankruptcy?

A. I'm sorry, we didn't hear you.

Q. Do you know if Mr. Kirkland ultimately filed for bankruptcy?

A. I don't know.

Q. Is it correct that Best Rescue does not exist today?

A. I don't know.

Q. When did you last have any investment with Best Rescue in terms of its business, as opposed to things like these depositions?

A. I don't recall. It's been a number of years.

Q. As of December 1999 had the Best Rescue business plan been completed?

A. No, not total completion, no.

Page 55

Q. As had the marketing plan been completed?

A. No, not totally completed.

Q. Had the testing and certification been completed?

A. Almost.

Q. Had all patents been received as of December 1999?

A. No, patents were still pending.

Q. Had Best Rescue signed any contracts with distributors as of December 1999?

A. I don't recall.

Q. Had Best Rescue completed advertising videos as of December 1999?

A. Not completed.

Q. Did Best Rescue have any sales orders as of December 1999, other than the $30,000 order we previously discussed?

A. I don't recall.

Q. As of December 1999 is it correct that Best Rescue had vacated its offices and was no longer paying office rent?

A. I don't recall.

Q. Do you know when Best Rescue vacated its offices?

A. I don't recall.

Page 56

Q. When it did have an office, approximately how many square feet did it have?

A. I don't know.

Q. If Best Rescue did receive orders for product in 1999, was it the company's plan or intention to manufacture the products to fill sales orders or would they have to go out to a separate manufacturer to make the product?

A. The product was assembled at their headquarters.

Q. Did other suppliers or entities make components of the Best Rescue product?

A. I'm sorry, I didn't understand your question, you broke up.

Q. I am trying to understand your statement that it was assembled by Best Rescue. Does that mean that other companies, other contractors, would make the different components of the product?

A. Yes.

Q. Did Best Rescue have contracts with contractors to make the various components for the product as of December 1999?

A. Yes.

Q. And who were those contractors?

A. I don't recall.

Page 57

A10118F
**ALBERT HEWITT   MARCH 6, 2007**

1     Q.   If you could please look at Exhibit 16.   And
2   my question will be, what is this document?
3         A.   Exhibit 15?
4     Q.   16.
5         A.   What is your question?
6     Q.   What is this document?
7         A.   It looks like an accounting record of some
8   sort.
9     Q.   Is this the accounting record for the account
10   that you had control over where UPW Mutual Aid Fund
11   monies were deposited?
12         A.   I don't know.
13     Q.   Do you know who prepared this ledger or
14   account?
15         A.   I don't -- I can't really comment on this
16   because it's a single attachment, this document is by
17   itself, I don't know where -- I don't know the origin of
18   this.
19     Q.   I'm looking at page one of the document and at
20   the top it says Best Rescue Systems, Inc., Transactions
21   by Account as of December 31, 1998.   Do you see that?
22         A.   I see that.
23     Q.   And page three says the same thing at the top,
24   but as of December 31, 1999, do you see that?
25         A.   Well, I don't have an actual page number that

Page 58

1   identify these documents.   Are these documents from the
2   certified public accountant that was hired by Best
3   Rescue?   I mean, I'm looking at pages that look to be
4   taken from a book, so, I mean, I'd like to answer your
5   question, but where did these documents come from?   Did
6   they come from the company?   Did they come from another
7   source?   Would you please identify where did these
8   documents come from.
9     Q.   My understanding is that the documents were
10   produced by you and were Bate stamped in the bottom
11   right-hand corner either by you or your attorney at that
12   time with the numbers AH and beginning with 0353 in
13   response to a subpoena back in approximately the year
14   2000.
15         A.   These documents were not produced by me.   I
16   don't know where you received these documents.   Best
17   Rescue at the time had a certified accounting firm.
18   Perhaps these documents were subpoenaed from the
19   certified accounting firm.
20     Q.   On this document, recognizing that you're
21   telling me that you don't recognize the document, at the
22   bottom on the first page on the ledger at 12/30/1998, it
23   says Al Hewitt and it shows an amount subtracted of
24   $57,000, do you see that?
25         A.   I see that.

