KOSHIBA AGENA & KUBOTA

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

FEB 22 2008

at 3 o'clock and 30 min P M.
SUE BEITIA, CLERK

JAMES E. T. KOSHIBA          768-0
CHARLES A. PRICE            5098-0
2600 Pauahi Tower
1001 Bishop Street
Honolulu, Hawaii 96813
Telephone No.: 523-3900
Facsimile No.: 526-9829
email: jkoshiba@koshibalaw.com
        cprice@koshibalaw.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STEVEN DECOSTA IN HIS ) <br> REPRESENTATIVE CAPACITY AS ) <br> CHAIRPERSON OF THE BOARD ) <br> OF TRUSTEES OF UNITED ) <br> PUBLIC WORKERS, AFSCME, ) <br> LOCAL 646, AFL-CIO, MUTUAL ) <br> AID FUND TRUST, REAL PARTY ) <br> IN INTEREST UNITED PUBLIC ) <br> WORKERS, AFSCME, LOCAL 646, ) <br> AFL-CIO, ) <br> ) <br>     Plaintiffs, ) <br> ) <br>     vs. ) <br> ) <br> GARY W. RODRIGUES, ) <br> ) <br>     Defendant. ) <br> _____ ) | CIVIL NO. CV03-00598 DAE LEK <br><br> PLAINTIFFS' PROPOSED <br> FINDINGS OF FACT AND <br> CONCLUSIONS OF LAW; <br> CERTIFICATE OF SERVICE <br><br><br><br> Trial Dates: February 29, March 6, 7, <br> and 11, 2008 |

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

I.    Introduction

1.    The non-jury trial in this case was held on February 29, March 6, 7, and 11, 2008.  Charles A. Price represented Plaintiffs Steven DeCosta in his Representative Capacity as Chairperson of the United Public Workers, AFSCME, Local 646, AFL-CIO, Mutual Aid Fund Trust , Real Party in Interest United Public Workers, AFSCME, Local 646, AFL-CIO (hereinafter "Mutual Aid Fund").  Eric A. Seitz represented Defendant Gary W. Rodrigues ("Rodrigues") .

2.    The parties stipulated to the admission of joint exhibits 1-42.

3.    The Mutual Aid Fund called the following witnesses to testify: Albert Hewitt (via deposition transcript), Alison Leong, George Yasumoto, and Dayton Nakanelua.

4.    Rodrigues testified via telephone and Rodrigues also called the following other witnesses to testify: Steven DeCosta, [other witnesses to be determined].

II.    Findings of Fact

Based upon the evidence presented, the Court makes the following findings of fact.

*The Mutual Aid Fund*

5.    The Mutual Aid Fund was established by the United Public Workers ("UPW") in 1984 and is a voluntary contribution plan that provides hospitalization benefits for participating employees and their dependents.  All contributions to the Mutual Aid Fund are made by employees represented by UPW or UPW employees.  UPW is a Hawaii union that represents "blue collar" public employees as well as employees from the private sector.  Neither the State of Hawaii nor its counties played any role in establishing or maintaining the Mutual Aid Fund.

6.    The UPW State Director serves as the Mutual Aid Fund's Plan Administrator and various UPW officers or board members serve as trustees on the Mutual Aid Fund's Board of Trustees.

7.    While Rodrigues was the UPW State Director, he served as the and Plan Administrator of the Mutual Aid Fund, from 1984 - 2002.

*The Best Rescue Loans.*

8.    From November 1998 through November 1999, the Mutual Aid Fund made $1.1 million in loans to Best Rescue Systems, Inc. ("Best Rescue").

9.    Best Rescue signed six (6) promissory notes in favor of the Mutual Aid Fund and the Mutual Aid Fund in fact loaned Best Rescue the amounts reflected in the Notes.  The Notes' dates (and amounts) were as follows: November 24, 1998 ($250,000), February 5, 1999 ($200,000), April 26, 1999 ($150,000), June

30, 1999 ($250,000), August 24, 1999 ($50,000), and November 22, 1999 ($100,000), totaling $1.1 million.

