IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| STEVEN DE COSTA, IN HIS | ) | CIVIL NO. 03-00598 DAE-LEK |
| REPRESENTATIVE CAPACITY | ) | |
| AS CHAIRPERSON OF THE | ) | |
| BOARD OF TRUSTEES OF | ) | |
| UNITED PUBLIC WORKERS, | ) | |
| AFSCME, LOCAL 646, AFL-CIO, | ) | |
| MUTUAL AID TRUST FUND, | ) | |
| REAL PARTY IN INTEREST | ) | |
| UNITED PUBLIC WORKERS | ) | |
| UNION, AFSCME, LOCAL 646, | ) | |
| AFL-CIO, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| GARY W. RODRIGUES, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court held a three-day bench trial in the above-captioned matter

on February 29, March 6 and 7, 2008.  Charles A. Price, Esq., appeared at the trial

on behalf of Plaintiffs.  Eric A. Seitz, Esq., and Lawrence I. Kawasaki, Esq.,

appeared at the trial on behalf of Defendant.

Exhibits 1 through 42 were admitted into evidence.  The following

witnesses testified: Alison Leong, George Yasumoto, Harold Moniz, Joseph

Vegas, Steven Perreira, Jr., Dayton Nakanelua, Steven DeCosta, Gary Rodrigues (via telephone) by consent of both parties, and Albert Hewitt (via deposition). After considering and weighing the documentary evidence presented and carefully assessing the credibility of the witnesses, the Court determines the following findings of fact and conclusions of law.[1]

### FINDINGS OF FACT

1.     The United Public Workers ("UPW") is a union that represents employees who work for either governmental employers or in the private sector.

2.     The Mutual Aid Fund trust ("MAF") is an employee welfare benefit plan.  It is a voluntary contribution plan that provides hospitalization and related benefits for participating UPW members, UPW employees, and their dependants.  Contributions to the fund are made by UPW members, UPW employees, and their dependants.  More than 10,000 persons participate in the MAF.  Each participant contributes one dollar per month to the MAF.

---

[1] This Judge again raised the issue with the parties that he had presided over Defendant's criminal trial, during which credibility findings were made, and that he would entertain any motions for recusal on that basis.  Both parties stated that they did not want to request a recusal, and this Judge finds that such recusal is unnecessary as this judge bears no personal animosity against the Defendant in this case and is fully capable of reviewing and judging this case de novo, including the Defendant's credibility.

3.      The description of the MAF Plan issued to participants provides that the participants have certain rights and protections under ERISA and that the Plan imposes ERISA duties upon the persons responsible for the operation of the Plan.

4.      Defendant previously testified that the MAF trust is an ERISA plan.

5.      The Administrative Services Agreement between UPW and the MAF notes that compliance with ERISA is required.

6       AFSCME attorney Larry Weinberg informed Defendant that MAF trustees may make investments that "are consistent with their fiduciary duty . . . and the requirements of . . . ERISA."  (Ex. 31.)

7.      The Audit of the 1998 MAF financial statements states that the MAF trust is subject to the provisions of ERISA.

8.      The MAF Board of Trustees (the "MAF Board") is made up of UPW members who have been elected to the following UPW positions:  President, Secretary-Treasurer, and the five Vice Presidents of the following divisions:  Private Sector, Oahu, Maui, Kauai, and the Big Island.

9.      Prior to 2000, the MAF Board had not received training regarding fiduciary duties.  Persons became members of Board because they had been elected to their other position.  Board members were generally blue collar workers with high school educations.

10.     Defendant Gary Rodrigues served as the State Director of the UPW from 1981 until November 2002.

11.     Defendant also served as the Plan Administrator of the MAF trust from its inception in 1984 to November 2002.  Defendant was never a trustee for the MAF trust.  As the Plan Administrator, Defendant attended MAF board meetings and made recommendations regarding investments.

12.     Albert Hewitt, an investment advisor at the time germane to this lawsuit, had been recommended to Defendant by persons with whom Defendant served on the board of Royal State Group.  Defendant believed that Hewitt had provided excellent investment advice and service to Royal State Group.

13.     Hewitt was hired by the UPW to invest its pension funds.  The investments recommended and managed by Hewitt for the pension fund were good investments.

14.     In 1994, at Defendant's request, the MAF Board hired Hewitt and authorized a minimum investment of $500,000 to be processed through Hewitt's company.

15.     Until late 1998, Hewitt provided good service and no auditor or other person questioned his investment advice.

4

16.     In 1998, Hewitt recommended to Defendant that the MAF invest in Best Rescue Systems, Inc. ("Best Rescue").  Hewitt explained that Best Rescue was developing a product that would help rescue people from high-rise buildings in the event of an emergency.

17.     Defendant had previously heard of Best Rescue at a board meeting for Royal State Group and believed that Royal State Group would invest in it.

18.     Defendant testified that he met with Adaline Uhrle**,** who at that time was a member of the MAF Board and the President of the UPW, and recommended to her that the MAF invest in Best Rescue.

19.     According to Defendant, Uhrle stated that he should proceed with an investment and it would be approved at the next MAF Board meeting.  Adeline Uhrle has passed away and was unable to testify at the trial.