Page 60

1   you're referring to.
2     Q.   I'm looking at the bottom right-hand corner
3   and it says AH-0355, which is the third page of Exhibit
4   16.
5         A.   Okay, I see that.
6     Q.   And do you see at the top where it says
7   Transactions By Account as of December 31, 1999?
8         A.   Correct.
9     Q.   Do you recognize this as being a ledger
10   showing deposits from and withdrawals from -- I'm sorry,
11   deposits to and withdrawals from a Best Rescue account?
12         A.   Well, again, I can't comment on these
13   documents because I don't know who originated these
14   documents.   You have to tell me who originated these
15   documents.   Are these from the company or are these from
16   someone else?   You're asking me to identify documents
17   that I'm not familiar with.
18     Q.   That's fine, I'm just asking if you recognize
19   it.   Is your answer you don't recognize it?
20         A.   I don't recognize them.
21     Q.   I'm looking at page one and it references on
22   the very first deposit made 11/24/1998, a deposit of
23   $250,000.   Do you know if that's referencing the $250,000
24   from the UPW Mutual Aid Fund account?
25         A.   Well, again, I'm going back to you have to

Page 59

1     Q.   Now, does that refresh your memory as to
2   whether at the end of December in 1998 you received
3   $57,000 from Best Rescue?
4         A.   Yes, I did.
5     Q.   What was that money for?
6         A.   That was for monies expended from June of 1998
7   until December of 1998 on the benefit -- for the benefit
8   of the company.
9     Q.   And was this a check to reimburse you for
10   those monies that you had spent or advanced for the
11   benefit of the company?
12         A.   Yes.
13     Q.   There are other payments reference to The
14   Hewitt Company in that ledger on page one.   Does that
15   refresh your memory as to whether The Hewitt Company also
16   received payments in December 1998 from Best Rescue?
17         A.   Yes.
18     Q.   And what were those payments for?
19         A.   I'm sorry, I can't make out the amounts.
20     Q.   I'm looking at 12/12/98, The Hewitt Company
21   and I see one for 1,500 and one for 6,000.   Does that
22   refresh your memory as to whether you received those
23   amounts from Best Rescue at that time?
24         A.   I don't see that date at all.
25     Q.   I'm looking at the first page under the names

Page 61

16 (Pages 58 to 61)

A10118F
ALBERT HEWITT   MARCH 6, 2007

1  and under the names there is The Hewitt Company that
2  appears twice in the middle of the ledger. Do you see
3  that?
4      A. I see that.
5      Q. And then opposite that it shows, under the
6  amounts, less 1,500 and less 6,000. Do you see that?
7      A. I don't see -- those numbers are not clear in
8  this document.
9      Q. Did you receive payments in December in
10  addition to the reimbursement amounts that you just
11  described from Best Rescue?
12      A. Yes.
13      Q. And what were those monies for?
14      A. Evidently they were from the loan origination
15  fee.
16      Q. And as we discussed before, is it correct that
17  you had told Mr. Rodrigues that you would be receiving a
18  loan origination fee in connection with the UPW Mutual
19  Aid Fund loans?
20      A. To the best of my knowledge.
21      Q. And is it correct that you had told
22  Mr. Rodrigues that you would be receiving from Best
23  Rescue reimbursements for monies that you had paid or
24  advanced on behalf of Best Rescue?
25      A. To the best of my knowledge.

Page 62

1      Q. As a result of the Best Rescue loans, did you
2  face criminal charges?
3      A. Would you clarify that question?
4      Q. I'm sorry, I didn't hear the answer.
5      A. Would you clarify the question?
6      Q. Did you face criminal charges as a result of
7  the Best Rescue loans?
8      A. I don't understand your question.
9      Q. Have you faced any criminal charges?
10      A. Yes.
11      Q. What was the reason for the criminal charges?
12  What was the government alleging against you?
13      A. A violation of the ERISA laws.
14      Q. And what specifically did they say, the
15  government say, was the violation of the ERISA laws?
16      A. I was a fiduciary of the Mutual Aid Fund
17  account.
18      Q. And how did you violate the ERISA laws as a
19  fiduciary, according to the government?
20      A. By taking a fee, the five percent loan
21  origination fee.
22      Q. And what was the ultimate consequences of the
23  charges that were made against you; what ultimately
24  happened in the criminal case?
25      A. I don't understand your question.