10.    Best Rescue was a new start up company in Florida that was developing a product to rescue people out of high-rise buildings in the event of a fire or other emergency.

11.    At the time the loans were made, Best Rescue did not have a completed business plan, marketing plan, shareholder agreement, engineering certification, fire organization seal of approval, patent, product videos, or manufacturing or distributorship group agreements.

12.    Best Rescue only had one product order, received in the summer of 1999, for $30,000.

13.    The Mutual Aid Fund loans were used for continued development of the Best Rescue product.

14.    The loans were made through an investment advisor, Albert Hewitt.  Mr. Hewitt always and only dealt with Rodrigues in connection with the Best Rescue loans and thought Rodrigues was the authorized representative.

15.    Mr. Hewitt never met the Mutual Aid Fund Trustees, made any presentations to the Board, or provided written reports.  During the time of the Best Rescue loans, Mr. Hewitt reported Best Rescue's status to Rodrigues on a monthly basis.

*Mr. Hewitt's Financial Ties to Best Rescue.*

16.    Mr. Hewitt had been hired by Best Rescue to obtain funding for the company.

17.    Mr. Hewitt controlled the Best Rescue account where the loan monies were placed.

18.    Mr. Hewiit was paid a 5% loan origination fee out of the Mutual Aid Fund loans.

19.    The loan monies were also used to pay Mr. Hewitt's fee for management and consulting services he performed for Best Rescue, as well as to reimburse Mr. Hewitt for expenses and advances he previously paid on behalf of Best Rescue, including $57,000 in advances he was reimbursed for by Best Rescue in December 1998 out of the Mutual Aid Fund's first November 1998 $250,000 loan.

*What Rodrigues Knew About Best Rescue and Hewitt.*

20.    Rodrigues knew of Mr. Hewitt's financial ties to Best Rescue. Specifically, Rodrigues knew that Mr. Hewitt controlled the Best Rescue account, and Rodrigues knew of the 5% loan origination fee, management and consulting fees, and reimbursements for advances.

21.    Mr. Hewitt even signed the last November 1999 Promissory Note on behalf of Best Rescue that was delivered to Rodrigues.

22.    Rodrigues knew that the initial loan monies were to be used to

develop the Best Rescue product and that the loans were to be repaid from funding or capitalization from another source in early 1999.

23.    That funding from another source never was obtained, yet additional Mutual Aid Fund monies were loaned thereafter.

24.    Rodrigues did not meet the principles of Best Rescue (other than Hewitt), did not visit its business, and did not do any due diligence regarding the company.

25.    The loan documentation was prepared by Best Rescue's lawyer, and not prepared or reviewed by a lawyer on behalf of the Mutual Aid Fund.

25.    Rodrigues did not tell Hewitt that the Mutual Aid Fund was an ERISA-governed employee welfare plan.

26.    Rodrigues and Hewitt had previously abandoned initial thoughts of investing monies from a separate UPW Pension Fund due to ERISA legal constraints.

*The Trustees' Involvement Regarding Best Rescue.*

27.    Rodrigues first told the Mutual Aid Fund Trustees about Best Rescue in February 1999.

28.    There were no Trustee meetings at all in 1998, the last previous meeting being June 1997.

29.    Rodrigues told the Trustees that Best Rescue was a good

investment. Trustee approval was not sought or obtained regarding Best Rescue, and no loan terms or total investment amounts were discussed, and there was no vote by the Trustees.

30.    By the time Rodrigues first mentioned Best Rescue to the Trustees in February 1999, he had already agreed to loan and had the Mutual Aid Fund pay $250,000 to Best Rescue in November 1998 and another $200,000 in early February 1999, and had already signed the Security Agreement on behalf of the Mutual Aid Fund.

31.    At the next Mutual Aid Fund Trustees' meeting, on June 19, 1999, the 1998 audited Financial Statements were provided to the Trustees, which noted that a total of $600,000 had been invested in Best Rescue as of March 30, 1999. Again, there was no vote or formal approval by the Trustees on any of these Best Rescue loans.