20.     At the time of Defendant's recommendation, Best Rescue was a new start-up company located in Florida.  Best Rescue did not have a completed business plan, marketing plan, shareholder agreement, or product videos. Defendant had not personally done any due diligence himself into Best Rescue, and Hewitt had not provided him with a copy of the business plan, financial statements, inventory lists, or other documents which could establish its credit worthiness.  The Defendant testified that he simply relied on Hewitt.

21.    On November 12, 1998, Hewitt sent a letter to Defendant stating that he would forward the promissory note from Best Rescue for a loan amount of $250,000.  Hewitt described the proposed investment as a short-term loan.  Hewitt explained that the interest to be paid on the loan, as evidenced by a Promissory Note, would be 18% instead of 25%, due to the state's mandated usury law. Hewitt further stated that there was no need to get a legal opinion regarding the loan and that the funds will be placed in an escrow account and will not be disbursed without his signature.  Hewitt stated that "[u]pon recapitalization of the Company in January when the other investors (DTRIC and Royal State Group) funds are expected, then $125,000 will move back to the Mutual Aid account and the remaining $125,000 will be converted to a stock investment instead of a note. Also at that time, $125,000 will move from the Pension account for a stock investment." (Ex. 1.)  Hewitt stated that he would forward a business plan, which was being completed.

22.    On November 28, 1998, Defendant executed a Security Agreement on behalf of the MAF.  The Security Agreement referenced the Promissory Note in the amount of $250,000, which was signed by Robert Kirkland, President of Best Rescue.  The Security Agreement stated that the loan made pursuant to the Promissory Note was interim financing and it would be repaid when long-term

financing was obtained, which was expected in January 1999.  The Note similarly stated that it constituted interim financing and that long-term financing was expected in January 1999.

23.     The Security Agreement listed all property, equipment and assets of Best Rescue, and other items, as being subject to the Security Agreement.  These items were not listed in detail.  The Security Agreement provided that the MAF had the right to record its security interest by filing a UCC-1 in Florida.

24.     The Security Agreement and all Promissory Notes were prepared by Best Rescue or on its behalf and were not prepared or reviewed by an attorney for the MAF.

25.     Defendant knew at this point that the money invested into Best Rescue would be placed into an account controlled by Hewitt.

26.     Defendant did not consult an attorney or other independent advisor regarding the investment, the usury laws, or the Security Agreement that he had signed.

27.     A check for $250,000 was provided by the MAF to Best Rescue, through Hewitt.

28.     Two signatures were required for checks from the MAF.  As the Secretary-Treasurer of the UPW, George Yasumoto, was authorized to and often

7

signed checks.  If he had questions about whether a certain check was authorized, he was told that Defendant would not mail the check if it should not go out. Yasumoto does not recall if he signed any check to Best Rescue.  UPW President Adaline Uhrle also had authority to sign checks.  If she was unavailable, she would authorize Defendant to sign checks.  Defendant does not recall signing any checks to Best Rescue.  No copies of the check or any other check to Best Rescue was produced.

29.    On February 5, 1999, the MAF loaned $200,000 to Best Rescue. Defendant received a Promissory Note, signed by Best Rescue President Kirkland. This second Promissory Note did not refer to the loan as interim and did not discuss expected long-term financing.  Defendant also received a letter stating that the original Security Agreement covered this second loan and the total investment by the MAF was now $450,000.

30.    Defendant knew that a UCC-1 statement had not been filed.

31.    The February 19, 1999 meeting minutes of the MAF Board meeting state that Defendant recommended investment in Best Rescue and he explained the 12/31/98 investment report.  There is no "m/s/c" following this language, which indicates that there was no motion made, seconded, and carried regarding investment in Best Rescue.  Board members testified that they did not recall taking

a vote on whether to invest in Best Rescue or to approve any previously made investments or loans. Board members recall only being informed that Best Rescue made rescue equipment for persons living in high-rise buildings. Defendant did not show the MAF Board members the Security Agreement or the two Promissory Notes that had been signed. Hewitt did not meet with the Board or make any presentations or reports to the Board. The meeting lasted approximately 15 minutes. The meeting minutes were taken by Secretary-Treasurer George Yasumoto.

32.    MAF board members testified that although they had an opportunity to question Defendant regarding his investment recommendations, they largely approved whatever Defendant presented because they believed that he had the UPW members' best interests at heart.

33.    On April 26, 1999, the MAF loaned $150,000 to Best Rescue. Defendant received a third Promissory Note signed by Kirkland, which stated that it was covered by the Security Agreement. Again, the Promissory Note did not refer to other long-term financing. Defendant received a letter from Hewitt stating that the investment now totaled $600,000.

34.    The June 19, 1999, MAF Board meeting minutes state that the 4/30/99 investment report was explained and no approval was required. The

9

meeting minutes also indicate that Defendant recommended additional investment into Best Rescue.  (Ex. 33.)  Again, however, no "m/s/c" followed this recommendation, indicating that there was no motion made, seconded, and carried regarding additional investment in Best Rescue.