Page 63

1      Q. Did you ultimately plead guilty to the
2  government's charges?
3      A. Yes, I was offered a plea agreement.
4      Q. And what kind of sentence did you receive?
5      A. I received 75 days in prison and one year
6  probation, of which six months was home detention.
7      Q. Did you tell the government that you had not
8  been informed that the Mutual Aid Fund Trust account was
9  an ERISA account?
10      A. Yes.
11      Q. What was the government's response -- what was
12  the prosecutor's response?
13      A. It didn't matter.
14      Q. Did they explain why?
15      A. No.
16      Q. In hindsight, if you had known that the Mutual
17  Aid Fund Trust account was an ERISA account, would you
18  have handled this transaction differently?
19          MR. SEITZ: Objection, calls for speculation.
20      Go ahead.
21  BY MR. PRICE:
22      Q. You can answer subject to that objection.
23      A. Yes.
24      Q. And how would you have handled it differently?
25      A. We wouldn't have moved funds in the Mutual Aid

Page 64

1  Fund to Best Rescue.
2          MR. PRICE: Thank you. I don't have any
3      further questions. Mr. Seitz will have some
4      questions for you.
5          CROSS-EXAMINATION
6  BY MR. SEITZ:
7      Q. Mr. Hewitt, do you want to take a little
8  break?
9      A. No, we can keep going.
10      Q. Okay, listen, do me a favor, though, I think
11  the reason we have difficulty hearing you is there's a
12  little bit of a gap when one person speaks and another
13  one starts to speak, so just hesitate for a moment when I
14  finish my question before you answer and then we will
15  probably be able to hear each other better. Okay?
16      A. Okay.
17      Q. Is that all right?
18      A. Yes.
19      Q. Are you there?
20      A. Yes.
21      Q. Okay, we didn't hear you. I can't hear your
22  responses, that's the problem. Let's try and go forward
23  then. Please tell me a little bit about yourself.
24  What's your educational background?
25      A. College, Saint Louis University, University of

Page 65

A10118F
## ALBERT HEWITT  MARCH 6, 2007

1  Pennsylvania.
2      **Q.   Did you get any degrees?**
3      A.   No.
4      **Q.   What was your course of study?**
5      A.   Business.
6      **Q.   I'm sorry, I didn't hear an answer.**
7      A.   Business.
8      **Q.   If you would please describe for me your**
9  **background as an investment advisor or counselor.**
10     A.   I spent two years at Merrill Lynch, five years
11  with E.F. Hutton and Company and then I went on my own in
12  1988.
13     **Q.   How did you meet Gary Rodrigues?**
14     A.   Through the Royal State Insurance Company
15  board.
16     **Q.   And how did you become connected with Royal**
17  **State?**
18     A.   I helped them in a recapitalization of the
19  company.
20     **Q.   Were you retained by them as a financial**
21  **advisor?**
22     A.   Yes.
23     **Q.   Who retained you for that purpose?**
24     A.   The Royal State Investment Board.
25     **Q.   And was there any one person there who was**

Page 66

1      **Q.   15.**
2      A.   Yes.
3      **Q.   And was it through your experience working**
4  **with Royal State that you were retained by Gary Rodrigues**
5  **to do work for UPW?**
6      A.   Yes.
7      **Q.   And when you were first retained to do any**
8  **work for UPW, what were you retained to do?**
9      A.   Manage the assets of the local pension
10  account.
11     **Q.   And did you manage the local pension account?**
12     A.   Yes.
13     **Q.   And what was the amount of money that was**
14  **involved in that pension account?**
15     A.   Less than two million.
16     **Q.   Did you ever meet with anybody at UPW other**
17  **than Gary Rodrigues in connection with your management of**
18  **that account?**
19     A.   No.
20     **Q.   Did you ever meet with the state board of UPW?**
21     A.   No.
22     **Q.   Did you ever meet with the executive**
23  **committee?**
24     A.   No.
25     **Q.   And I heard your testimony, is it your**