32.    Trustee meetings were sporadically held (none in 1998 and typically not more than 3 times in other years), and were usually short in duration (around 15 minutes). The meetings were pro forma and perfunctory in nature, and Rodrigues usually led the meetings and did most of the talking.

33.    The Trustees were "blue collar" workers who did no have any training regarding their duties or responsibilities as trustees or training regarding financial matters. Financial Statements, when provided, were given to the Trustees

before the meeting and collected after the meeting.

*Rodrigues Calls the Loans and Replaces Hewitt.*

32.    In December 1999, Rodrigues called the loans and demanded repayment. Rodrigues did so because UPW's "parent" union, AFSCME, which was then-conducting an audit of UPW and UPW-sponsored plans, had questioned the Best Rescue investment.

33.    In early 2000, Rodrigues replaced Hewitt with First Hawaiian Bank ("FHB") as the new Mutual Aid Fund investment advisor. FHB presented an Investment Policy Statement, the first ever for the Mutual Aid Fund, and Rodrigues signed the FHB Agency Agreement, Fee Schedule, and Investment Policy Statement on behalf of the Mutual Aid Fund in March 2000.

34.    Rodrigues subsequently presented these documents that he had already signed to the Mutual Aid Fund Trustees at their April 1, 2000 meeting.

35.    In January 2001, the Trustees saw the 1999 audited Financial Statements discussing the $1.1 million in Best Rescue loans and the default.

36.    In July 2001, the Trustees received the 2000 audited Financial Statements showing that the $1.1 million was uncollectible and was written off.

37.    None of these matters involving Best Rescue were presented to the Trustees for vote or approval.

38.    Rodrigues exercised discretionary control and authority, and

directed all Mutual Aid Fund actions and decisions relating to Best Rescue.

*Rodrigues Is Replaced As Plan Administrator.*

39.    On November 19, 2002, Rodrigues, was found guilty on charges of federal money laundering, embezzlement, and mail fraud in connection with other UPW-sponsored health, dental, and life insurance plans (not involving the Mutual Aid Fund or Best Rescue loans).

40.    Following the guilty verdict, AFSCME, the International Union with which UPW is affiliated, suspended Rodrigues and UPW's State Executive Board members, placed UPW under "administratorship," and appointed an Administrator to oversee and run the union.

41.    Peter Trask served as the UPW Administrator until August 2003; his successor was Elizabeth Ho. The union was in administratorship for over a year and until elections for new UPW officers and executive board members were completed.   The Administrator assumed all responsibilities over UPW matters, including all decision-making authority over union-sponsored welfare benefit plans such as the UPW-sponsored Mutual Aid Fund.

42.    The Administrator authorized this instant lawsuit against Rodrigues. The Complaint was filed on October 31, 2003.

43.    Subsequently, after elections and termination of the administratorship, the newly elected Mutual Aid Fund Board of Trustees authorized

and ratified continued pursuit of this lawsuit at a Trustees' meeting in May 2004.

*Best Rescue Fall Out.*

44.    In November 2003, the federal government filed an indictment against Mr. Hewitt in connection with the Mutual Aid Fund loans to Best Rescue, *USA v. Hewitt*, U.S. District Court for the District of Hawaii, No. 03-CR-00552-SOM.  Mr. Hewitt was convicted of fraud in connection with an ERISA employee welfare benefit plan and served time in a federal penitentiary.

44.    The Best Rescue loan amounts were never repaid.  Best Rescue and its principals, including Mr. Hewitt, all filed for bankruptcy and no amounts were recovered from them.

45.    The Mutual Aid Fund lost $1.1 million plus interest, except that the Mutual Aid Fund recovered, in October 2006, some amount from Mr. Hewitt's insurer in a confidential settlement.

III.    Conclusions of Law

*Jurisdiciton and Venue.*

46.    This Court has jurisdiction pursuant to the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. § 1001 et seq. and  28 U.S.C. § 1131. Venue is proper because the Mutual Aid Fund is administered in Hawaii, the breaches of fiduciary duty took place in Hawaii, and Rodrigues then-resided in Hawaii.