35.     At this meeting, however, there was a motion made, seconded and carried to approve the Audit for the period of January 1, 1998 to December 31, 1998.  Note 2 on page 6 of the Audit stated that on November 24, 1998, the MAF invested $250,000 in Best Rescue, through a promissory note, with interest only payable each month, and that the promissory note was secured by all property, equipment, and assets of Best Rescue.  (Ex. 18.)  The Audit also indicated the MAF trust invested an additional $350,000 in Best Rescue on the same basis.  This Board meeting lasted only three minutes and the MAF Board members testified that they received documents, such as the Audit, for their review at the beginning of each meeting, and not prior thereto.  Again, Defendant did not present the Board with copies of any of the Promissory Notes.

36.     On June 30, 1999, the MAF loaned $250,000 to Best Rescue. Defendant received a fourth Promissory Note signed by Kirkland, which stated that it was covered by the Security Agreement.  Again, the Promissory Note did not

refer to other long-term financing.  Defendant received a letter from Hewitt stating

that the investment now totaled $850,000.

37.     On August 24, 1999, the MAF loaned $150,000 to Best Rescue.

Defendant received a fifth Promissory Note signed by Kirkland, which stated that

it was covered by the Security Agreement.  Again, the Promissory Note did not

refer to other long-term financing.  Defendant received a letter from Hewitt stating

that the investment now totaled $1,000,000.

38.     On September 10, 1999, Defendant received a letter from Hewitt

enclosing checks for interest for two periods.  Hewitt stated that total sales of Best

Rescue have been $30,000, and that Best Rescue had undergone an entire

metamorphosis since the first investment was made last November 1998.  Hewitt

further stated that Best Rescue would be able to fill the first group of orders by the

end of the month.  Hewitt estimated the company's sales to be $600,000-$750,000

for 1999 and up to $10,000,000 the following year.

39.     On November 22, 1999, the MAF loaned another $100,000 to Best

Rescue.  Defendant received a sixth Promissory Note signed by Hewitt, as

management for Best Rescue.  The Promissory Note was covered by the Security

Agreement.  Defendant received a letter from Hewitt stating that the investment

now totaled $1,100,000.  Defendant did not question why Hewitt signed the Promissory Note, rather than Kirkland.

40.    In December 1999, the international union, AFSCME, conducted an audit of the UPW.  On December 10, 1999, AFSCME recommended that Defendant demand repayments of the loans to Best Rescue because all but one of the loans were in default.  Defendant did so orally and on December 15, 1999, Defendant requested in writing to Best Rescue that all of MAF's investments, including interest, be returned.

41.    Hewitt had informed AFSCME that he had be retained by Best Rescue to find capital to finance its operations and that he was being compensated by Best Rescue.  AFSCME informed Defendant that this presented a conflict of interest on Hewitt's part and by at least mid-1999 Hewitt actually controlled the financial operations of Best Rescue.

42.    Despite Defendant's request for return of the loans, Best Rescue did not return the money.

43.    The MAF filed a lawsuit against Best Rescue on January 31, 2000, to collect the $1.1 million.  The MAF was unable to obtain any money from Best Rescue because it had filed for bankruptcy.

12

44.     Hewitt was convicted of federal felony charges for taking a five percent loan origination fee with respect to the loans from the MAF to Best Rescue in violation of the criminal provisions of ERISA.

45.     Hewitt claimed that he did not know the MAF was an ERISA plan and had he known that he would not have moved MAF funds into Best Rescue.

46.     Hewitt also claimed bankruptcy, however, the MAF received $200,000 from Hewitt's insurer in settlement of the lawsuit it filed.  In 2006, The MAF Board accepted this $200,000 because at the time of their acceptance, Hewitt had been convicted of a crime with respect to the very transactions at issue and the insurer stated that the policy was unenforceable due to Hewitt's criminal conviction.

47.     In March 2000, Defendant signed an Agreement with First Hawaiian Bank for the bank to be the new investment advisor to the MAF.  Defendant also signed First Hawaiian Bank's Investment Policy Statement, which provided that investments are limited to securities for which there exits a recognized market or exchange providing ready liquidity.  In April 2000, after signing the documents, Defendant presented the First Hawaiian Bank documents to the MAF Board for their approval.

48.     On November 19, 2002, Defendant was found guilty on charges of money laundering, embezzlement and mail fraud in connection with other UPW sponsored plans, but not involving the MAF.[2]  AFSCME suspended Defendant and placed the UPW under administratorship.  After being suspended, Defendant submitted his resignation.

49.     The administrator authorized the instant lawsuit and the Complaint was filed on October 31, 2003.  After elections were held and the administratorship was terminated, on May 23, 2004, the new MAF Board authorized and ratified continued pursuit of this lawsuit.

50.     Count 1 of the Complaint alleges a breach of fiduciary duty in violation of 29 U.S.C. § 1104 (a)(1)(A).  Count 2 alleges liability for breach of fiduciary duty by Co-fiduciary, pursuant to 29 U.S.C. § 1105, and Count 3 alleges that Defendant engaged in prohibited transactions in violation of 29 U.S.C. § 1106 (a)(1)(D).[3]

---

[2] The Defendant's convictions were upheld on appeal by the Ninth Circuit and the Supreme Court denied certiorari.