Page 68

1  **your point of contact?**
2      A.   Ron Toyufuku.
3      **Q.   Did you ever meet a person in connection with**
4  **Royal State Corporation by the name of Russell Okata?**
5      A.   Yes.
6      **Q.   Was Mr. Okata the chairman of the board when**
7  **you were advising them?**
8      A.   To the best of my knowledge.
9      **Q.   And was Gary Rodrigues a member of the board?**
10     A.   Yes.
11     **Q.   What exactly did you do for Royal State?**
12     A.   I managed their investment portfolio, in
13  addition to providing consulting services on various
14  projects.
15     **Q.   And what was the extent of their investment**
16  **portfolio, if you can recall?**
17     A.   I don't understand your question.
18     **Q.   How much money did you manage for them?**
19     A.   I started off managing 12 million.
20     **Q.   And eventually did it grow to about 15**
21  **million?**
22     A.   I'm sorry, I didn't hear you.
23     **Q.   Eventually did that amount grow to about 15**
24  **million?**
25     A.   15 or 50?

Page 67

1  testimony that you've never met with anybody directly
2  associated with the Mutual Aid Fund Trust other than Gary
3  Rodrigues?
4      A.   Rephrase your question.
5      **Q.   Was it your testimony that you never met with**
6  **anybody associated with the Mutual Aid Fund Trust other**
7  **than Gary Rodrigues?**
8      A.   That was my testimony.
9      **Q.   Okay.  Did you submit regular written reports**
10  **pertaining to the investments that you were handling for**
11  **the staff pension account?**
12     A.   No.
13     **Q.   I'm sorry, we didn't hear your answer.**
14     A.   No.
15     **Q.   There were no written reports submitted?**
16     A.   No.
17     **Q.   Were those accounts audited on a regular**
18  **basis?**
19     A.   Yes.
20     **Q.   And were they audited by outside auditors?**
21     A.   Yes.
22     **Q.   And were those audits provided, to your**
23  **knowledge, to UPW?**
24     A.   Yes.
25     **Q.   Were there any -- when did you first**

Page 69

18 (Pages 66 to 69)

A10118F
## ALBERT HEWITT   MARCH 6, 2007

1  start managing the staff pension account?
2      A.  It was in the early 1990's.
3      Q.  And that's right after you met Gary Rodrigues,
4  I think you said you met him in 1990?
5      A.  Approximately that date.
6      Q.  Between then and 1998, were there ever any
7  complaints about the financial advice or management that
8  you were providing to UPW?
9      A.  Not to my knowledge.
10      Q.  How did the issue first come up of any kind of
11  investment in Best Rescue?
12      A.  I brought it to my clients' attention in
13  Hawaii.
14      Q.  And your client was?
15      A.  Royal State Investment -- I'm sorry, Royal
16  State Insurance Company and DTRIC and UPW.
17      Q.  You brought it to all three?
18      A.  Yes.
19      Q.  And were all three interested when you first
20  raised it with them?
21      A.  Yes.
22      Q.  And I think you said, however, the only entity
23  that ever produced any money was the UPW Mutual Aid Fund
24  Trust, is that correct?
25      A.  Yes.

Page 70

1  management of the Mutual Aid Fund Trust prior to the
2  discussion of Best Rescue first coming up?
3      A.  Not to my knowledge.
4      Q.  Were there regular reports of the management
5  of those funds that were provided to UPW?
6      A.  Yes.
7      Q.  And to your knowledge, were those reports
8  audited?
9      A.  Yes.
10      Q.  Were you aware at any time that the Mutual Aid
11  Fund Trust had a board of trustees?
12      A.  No.
13      Q.  Did Gary Rodrigues ever represent to you that
14  he was authorized to make investment decisions regarding
15  the Mutual Aid Fund Trust?
16      A.  Would you repeat your question.
17      Q.  Did Gary Rodrigues ever represent to you that
18  he was authorized to make decisions pertaining to
19  investments of Mutual Aid Fund Trust monies?
20      A.  To the best of my knowledge.
21      Q.  To the best of your knowledge what?
22      A.  To the best of my knowledge he was authorized.
23      Q.  And do you know by whom or through what
24  process he was authorized?
25      A.  No.