*The Mutual Aid Fund Is An ERISA-Governed Plan*

47.    The Mutual Aid Fund is an employee welfare benefit plan governed by ERISA. 29 U.S.C. § 1002(1) defines an "employee welfare benefit plan" as "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employee or by an employee organization, or by both, to the extent such plan, fund, or program was established or is maintained for the purpose of providing its participants or beneficiaries, through the purchase of insurance or otherwise, (a) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident . . . ."

48.    The Mutual Aid Fund is not exempt from ERISA as a "governmental plan."    "Governmental plans," meaning "plans established or maintained for its employees by the Government of the United States, by the government of any state or political subdivision thereof, or any agency or instrumentality of any of the foregoing." 29 U.S.C. § 1002(32). The governmental plan exception is a narrow one. <u>Silvera v. Mutual Life Ins. Co. of N.Y.</u>, 884 F.2d 423, 425 (9th Cir. 1989).

49.    The Mutual Aid Fund was established by UPW for the benefit of union members and UPW employees. Neither the State nor the counties played any role in establishing or maintaining the Mutual Aid Fund.

*Rodrigues Owed Fiduciary Duties to the Mutual Aid Fund.*

50.    Rodrigues owed fiduciary duties to the Mutual Aid Fund. "[A] person is a fiduciary with respect to a plan to the extent [i] he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or [iii] he has any discretionary authority or discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002 (21)(A).    Rodrigues exercised discretionary authority and control over the management, assets, investments, and loan decisions of the Mutual Aid Fund.

51.    Rodrigues did not consult with or obtain approval from the Trustees relating to the Best Rescue loans. He made loan commitments without their knowledge.  To the extent he did ever seek approval from the union boards and welfare plan boards generally, they invariably and uncritically followed Rodrigues' recommendations and advice.  The Mutual Aid Fund Trustees did not question Rodrigues' recommendation regarding the Best Rescue loans, and Rodrigues did not seek their pre-approval as to any amounts or the terms of the loans. Rodrigues' role was not merely ministerial.  In fact, Rodrigues exercised the full power and authority of the Board.  He was the de facto Board, and the Trustees' roles had been reduced to merely ministerial figure heads.

-12-

*Rodrigues Breached His Fiduciary Duties.*

52.    29 USC § 1104(a) imposes on fiduciaries a "prudent man standard of care." More specifically, a fiduciary shall discharge his duties . . . "(B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in  the conduct of an enterprise of a like character and with like aims; (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so[.]" 29 U.S.C. § 1104(a)(1)(B), (C).

53.    Rodrigues' investment of Mutual Aid Fund monies in Best Rescue was not based upon reasonable due diligence and was imprudent. Best Rescue had no revenue and was obviously a risky new company. Mr. Hewitt's advice was obviously tainted and compromised by his financial affiliation with Best Rescue and known conflict of interest. No investment policy was in place at the time of the loans. The Best Rescue investment violated the prudent Investment Policy Statement guidelines that Rodrigues subsequently agreed to and signed the following year in March 2000, which prohibited investments in companies with a record of less than three years of continuous operation or investments in companies with which the investment manager had an interest.  Also, the Best Rescue investment, per the 1999 audited Financial Statements, represented 45% of the Mutual Aid Fund's net

assets ($2.4 million), which certainly violated the prudent diversification requirement of ERISA.

54.    Pursuant to ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), Rodrigues is liable for breaching his fiduciary duty by failing to prudently invest Mutual Aid Fund monies.

55.    Pursuant to ERISA § 405, 29 U.S.C. § 105, Rodrigues is liable for assisting Mr. Hewitt's breaches of fiduciary duty by failing to prudently invest Mutual Aid Fund monies.

56.    Pursuant to § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), Rodrigues is liable for facilitating an improper prohibited transfer to Mr. Hewitt of loan origination fees, management and consulting fees, and reimbursements for advances, taken by Mr. Hewitt out of the Mutual Aid Fund loans to Best Rescue.