[3]The parties presented evidence and arguments pertaining to other facts, including but not limited to, a meeting held by Defendant at the union hall after he had been convicted and suspended by the AFSCME, and the written AFSCME audit findings not being shared by Defendant with the MAF Board.  This Court did not make factual findings regarding these issues because they are not directly

(continued...)

## CONCLUSIONS OF LAW

I.   This Lawsuit Was Properly Authorized and Timely Filed

51.   The evidence presented established that this lawsuit was properly authorized.  First, the AFSCME-appointed administrator authorized the filing of the lawsuit.  That decision was ratified by the elected MAF Board in May 2004.

52.   As determined in this Court's Order Denying Defendant's Renewed Motion for Summary Judgement, the instant lawsuit was filed within the applicable statute of limitations period.  Defendant presented no evidence that any MAF Board member had actual knowledge of his alleged breach of fiduciary duties and failed to file the instant lawsuit within the statute of limitations period.  See Ziegler v. Conn. Gen. Life Ins. Co., 916 F.2d 548, 552 (9th Cir. 1990) ("[A]n ERISA plaintiff's cause of action cannot accrue and the statute of limitations cannot begin to run until the plaintiff has actual knowledge of the breach, regardless of when the breach actually occurred.").

II.   The MAF Is an ERISA Plan

53.   ERISA defines "welfare plan" as

any plan, fund, or program which was . . . established or maintained by an employer or by an employee

_____

[3](...continued)
relevant to the determination of whether Defendant breached his fiduciary duties.

> organization, or by both, . . . for the purpose of providing
> for its participants or their beneficiaries, through the
> purchase of insurance or otherwise, (A) medical, surgical,
> or hospital care or benefits, or benefits in the event of
> sickness, accident, disability, death or unemployment, or
> vacation benefits[.]

29 U.S.C. § 1002(1) (emphasis added).

54.    The term "employee organization" means any labor union.  29 U.S.C. § 1002(4).

55.    The UPW is a labor union as defined in ERISA.

56.    Governmental plans are not covered by ERISA.  29 U.S.C. § 1003(b)(1).

57.    Governmental plans are those plans "established or maintained for . . . employees . . . by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing."  29 U.S.C. § 1002(32).

58.    ERISA attempts to "provide the widest possible protection to all [employee welfare] plans," and the governmental plan exception to this broad coverage is a narrow one.  See Silvera v. Mutual Life Ins. Co. of N.Y., 884 F.2d 423, 425 (9th Cir. 1989).

59.    In Silvera, the Ninth Circuit found that although the City hired a private company to help administer a group benefits plan, the plan was a

governmental plan because the City endorsed the plan, automatically provided it to all employees, and paid the premiums itself directly to the insurer.  884 F.2d at 426.  Thus, "the City did in fact 'establish or maintain' an employee welfare benefit plan and, since City is a political subdivision of a state, that plan qualified as a governmental plan under 29 U.S.C. § 1002(32) and was therefore exempt from ERISA coverage pursuant to 29 U.S.C. § 1003(b)(1)."  Id.

60.    The Declaration of Trust for the MAF shows that the MAF trust was established by the UPW.  The UPW is an employee organization, not a political subdivision of the State.  The Declaration of Trust and witness testimony establishes that the contributions to the Plan were made by the members of UPW, not their employers.  Such contributions were voluntary contributions.  Several important documents state that the MAF is an employee welfare plan governed by ERISA.  Likewise, Defendant previously testified that the MAF is an ERISA Plan.

61.    Defendant presented evidence that the employees who participate in the MAF trust are employees both in the private and public sector and that the majority of employee participants are employed by the government.

62.    There is no evidence, however, that the MAF trust was established or maintained by the State of Hawaii, a political subdivision, agency or instrumentality thereof.

17

63.     There is no evidence that any government employer played a role in negotiating the premiums or purchasing the Plan, endorsed the Plan, automatically provided it to all employees, and/or paid the premiums itself directly to the insurer.

64.     Thus, this Court finds that the MAF is an employee welfare plan governed by ERISA and is not exempt from ERISA as a governmental plan.

65.     Having found that ERISA is at issue in this lawsuit, this Court has jurisdiction pursuant to 28 U.S.C.§ 1331.

III.    Defendant Acted as a Fiduciary

66.     ERISA defines a fiduciary as any person who

> exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) . . . renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) . . .  has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

67.     A person who exerts any control over the management or disposition of plan assets is a fiduciary.  See IT Corp. v. Gen. Am. Life Ins. Co., 107 F.3d 1415, 1421 (9th Cir. 1997).

68.     Whether a person exerts control, is a functional test that turns on the activity, rather than the title, of the person in question.  See CSA 401(K) Plan v. Pension Prof'ls, Inc., 195 F.3d 1135, 1138 (9th Cir. 1999) (actions and not title determine ERISA fiduciary status).  This is because "ERISA defines fiduciary not in terms of formal trusteeship, but in functional terms of control and authority over the plan, thus expanding the universe of persons subject to fiduciary duties-and to damages-under § 409(a)." IT Corp., 107 F.3d at 1419 (citation and internal quotation marks omitted); see also Chao v. Graf, No. CV-N-01-0698, 2002 WL 1611122, at *8 (D. Nev. Feb. 1, 2002) ("Determinations of whether a party is a fiduciary focus on the party's functional control and authority over a plan rather than how their duties are formally characterized.").