Page 72

1      Q.  Prior to investing any Mutual Aid Fund Trust
2  monies in Best Rescue, what other investments had you
3  handled of that entity's money?
4      A.  Would you rephrase your question?  It's
5  confusing.
6      Q.  Sorry.  Prior to having the Mutual Aid Fund
7  Trust monies involved in Best Rescue, what other
8  investments did you handle for that entity?
9      A.  For the Mutual Aid Fund?
10      Q.  Yes.
11      A.  Clarify your question.
12      Q.  Okay, when did you first start to manage
13  Mutual Aid Fund Trust monies?
14      A.  I don't recall the exact date.
15      Q.  It was prior to 1998 however, correct?
16      A.  Yes.
17      Q.  And were you doing that for a period of
18  several years before the issue of Best Rescue ever came
19  up?
20      A.  Yes.
21      Q.  And what kind of investments were you engaged
22  in for the Mutual Aid Fund Trust prior to any issue of
23  Best Rescue coming up?
24      A.  Stocks and bonds.
25      Q.  And were there ever any complaints about your

Page 71

1      Q.  Did you ever talk to him about that?
2      A.  No.
3      Q.  You knew that he was the administrator of the
4  plan, is that correct?
5      A.  I don't understand the word administrator.
6      Q.  Well, that was the title that he signed some
7  of these documents, right?
8      A.  That's what was stated earlier.
9      Q.  Okay.  Do you know if he had any other title
10  with respect to the Mutual Aid Fund Trust?
11      A.  No.
12      Q.  Did you ever ask him?
13      A.  No.
14      Q.  Did you ever need to ask him?
15      A.  No.
16      Q.  Just give me a minute, I've got a bunch of
17  notes here.  I'll be right back to you, hold on a second.
18  Let me ask you initially on another subject altogether,
19  did you do anything or review anything in preparation for
20  this deposition today?
21      A.  No.
22      Q.  Have you ever talked to Mr. Price
23  substantively about the matters that you testified to
24  here today?
25      A.  What do you mean?

Page 73

19 (Pages 70 to 73)

A10118F

**ALBERT HEWITT   MARCH 6, 2007**

1    Q.  Has he ever questioned you about these matters
2    previously?
3    A.  No.
4    Q.  Have you had any contact with the UPW or any
5    attorneys representing the UPW, other than to arrange the
6    logistics of the deposition?
7    A.  Yes.
8    Q.  What have those contacts been?
9    A.  I've talked to -- I've been involved with many
10   attorneys for the UPW.
11   Q.  Can you give me some of their names?
12   A.  I can't recall names at this point.
13   Q.  Were you also involved in a lawsuit by the
14   parent union, AFSCME?
15   A.  Yes.
16   Q.  And was your deposition taken in that case?
17   A.  Yes.
18   Q.  And what is the status of that lawsuit, do you
19   know?
20   A.  That lawsuit has been settled.
21   Q.  And what were the terms of the settlement?
22   A.  I don't know.  They were private.
23   Q.  Were you a party to the settlement?
24   A.  Yes.
25   Q.  Do you have any documents pertaining to that

Page 74

1    Q.  Did you ever puff it up or add rosy material
2    to impress him beyond what was actually taking place?
3    A.  No.
4    Q.  What was the nature of your relationship with
5    Gary Rodrigues, how would you characterizes it?
6    A.  I was his advisor.
7    Q.  Did you have mutual confidence in one another?
8    A.  To the best of my knowledge, yes.
9    Q.  Did you ever pay any money to Gary Rodrigues
10   from any investments or any loan origination fees or
11   anything like that?
12   A.  Never.
13   Q.  Did he ever ask for any monies?
14   A.  Never.
15   Q.  Do you know, did the Mutual Aid Fund Trust do
16   any kind of due diligence before it invested any monies
17   or loaned any monies to Best Rescue?
18   A.  Not to my knowledge.
19   Q.  You're not aware of any due diligence that
20   would have been done?
21   A.  No.
22   Q.  What was it that happened with regard to First
23   Hawaiian Bank that led to some questions being raised
24   about the investment of UPW staff pension money?
25   A.  I did the inquiry with them, there weren't