57.    Rodrigues must reimburse the Mutual Aid Fund the total of $1.1 million, plus pre-judgment interest at 10% per annum commencing December 1, 1999, plus attorney's fees and costs in an amount to be determined after the filing of an appropriate motion, less the sum recovered by the Mutual Aid Fund in its confidential settlement with Mr. Hewitt's insurer.

*This Lawsuit Was Properly Authorized*

58.    Rodrigues' defense that this lawsuit was not properly authorized fails. The AFSCME-appointed Administrator assumed control over the union and

-14-

its union-sponsored employee welfare benefit plans and authorized the filing of the instant lawsuit. That decision to pursue Rodrigues was subsequently formally authorized and ratified when the Administrator was replaced by a new duly elected Board of Trustees for the Mutual Aid Fund in May 2004.

*Plaintiffs' Claims Are Not Barred By The Statute of Limitations*

59.    Rodrigues' statute of limitations defense fails. "The six-year time period reflects Congress' determination to impress upon those vested with the control of pension funds the importance of the trust they hold. Thus, Congress evidently did not desire that those who violate the trust could easily find refuge in a time bar." Brock v. Nellis, 809 F.2d 753, 754 (11th Cir. 1987). "Section 1113 sets a high standard for barring claims against fiduciaries prior to the expiration of the section's six year limitations period . . . ." Gluck v. Unisys Corp., 960 F.2d 1168, 1176 (3rd Cir. 1992). "Of course, a plaintiff may have constructive knowledge of a breach before he actually knows of the breach, but section 1113 calls for actual knowledge." Gluck, 960 F.2d, at 1176. "Indeed, the key to the ERISA statute of limitations when it applies to these types of violations is not 'actual harm', but rather 'actual knowledge' of the ERISA breach or violation. Ziegler v. Connecticut General Life, 916 F.2d 548, 552 (9th Cir. 1990). "We hold that, under 29 U.S.C. 1113(2), 'actual knowledge of a breach or violation' requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists . . .

.We disagree that mere knowledge of a transaction is always enough. 'Actual knowledge of a breach or violation' requires knowledge of all relevant facts at least sufficient to give the plaintiff knowledge that a fiduciary duty has been breached or ERISA provision violated." Gluck, 960 F.2d, at 1177. "The statute of limitations [under 29 U.S.C. § 1113] itself indicates a two-step analysis or accrual of an ERISA action: first, when did the alleged 'breach or violation' occur; and second, when did [plaintiff] have 'actual knowledge' of the breach or violation?" Ziegler, 916 F.2d, at 550.

60.    Rodrigues not met his burden of showing "actual knowledge" of all material facts supporting his breaches of fiduciary duty three years before the October 31, 2003 Complaint. In order to invoke that the narrower three year statute of limitations (as opposed to the six year statute of limitations), Rodrigues must show actual knowledge outside of the limitations period (1) that Rodrigues failed to do adequate due diligence, (2) that Best Rescue was an under-capitalized start-up company with no real assets, product inventory, or sales, and (3) that Rodrigues' knew of Mr. Hewitt's financial arrangement with Best Rescue resulting in Best Rescue paying Mr. Hewitt monies out of the Mutual Aid Fund loans. Rodrigues has failed to meet this showing.

61.    As for the current Mutual Aid Fund Trustee Chairman Steven De Costa, who was joined as a real party in interest plaintiff in June 2007, the 9th Circuit