69.     Activities taken by a person may result in a finding that the person is a fiduciary, regardless of whether the activities were outside of the contracted duties of that person.  CSA 401(K) Plan, 195 F.3d at 1140 ("A person's actions, not the official designation of his role, determines whether he enjoys fiduciary status, regardless of what his agreed-upon contractual responsibilities may be." ) (citation and internal quotation marks omitted) (citing cases); see also McMorgan & Co. v. First Cal. Mortgage Co., 916 F. Supp. 966, 970 (N.D. Cal. 1995) (the actual

"exercise of discretionary authority may confer fiduciary status, regardless of whether it was granted.").

70.     Defendant did not have the title of trustee and the Mutual Aid Fund Declaration of Trust provides that trustees have the power to invest and disburse all money.  However, the evidence establishes that the Defendant was empowered by the MAF Board to act on their behalf with regard to investment of MAF funds, as they relied upon his judgment.

71.     Defendant was the primary and only contact for Hewitt with respect to the MAF.  Hewitt made no presentations to the MAF Board and made no reports to the Board regarding Best Rescue.  All information presented to the MAF Board regarding Best Rescue came from Defendant.

72.     Defendant approved and signed the Security Agreement and approved the Promissory Notes for each of the six loans made to Best Rescue.  Defendant never showed the MAF Board the Security Agreement or any Promissory Note.

73.      Defendant presented information regarding Best Rescue to the MAF Board, only after the first two loans for a total of $450,000 had already been made. Defendant did not inform the Board that the second loan was made despite the fact that Best Rescue had failed to obtain long-term financing and repay half of the first loan.

74.    Defendant never explained to the MAF Board that he had done no due
diligence of his own into Best Rescue.

75.    Although the notes of the February 1999 MAF Board meeting indicate
that an investment would be made into Best Rescue, the two loans that had already
been made and their terms were not approved or ratified by the Board.  There was
no discussion of specific loan amounts and terms, there was no motion, seconded
and carried with respect to the two loans, and no vote was taken.

76.    The trustees testified that the Board followed Defendant's directions
and recommendations, and relied on him to invest MAF trust monies.

77.    This evidence is sufficient to establish that Defendant exercised
substantial discretionary authority and control of the management of MAF
investments, assets and loan decisions.  Therefore, Defendant was a fiduciary of
the trust.  See Patelco Credit Union v. Sahni, 262 F.3d 897, 908-09 (9th Cir. 2001)
(undisputed evidence of defendant's control over plan assets, including moving
funds between accounts, is sufficient to establish that he is a fiduciary).

78.    Defendant testified that he had spoken to Adaline Uhrle prior to the
first loan being made to Best Rescue.  Adaline Uhrle has passed away and
therefore was unavailable to corroborate or contest Defendant's statement.
However, even if Uhrle approved the first loan or general investment in Best

21

Rescue, Defendant did not testify that Uhrle approved every loan made to Best Rescue or that she authorized investing 40% of the trust assets into one company or a total of $1.1 million.

79.    Thus, Uhrle's approval does not lessen the amount of authority and control that Defendant exerted over the investment of MAF funds into Best Rescue.  Indeed, the evidence shows that Defendant was the only person who reviewed the Security Agreement and each Promissory Note.  Defendant was the only person who was aware of the amount of each individual loan and its terms at the time it was made.

80.    Although in June 1999, the MAF Board approved the audit, which on page 6 note 2, briefly discussed some of the loans made to Best Rescue, such approval was made in a three-minute meeting where the trustees received the audit from Defendant at the beginning of the session.  Therefore, the record does not reflect a thorough approval of the loans.  Even if it did, such after-the-fact approval does not lessen the amount of authority and control that Defendant exerted over the MAF trust.

81.    Furthermore, when further investment into Best Rescue was discussed, there was no motion made, seconded and carried to approve such continued investment.  No vote was taken.

82.     Moreover, as Defendant never presented the Board with copies of the Security Agreement, Promissory Notes, or information (other than brochures) of Best Rescue, it is clear that the MAF Board did not approve the loan terms, such as the date of repayment and interest rate.

83.     Defendant had authority to negotiate the terms of the loans, including each individual amount, the total investment, the interest rate, and the repayment due date.

84.     Focusing on Defendant's activities, and not on Defendant's title, this evidence is sufficient to establish by far more than a preponderance of the evidence that Defendant exercised discretionary authority and control over the management of the assets of the MAF trust, and therefore, acted as a fiduciary in making the loans to Best Rescue.

IV.     <u>Count 1, Violation of 29 U.S.C. § 1104, Imprudent Investment</u>

85.     ERISA imposes a prudent man standard of care on fiduciaries.  29 U.S.C. § 1104(a).  ERISA's prudence standard is not that of a prudent lay person. The fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]"  29 U.S.C. § 1104(a)(1)(B).  "This duty is one of

the 'highest known to the law.'" <u>Howard v. Shay</u>, 100 F.3d 1484, 1488 (9th Cir. 1996) (citation omitted).