Page 76

1    settlement?
2    A.  Yes.
3    Q.  Was money recovered by the parent union from
4    the investment that UPW Mutual Aid Fund Trust made in
5    Best Rescue?
6    A.  To the best of my knowledge, yes.
7    Q.  You don't know how much?
8    A.  No.
9    Q.  Is it your belief, based on the information
10   you have and your recollection of the events, that at any
11   time Gary Rodrigues violated any fiduciary obligation
12   that he may have had?
13   MR. PRICE:  Objection, calls for a legal
14   conclusion.
15   BY MR. SEITZ:
16   Q.  Go ahead, Mr. Hewitt.
17   A.  I can't answer that.  I don't know.
18   Q.  Did Gary Rodrigues, to your knowledge, ever
19   misrepresent anything to you?
20   A.  Not to my knowledge.
21   Q.  Did you ever misrepresent anything to him?
22   A.  No.
23   Q.  When you gave him progress reports about Best
24   Rescue, was everything you told him true?
25   A.  To the best of my knowledge.

Page 75

1    questions, I asked the questions.  I had a discussion
2    with First Hawaiian Bank as to the suitability.  They
3    didn't have questions, I had the questions.
4    Q.  And what was the difference in the situation
5    involving the UPW money, staff pension money and any
6    loans or investments that came from the Mutual Aid Fund
7    Trust?
8    A.  I don't understand your question.
9    Q.  Why was it that those same questions did not
10   apply to the Mutual Aid Fund Trust money?
11   A.  Because the Mutual Aid Fund, to my knowledge,
12   was not under ERISA law, was not covered under ERISA law.
13   Q.  And are you satisfied, as you sit there today,
14   that you were wrong about that at the time, that was an
15   incorrect assumption on your part?
16   A.  No, as I sit here to this day, I believe that
17   I was misinformed of the type of account the Mutual Aid
18   Fund was.
19   Q.  And who misinformed you?
20   A.  The people that controlled the account.
21   Q.  And who was that?
22   A.  Smith Barney acted as custodian for the
23   account and Mr. Rodrigues evidently was the person in
24   charge of the account.
25   Q.  Did you ever deal with people at Smith Barney

Page 77

A10118F
**ALBERT HEWITT   MARCH 6, 2007**

1  in connection with the investment of monies or loans in
2  Best Rescue?
3      A.  Yes.
4      Q.  Who did you deal with at Smith Barney?
5      A.  Peter Backus.
6      Q.  And did you have any discussions with
7  Mr. Backus about the nature of the UPW Mutual Aid Fund
8  Trust?
9      A.  Clarify your question.
10     Q.  Sure.  Did you have any discussions with them
11 directly pertaining to the monies from the Mutual Aid
12 Fund Trust being invested in or loaned to Best Rescue?
13     A.  Yes.
14     Q.  And did you provide Smith Barney information
15 about the nature of that particular company?
16     A.  Yes.
17     Q.  And did they raise any issues with you about
18 the appropriateness of monies from the UPW Mutual Aid
19 Fund Trust being utilized for that purpose?
20     A.  No.
21     Q.  To your knowledge, based on everything that
22 you saw or heard, was Gary Rodrigues ever informed that
23 there might be some problem about this particular
24 investment?
25     A.  I don't know.