has viewed the necessity of joining or substituting current trustees of welfare plans as a merely procedural, not substantive, matter where the joinder of a current trustee does not change the allegations of the underlying Complaint.  As noted in Local 159 v. Nor-Cal Plumbing, Inc., 185 F.3d 978, 982 fn. 4 (1999), the Ninth Circuit has allowed ERISA trust funds to bring ERISA suits where the issue of the trust funds' standing under ERISA has never been raised.  Id. citing Pension Trust Fund for Operating Eng'rs v. Triple A Mach. Shop, Inc., 942 F.2d 1457, 1461 (9th Cir. 1991); Brick Masons Pension Trust v. Industrial Fence & Supply, Inc., 839 F.2d 1333, 1335 (9th Cir. 1988); Operating Eng'rs Pension Trust v. Cecil Backhoe Serv., Inc. , 795 F.2d 1501, 1503 (9 th Cir. 1986); and  Laborers health & Welfare Trust Fund v. Kaufman & Broad, Inc., 707 F.2d 412, 415-16 (9th Cir. 1983). Here, after Rodrigues first raised the issue of standing and jurisdiction in his Reply Memorandum, filed May 11, 2008, the court allowed the Mutual Aid Fund to join Steve DeCosta as a real party in interest plaintiff in his capacity as a current trustee.  The Ninth Circuit Court of Appeals in the case Motion Picture Industry Pension & Health Plans v. N.T. Audio Visual Supply, Inc., 259 F.3d 1063, after noting that the court lacked jurisdiction to hear an ERISA claim brought in the names of employee welfare plan entities as plaintiffs, granted the plans' *appellate* motion, filed after the appellate oral argument, to join two current  members of the Board of Directors as fiduciary plaintiffs in order to establish jurisdiction.  Id. at 1065 fn. 1;  see also Bowles v.

Reade, 198 F.3d 752, 761 (1999) (Ninth Circuit Court affirmed ERISA plans' amendment of complaint that added a trustee of the plans as a named party plaintiff in order to establish ERISA jurisdiction).  Likewise, this Court deems Steven DeCosta's joinder as necessary merely for procedural purposes.  Regardless, Rodrigues has failed to show that Mr. DeCosta had sufficient actual knowledge so as to trigger the shorter 3 year statute of limitations.

*The Former Trustees Are Not Indispensable Parties.*

62.    The former trustees of the Mutual Aid Fund did not received any training about their role as trustees, did not control or vote on the Best Rescue investment, and were not given sufficient information about the investment.  They relied upon and trusted Rodrigues.  Regardless, to the extent that they have any alleged culpability, their absence does not expose Rodrigues to a risk of incurring multiple or inconsistent obligations, and FRCP Rule 19 does not require that joint tortfeasors be joined as necessary parties.  See, e.g., Temple v. Synthes Corp., 498 U.S. 5, 7 (1990) (joint tortfeasors are not necessary authorities).

Accordingly, a Judgment will be entered in favor of the Mutual Aid Fund and against Rodrigues consistent with the Findings and Conclusions above.

DATED:  Honolulu, Hawaii, _____.


_____
HON. DAVID A. EZRA
Judge of the Above-Entitled Court


Respectfully submitted,

DATED:  Honolulu, Hawaii, February 22, 2008.


_____
JAMES E.T. KOSHIBA
CHARLES A. PRICE
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| STEVEN DECOSTA IN HIS | ) | CIVIL NO. CV03-00598 DAE LEK |
| REPRESENTATIVE CAPACITY | ) | |
| AS CHAIRPERSON OF THE | ) | CERTIFICATE OF SERVICE |
| BOARD OF TRUSTEES OF | ) | |
| UNITED PUBLIC WORKERS, | ) | |
| AFSCME, LOCAL 646, AFL-CIO, | ) | |
| MUTUAL AID FUND TRUST, | ) | |
| REAL PARTY IN INTEREST | ) | |
| UNITED PUBLIC WORKERS, | ) | |
| AFSCME, LOCAL 646, AFL-CIO, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| GARY W. RODRIGUES, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the date noted below, a

copy of the foregoing document was duly served upon the following by hand

delivery, addressed as follows:

ERIC A. SEITZ, ESQ.
820 Mililani Street, Suite 714
Honolulu, Hawaii 96813

Attorney for Defendant
GARY W. RODRIGUES

DATED:  Honolulu, Hawaii, February 22, 2008.

_____
JAMES E.T. KOSHIBA
CHARLES A. PRICE
Attorneys for Plaintiffs