86.     In considering whether the prudent man standard was met, the court must consider the merits of the transaction, and "the thoroughness of the investigation into the merits of the transaction." <u>Id.</u> (citations omitted).  The question is whether the fiduciary "employed the appropriate methods to investigate the merits of the investment and to structure the investment." <u>Donovan v. Mazzola</u>, 716 F.2d 1226, 1233 (9th Cir. 1983).

87.     "The failure to make any independent investigation and evaluation of a potential plan investment is a breach of fiduciary obligations[.]" <u>United States v. Mason Tenders Dist. Council of Greater N.Y.</u>, 909 F. Supp. 882, 886-87 (S.D.N.Y. 1995).

88.     In addition, fiduciaries must diversify "the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so[.]"  29 U.S.C. § 1104(a)(1)(C).  The prudent person standard "requires that a fiduciary give appropriate consideration to the role a proposed investment plays in a portfolio as a whole . . . . Appropriate consideration includes: . . . [c]onsideration of . . . [t]he composition of the portfolio with regard to

24

diversification[.]" <u>Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.</u>, 259 F.3d 1036, 1043 (9th Cir. 2001) (citing 29 C.F.R. § 2550.404a-1(b)(2)).

89.  "[T]he prudent person standard is not concerned with results; rather, it is a test of how the fiduciary acted viewed from the perspective of the time of the [challenged] decision rather than from the vantage point of hindsight." <u>Roth v. Sawyer-Cleator Lumber Co.</u>, 16 F.3d 915, 918 (8th Cir. 1994) (citation and internal quotations omitted) (brackets in original).

90.  "A trustee's lack of familiarity with investments is no excuse." <u>Mason Tenders Dist. Council of Greater N.Y</u>, 909 F. Supp. at 886.  A trustee has a duty to seek independent advice where he lacks the requisite education, experience and skill.  <u>Donovan v. Bierwirth</u>, 680 F.2d 263, 272-73 (2nd Cir. 1982).

91.  Obtaining an independent assessment from a qualified financial advisor is "evidence of a thorough investigation[.] [However,] it is not a complete defense to a charge of imprudence. . . . The fiduciary must (1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances." <u>Howard</u>, 100 F.3d at 1489 (citations omitted).

92.  "ERISA's fiduciary standard of prudence requires more than mere reliance on expert advice. . . . The fiduciary also has a duty to exercise his own

judgment in the light of the information and advice he receives." <u>Crowhurst v.</u>

<u>Cal. Inst. of Tech.</u>, No. CV 96-5433 RAP, 1999 WL 1027033, at *19 (C.D. Cal.

July 1, 1999) (citing <u>Mazzola</u>, 716 F.2d at 1234).

93.     In <u>Howard</u>, the Ninth Circuit found that the ERISA fiduciaries failed

to prove that they fulfilled their duties.  100 F.3d at 1489.  Focusing on their

investigation into sale of stock from an Employee Stock Option Plan ("ESOP") to

a fiduciary of the ESOP, the court noted that the fiduciaries completed the

transaction at issue without negotiation, and they did not question the valuation of

the stock or retain a second firm to review it.  The valuation had discounted the

value of the stock by 60% compared to the previous valuation.  The court found

that "[a] prudent fiduciary would have sought an explanation."  <u>Id.</u>  There were

other assumptions made in the valuation, which the court found should have

questioned by a prudent fiduciary.  <u>Id.</u>

94.     In sum, the Ninth Circuit held that

> [a]n independent appraisal is not a magic wand that
> fiduciaries may simply wave over a transaction to ensure
> that their responsibilities are fulfilled.  It is a tool and,
> like all tools, is useful only if used properly.  To
> justifiably rely on an independent appraisal, a conflicted
> fiduciary need not become an expert in the valuation of
> closely held corporations.  But the fiduciary is required to
> make an honest, objective effort to read the valuation,
> understand it, and question the methods and assumptions

> that do not make sense.  If after a careful review of the
> valuation and a discussion with the expert, there are still
> uncertainties, the fiduciary should have a second firm
> review the valuation.

Id. at 1489-90.

95.    Although the situation in this case is factually different from the

Howard case in that Defendant was not a conflicted fiduciary, the Howard case is

instructive as the amount of reliance a fiduciary may place on an investment

advisor.

96.    Hewitt was a qualified investment advisor when he was recommended

and hired by Defendant and the MAF trust in 1994.  He had made good

investments for Royal State Group and for the UPW pension fund.  Hewitt

thereafter made good investments for the MAF trust.  There was no reason to

believe in 1998, when he recommended investment in Best Rescue, that he would

recommend an imprudent investment.

97.    The initial investment made by Defendant was only $250,000 out of

the MAF total approximate $2.4 million in funds.  The initial loan was short-term,

with half of the amount expected to be repaid in approximately two months, when

long-term financing was received from two other companies, one of which was

Royal State Group.  Defendant believed that Royal State Group would be

investing.  No evidence was presented which showed that at this time, Defendant

had any knowledge that Hewitt had a conflict of interest.