Page 78

1  complaint that Mr. Price asked you about, were there any
2  other defendants in that criminal case?
3      A.  No.
4      Q.  Was there any implication that you had acted
5  with anybody else?
6      A.  No.
7      Q.  You've been sued by the parent union AFSCME
8  over this matter.  Have there been any other lawsuits?
9      A.  No.
10     Q.  Are you currently employed, sir?
11     A.  Yes.
12     Q.  What are you currently doing?
13     A.  I'm a car salesman.
14     Q.  Prior to this problem with Best Rescue, had
15 you ever had any disciplinary action taken against you in
16 connection with any of the licenses or certifications
17 that you held?
18     A.  No.
19     Q.  Had anyone ever sued you alleging any breach
20 of fiduciary obligations prior to this matter of Best
21 Rescue?
22     A.  Not to my knowledge.
23     Q.  Based upon your history and your background,
24 is there anything about you which Gary Rodrigues knew or
25 should have known that would have caused him to question

Page 80

1      Q.  From your knowledge on your working with Gary,
2  had Gary known of some issue or some problem, do you
3  think he would have proceeded with the transmission of
4  the funds?
5      MR. PRICE:  Objection, calls for speculation.
6  BY MR. SEITZ:
7      Q.  Did you understand my question?
8      A.  Yes.  I don't believe so.
9      Q.  Was Gary the kind of person who would ever
10 risk any monies belonging to UPW or any UPW entity in a
11 risky investment?
12     A.  No.
13     Q.  For the record, there was an objection.  I
14 guess the same objection.
15     MR. PRICE:  We were talking at the same time,
16 so I guess it was difficult to hear.
17 BY MR. SEITZ:
18     Q.  Just give me a minute, Mr. Hewitt, I may be
19 done.  Are you available, if necessary, to testify at a
20 trial in this case?
21     A.  Yes.
22     Q.  Are you willing to come to Hawaii if you get a
23 subpoena for that purpose?
24     A.  Yes.
25     Q.  Other than you being named in the criminal

Page 79

1  advice that you gave him?
2      A.  Not to my knowledge.
3      Q.  When was the last time you had any contact
4  with Mr. Rodrigues?
5      A.  Years ago.
6      Q.  Other than Best Rescue, did you also make
7  recommendations of investments in other companies to the
8  UPW entities?
9      A.  Yes.
10     Q.  And in connection with those recommendations,
11 did you supply them with information about those
12 investment opportunities?
13     A.  No.
14     Q.  Did they follow your recommendations in some
15 instances?
16     A.  Yes.
17     Q.  And did they reject your recommendations in
18 other instances?
19     A.  No.
20     Q.  They always followed your recommendations?
21     A.  Yes.
22     Q.  And other than Best Rescue, were there any of
23 those recommendations and investments that turned out to
24 be bad, to your knowledge?
25     A.  I don't recall.

Page 81

21 (Pages 78 to 81)

1        MR. SEITZ:  I'm done, Mr. Hewitt.  Thank you
2    very much.
3            REDIRECT EXAMINATION
4    BY MR. PRICE:
5        **Q.  I have one question.  Mr. Hewitt, did you**
6    **provide any financial management services to**
7    **Mr. Rodrigues personally?**
8        A.  Yes.
9        **Q.  During what period of time?**
10       A.  I don't know the exact dates, I don't recall.
11       **Q.  Was it for more than a year or less than a**
12   **year?**
13       A.  More than a year.
14       **Q.  Was it more than five years?**
15       A.  I don't recall the exact dates.
16       **Q.  Did you charge him for your services?**
17       A.  No.
18           MR. PRICE:  I don't have any further
19   questions.
20           MR. SEITZ:  I have none.  Thank you.  I think
21   we're done.
22
23           (Ending time: 5:05 p.m.)
24
25

Page 82

1
2
3
4        I, SUSAN WEISHAUPT, Certified Shorthand
5    Reporter, certify;
6        That the foregoing proceedings were taken
7    before me at the time and place therein set forth, at
8    which time the witness was put under oath by me;
9        That the testimony of the witness, the
10   questions propounded, and all objections and statements
11   made at the time of the examination were recorded
12   stenographically by me and were thereafter transcribed;
13       That the foregoing is a true and correct
14   transcript of my shorthand notes so taken.
15       I further certify that I am not a relative or
16   employee of any attorney of the parties, nor financially
17   interested in the action.
18       I declare under penalty of perjury under the
19   laws of Florida that the foregoing is true and correct
20       Dated this 9th day of March 2007.
21
22
23
     _____
     SUSAN WEISHAUPT, CSR
24
25

Page 83