98.    Thus, although it is a close call, based upon the facts set forth in

paragraphs 96 and 97 above, Plaintiffs have not shown by a preponderance of the

evidence that at the time of the first investment it was unreasonable for Defendant

to rely upon Hewitt's advice and recommendation to invest into Best Rescue,

without conducting his own independent investigation into Best Rescue.  As far as

Defendant knew, based upon his past experience with Hewitt, the initial investment

into Best Rescue would not be imprudent.  Therefore, Plaintiffs have not

demonstrated by a preponderance of the evidence that Defendant breached his

fiduciary duties by making and approving the initial loan of $250,000.

99.    Plaintiffs have, however, demonstrated by a preponderance of the

evidence that Defendant clearly breached his fiduciary duties with respect to all

other loans made to Best Rescue by failing to question Hewitt about the absence of

long-term financing and repayment of half of the principal of the first loan, and

instead continuing to blindly rely on Hewitt.  Indeed, all subsequent Promissory

Notes accepted by Defendant after the initial loan did not refer to long-term

financing.  Defendant continued to make further investment into Best Rescue

without questioning the absence of the expected long-term financing or the failure

28

of Best Rescue to repay half of the initial loan, as promised in the initial

Promissory Note and Security Agreement.  Such blind reliance on Hewitt in the

face of clear red flags was not reasonably justified.   As in <u>Howard</u>, Defendant

should have made  an honest, objective effort to read the subsequent Promissory

Notes, understand them, and question the areas that did not make sense.  If after a

careful review of the subsequent Promissory Notes and a discussion with Hewitt,

there were still uncertainties, Defendant should have had another expert or attorney

review the investment to determine if further investment was warranted.

100.   A prudent fiduciary clearly would have at least asked for an

explanation prior to authorizing and recommending further investment, and would

have done an independent investigation into the circumstances or had a second

independent investment advisor or attorney do so.

101.   "Having found that a trustee has failed to investigate a particular

investment adequately . . . a court must then examine whether, considering the

facts that an adequate and thorough investigation would have revealed, the

investment was objectively imprudent."  <u>Mason Tenders Dist. Council of Greater</u>

<u>N.Y.</u>, 909 F. Supp. at 887.

102.   If a prudent fiduciary inquired into the prospects of long-term

financing, the fiduciary would have discovered that neither of the other two

29

companies decided to invest, and discovered the lack of assets, financial

statements, and credit worthiness of Best Rescue.  A prudent fiduciary would not

have made further investments in such a company.  Certainly, a prudent fiduciary

would not invest 40% of the trust fund monies into one risky start-up company.

Investing so much money into one start-up company with limited assets, and an

incomplete business plan is an objectively imprudent investment.

103.   Having failed to conduct an independent investigation and/or question

Hewitt after numerous red flags were raised, Defendant breached his fiduciary

duties with respect to all loans to Best Rescue other than the initial loan.

104.   The fact that the MAF Board members were also fiduciaries, does not

make Defendant less liable.  First, each fiduciary is jointly and severally liable.

Second, Defendant did not provide the MAF Board with copies of the Security

Agreement and Promissory Notes.  Thus, there is no evidence that they were aware

that the first loan was to be short-term and long-term financing was expected only

two months later.  Defendant was the only fiduciary with such information.

Finally, the MAF Board accepted Defendant's recommendations without hesitation

and he was clearly aware of such.

105.   Therefore, Defendant is liable under this section of ERISA for making

an imprudent investment.

30

V.    Count 2, 29 U.S.C. § 1105, Liability for Breach by Hewitt

106.   29 U.S.C. § 1105 provides that a fiduciary

> shall be liable for a breach of fiduciary responsibility of
> another fiduciary with respect to the same plan in the
> following circumstances: (1) if he participates knowingly
> in, or knowingly undertakes to conceal, an act or
> omission of such other fiduciary, knowing such act or
> omission is a breach; (2) if, by his failure to comply with
> section 1104(a)(1) of this title in the administration of his
> specific responsibilities which give rise to his status as a
> fiduciary, he has enabled such other fiduciary to commit
> a breach; or (3) if he has knowledge of a breach by such
> other fiduciary, unless he makes reasonable efforts under
> the circumstances to remedy the breach.

107.   Hewitt was convicted for taking a loan origination fee from the MAF

while he was a fiduciary of that trust.

108.   Defendant failed to conduct due diligence on Best Rescue at any time.

Defendant also failed to make himself aware of Hewitt's loan origination fee.

Defendant failed to have an attorney review the Security Agreement and

Promissory Notes on MAF's behalf.  Defendant breached his fiduciary duties by

relying whole-heartedly on Hewitt, failing to take the actions listed above, and

failing to question the absence of long-term financing for Best Rescue prior to

recommending and authorizing continued investment.  All of these actions led to

the imprudent investment, most of which could have been avoided, had Defendant

fulfilled his duties.  In addition, these actions allowed Hewitt to continue to earn loan origination fees for loans in breach of Hewitt's fiduciary duties.

109.   Plaintiffs have shown by a preponderance of the evidence that by making imprudent investments, Defendant enabled Hewitt to breach his fiduciary duties.  Therefore, Defendant is liable under this section.

110.   However, as Defendant's liability under this section is contingent on his liability under 29 U.S.C. § 1104, Defendant again is not liable for the first loan made because this Court has found that the making of the first loan was not in breach of his fiduciary duties.

VI.   <u>Count 3, 29 U.S.C. § 1106, Prohibited Transactions</u>

111.   29 U.S.C. § 1106 provides that a fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . .  transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."  29 U.S.C. § 1106(a)(1)(D).

112.   The term "party in interest" means "a person providing services to [an employee benefit] plan."  29 U.S.C. § 1002(14)(B)

113.   Hewitt was the investment advisor to the MAF and provided investment services to the Plan.  Hewitt took a five percent loan origination fee from the MAF loans to Best Rescue.  This was in addition to fees he was paid by

the MAF for his services.  Hewitt was convicted for taking such fee, in violation of ERISA, in part because he was a fiduciary of the Plan.

114.   Defendant recommended that the MAF make these loans to Best Rescue, through Hewitt.  Defendant thus caused the MAF Plan to transfer assets to a party in interest.

115.   However, Plaintiffs presented no evidence showing that Defendant knew that Hewitt was taking such a fee from the loan at the time each loan was made.  Plaintiffs only presented evidence that at some point Hewitt told Defendant about the five percent origination fee.  This, however, could have happened after all loans were made.

116.   As Plaintiffs failed to prove by a preponderance of the evidence that Defendant knew or should have known that at the time of his actions, such actions caused a prohibited transfer, Defendant is not liable under this section of ERISA. Cf Donovan v. Bryans, 566 F. Supp. 1258, 1262-63 (D.C. Pa. 1983) (the fiduciaries admitted that they knew a party in interest was to be the actual recipient of the loan proceeds).

VII.   Former Trustees Are Not Indispensable Parties

117.   Federal Rule of Civil Procedure 19 provides in part

> A person who is subject to service of process and whose
> joinder will not deprive the court of subject-matter
> jurisdiction must be joined as a party if: (A) in that
> person's absence, the court cannot accord complete relief
> among existing parties; . . . .

118.   The Advisory Committee Notes to the Rule provide that "a tortfeasor with the usual 'joint-and-several' liability is merely a permissive party to an action against another with like liability."  Fed. R. Civ. P. 19(a) Advisory Comm. Notes. "It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit."  Temple v. Synthes Corp., Ltd., 498 U.S. 5, 7 (1990).

119.   Even if the other MAF Board members could be considered joint tortfeasors, their joinder is not necessary as they are not indispensable parties.

VIII.  Damages

120.   Any person who is a fiduciary with respect to a plan who
breaches any of the responsibilities, obligations, or duties
imposed upon fiduciaries by this subchapter shall be
personally liable to make good to such plan any losses to
the plan resulting from each such breach, and to restore
to such plan any profits of such fiduciary which

34

have been made through use of assets of the plan by the fiduciary[.]

29 U.S.C. § 1109.

121.   "If a breach of trust consists only in investing too large an amount in a single security or type of security, the trustee is liable only for such loss as results from the investment of the excess beyond the amount which it would have been proper so to invest." Cal. Ironworkers, 259 F.3d at 1046.

122.   As noted above, Defendant did not breach his fiduciary duties with respect to the first loan of $250,000.

123.   However, because Defendant failed to ask for an explanation of the failure to obtain long-term financing, the remaining five loans were clearly imprudent and made in breach of Defendant's duties.

124.   Defendant is liable for those five loans, which total $850,000.

125.   Plaintiffs have already recovered $200,000 from Hewitt's insurance company.  Evidence was presented that at the time the settlement was entered into, Hewitt had already been convicted for a crime arising from the MAF loans into Best Rescue, and that the insurance policy contained a coverage exclusion for conviction of a crime.  Therefore, this Court finds that a settlement of $200,000 was not a failure to mitigate damages because there was a serious risk that

Plaintiffs would be unable to recover any money due to the conviction for the very loans at issue.

126.   The parties have not addressed whether this Court should deduct the recovered $200,000 from Hewitt's insurer from the $850,000 for which Defendant has been found liable or from the total $1.1 million loss.  This Court hereby orders the parties to simultaneously file supplemental briefs, no longer than 30 pages, by April 3, 2008, on this legal issue of whether the $200,000 recovered money should be deducted from Defendant's liability or from the total loss.  Following this Court's determination of whether Defendant's liability should be set off by the recovered $200,000, this Court will direct entry of final judgment in favor of Plaintiffs.

127.   Defendant is also liable for pre-judgment interest and attorneys fees and costs.  The attorney's fees application is referred to the Magistrate Judge upon Plaintiffs' motion for a Report and Recommendation.  In their motion to the Magistrate Judge, Plaintiffs must include the appropriate statute or legal basis for the pre-judgment interest rate and the appropriate date of accrual.

128.   Any finding of fact which may be deemed, in whole or in part, more properly a conclusion of law shall be deemed as such, and any conclusion of law

which may be deemed, in whole or in part, more properly a finding of fact shall be

deemed as such.

    IT IS SO ORDERED.

    DATED:  Honolulu, Hawaii, March 20, 2008.



_____
David Alan Ezra
United States District Judge

Steven DeCosta in his representative capacity as chairperson of the Board of Trustees of United Public Workers, AFSCME, Local 646, et al. vs. Gary W. Rodrigues, CV No. 03-00598 DAE-LEK; FINDINGS OF FACT AND CONCLUSIONS OF LAW